IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

─────────────────────────────────────

TOMMY CROSBY,

Plaintiff,

v.

O'CONNELL, M.D., *et al.,*

Defendants.

─────────────────────────────────────

Civil Action No.
9:07-CV-1138 (GLS/DEP)

APPEARANCES:                          OF COUNSEL:

FOR PLAINTIFF:

TOMMY CROSBY, *Pro Se*

92-A-8525
Great Meadow Correctional Facility
Box 51
Comstock, NY 12821

FOR DEFENDANTS:

HON. ANDREW M. CUOMO                  DAVID L. COCHRAN, ESQ.
New York State Attorney General       Assistant Attorney General
The Capitol
Albany, New York 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

Plaintiff Tommy Crosby, a New York State prison inmate who is

proceeding *pro se* and *in forma pauperis*, has commenced this action

pursuant to 42 U.S.C. § 1983, complaining of the deprivation of his civil

rights.  In his complaint, plaintiff alleges that by failing to inform him over a

ten year period that he had tested positive for the Hepatitis virus and to

medically treat him accordingly over that period, defendants were

deliberately indifferent to his serious medical needs, in violation of his

protected rights under the Eighth and Fourteenth Amendments to the

United States Constitution, the Americans With Disabilities Act ("ADA"), 42

U.S.C. § 12,0101 *et seq*., section 504 of the Rehabilitation Act of 1973, 29

U.S.C. § 794, and state law.  As relief, plaintiff's complaint seeks recovery

of compensatory and punitive damages, as well as affirmative injunctive

relief directing that his medical records be explained to him by a qualified

physician, that he be evaluated by a gastroenterologist, and that he receive

all treatment recommended by that medical specialist.[1]

      Currently pending before the court is a motion brought by the

defendants requesting the entry of summary judgment dismissing plaintiff's

---

[1]   Plaintiff's complaint also seeks a declaratory judgment directing that his disciplinary records from February 19, 1995 through the end of 2005 be expunged to eliminate all reference to disciplinary determinations.  Plaintiff's complaint, however, discloses no connection between his medical indifference claims and this request for relief.

complaint.  In their motion defendants argue that plaintiff's claims should be dismissed for a variety of reasons, including substantively as lacking in merit, and procedurally as barred by the statute of limitations.  Having carefully reviewed the record now before the court, considered in light of the arguments raised by the defendants and in plaintiff's opposition to their motion, I recommend that a portion of defendants' motion be granted, but that it be denied in principal part based upon defendants' failure to carry their initial burden of establishing the lack of any triable issue of fact.

I.    BACKGROUND[2]

At the times relevant to his complaint, plaintiff was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS").  Plaintiff's claims in this action center upon defendants' alleged failure to properly evaluate and treat his Hepatitis C condition for a period of approximately ten years, during which he was confined in three separate correctional facilities.[3]

---

[2]    In light of the procedural posture of the case, the record now before the court has been interpreted in a light most favorable to the plaintiff, as a non-moving party, with all inferences drawn, and ambiguities resolved, in his favor.  *See Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

[3]    Plaintiff was diagnosed in 1995 as suffering from Hepatitis A, B and C. Complaint (Dkt. No. 1) ¶¶ 50-51, Exhs. A and B.  The focus of plaintiff's complaint, however, is upon defendants' failure to treat his Hepatitis C condition.  Hepatitis C, which courts have described as "a chronic and potentially fatal disease," *Ibrahim v. Dist.*

In February of 1995, plaintiff was confined in the Attica Correctional Facility ("Attica").  Complaint (Dkt. No. 1) ¶ 45.  While at Attica, plaintiff was under the care of various medical personnel, including Dr. O'Connell, Physician Assistant Robert Magee, Dr. Robert Takos, and Dr. Thomas Edwards.  *Id.* ¶¶ 49-65.  Plaintiff states that he reported to sick call at Attica "on a regular basis complaining of loss of appetite, nausea, vomiting, migraine headaches, fatigue, abdominal pains, chest abscesses, joint pains, and persistent flu-like symptoms."  *Id.* ¶ 46.  Blood tests performed in August, 1995 revealed that plaintiff tested positive for Hepatitis C.  *Id.* ¶ 55 and Exh. B.

In 1995 or 1996, a "very painful inflammation" between plaintiff's left thumb and index finger was surgically removed.  *Id.* ¶¶ 57-58.  Although plaintiff contends otherwise, there is no indication in his medical records or elsewhere that the condition was in any way related to Hepattiis C.  Genovese Decl. (Dkt. No. 60-4) ¶¶ 7, 9.  Plaintiff also required medical

---

*of Columbia*, 463 F.3d 3, 7 (D.C. Cir. 2006), is

> "the most common form of postransfusion hepatitis; it can also follow parenteral drug abuse or other intimate personal contact with an infected person.  This is a common acute sporadic form of hepatitis, and approximately 50 percent of acutely infected persons develop chronic hepatitis.  Although the chronic infection is usually mild and asymptomatic, cirrhosis may occur."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 856 (31st ed. 2007).

4

treatment in 1996 after developing "very painful abscesses on his chest area" and "very painful blistered skin rashes" between his thighs. Complaint (Dkt. No. 1) ¶¶ 62, 64.  Those conditions were diagnosed as resulting from fungal infections.  Genovese Decl. (Dkt. No. 60-4) ¶ 11. While in Attica, none of plaintiff's medical providers informed him of the August, 1995 laboratory test results which revealed that he had tested positive for Hepatitis C, nor did he receive any evaluation or treatment for Hepatitis C while at that facility.  Complaint (Dkt. No. 1) ¶¶ 46-65, and Exhs. A, B.

Plaintiff was transferred from Attica into the Great Meadow Correctional Facility ("Great Meadow") in October of 1997, and remained at that facility until approximately August of 2001.  Complaint (Dkt. No. 1) ¶¶ 66, 74.  During that time, plaintiff was under the care of Physician Assistant Ted Nesmith, Dr. Albert Paolano, and Dr. William Smith.  *Id.* ¶ 66. Plaintiff reported to sick call at Great Meadow on numerous occasions, complaining of the same flu-like symptoms he experienced while at Attica. *Id*. ¶¶ 67-71.  Plaintiff also sought medical care at the facility for "very painful blistered skin rashes" between his thighs and migraine headaches. *Id*. ¶¶ 68-70.  Plaintiff's skin rashes were similarly diagnosed by medical

5

personnel as fungal infections.  Genovese Decl. (Dkt. No. 60-4) ¶ 11.

During the time of his confinement at Great Meadow, Crosby was never

informed by his medical providers "that he is suffering from the very

potentially fatal disease Hepatitis C," nor did he receive evaluation or

treatment for that condition.  Complaint (Dkt. No. 1) ¶ 72.

Plaintiff was transferred from Great Meadow into the Shawangunk

Correctional Facility ("Shawangunk") in August, 2001.  Complaint (Dkt. No.

1) ¶ 74.  While there, plaintiff signed up for sick call on a "regular basis",

complaining to Dr. Anthony Forte about the same symptoms he had

experienced at Attica and at Great Meadow.  *Id*. ¶ 76.  Dr. Forte never

informed plaintiff that he had Hepatitis C.  *Id*. ¶ 77.

In 2004, shortly after Dr. Forte's death, Dr. Maryann Genovese

assumed responsibility for plaintiff's medical care.  Complaint (Dkt. No. 1)

¶¶ 77-78.  During that time frame plaintiff continued to seek medical

treatment, complaining of "migraine headaches, abdominal pain, vomiting,

loss of appetite, nausea, fatigue, flu-like symptoms, joint pains, night

sweats, and abnormal bowel movements." *Id*. ¶ 79.  Plaintiff also

complained to Dr. Genovese that he was not able to "walk, sit, or stand for

more than five minutes," had skin rashes on his upper and lower body, and

experienced "loud ringing" in his ears.  *Id*. ¶¶ 80-81.  Plaintiff was

diagnosed with arthritis and high blood pressure in 2004, and as suffering

from a fungal infection.  *Id*. ¶ 86; *see also* Genovese Decl. (Dkt. No. 60-4)

¶ 16.    Plaintiff's sinus condition progressed to a point where he was

scheduled for sinus surgery in late 2005.  Complaint (Dkt. No. 1) ¶¶ 93-95.

During the course of those encounters, Dr. Genovese never informed

Crosby that he had tested positive for Hepatitis C in 1995.  *Id*.

In October of 2004, plaintiff was summoned to the Shawangunk

health care unit for his "five year check-up."  Complaint (Dkt. No. 1) ¶ 85.

Plaintiff received notification from the medical department on October 22,

2004, to the effect that lab test results showed his "liver numbers" were

"slightly elevated," and that Dr. Genovese would check him for Hepatitis.

*Id*. ¶ 88.  On November 9, 2004, plaintiff was notified that he had tested

positive for the Hepatitis virus.  *Id.* ¶ 89.

Following that positive test result, plaintiff underwent further

evaluation for the disease, including consultation with a gastroenterologist

in February, 2005.  Genovese Decl. (Dkt. No. 60- 4) ¶ 24.  A liver biopsy

recommended by the specialist was performed in March, 2005, and plaintiff

was again evaluated by the gastroenterologist in May of 2005.  *Id*. ¶¶ 24-

26.  According to Dr. Genovese, plaintiff "was treated for hepatitis C on 10/5/06 and 1/12/07," nearly ten years after his diagnosis and two years after his 2004 positive Hepatitis C test results.[4]  Genovese Decl. *Id.* ¶ 29.

In December, 2005, plaintiff read an article published in the *Village Voice* entitled "Rotting Away."  Complaint (Dkt. No. 1) ¶ 96.  According to Crosby, the article "explained how DOCS medical staff and Chief Medical Officer Lester N. Wright knew that prisoners had been diagnosed with the potentially fatal Hepatitis A, B or C, up to eight, nine, and ten years" back without being informed of the diagnosis or provided treatment for the virus.[5]  *Id*. ¶ 97.  The news article prompted plaintiff to request copies of his medical records.  In February, 2006, Crosby obtained those records, and from them learned for the first time that he had tested positive for Hepatitis C in 1995.  *Id*. ¶¶ 98-99.

---

[4]    The treatment dates provided by Dr. Genovese may in fact be incorrect.  Plaintiff indicates that he received Hepatitis treatment in 2005.  *See* Crosby Aff. (Dkt. No. 63-1) ¶ 21; *see also* Plaintiff's Exhibits (Dkt. No. 63-3) p. 29 (Letter from Legal Aid Society Staff Attorney to Facility Health Services Director at Elmira Correctional Facility, stating that plaintiff "reports that he was on treatment for Hepatitis C from June 2005 through June 2006.")

[5]    Plaintiff alleges that this "policy" was intended to reduce the costs of Hepatitis C treatment, and was effectuated in part by requiring inmates to complete medically unnecessary alcohol and drug rehabilitation programs prior to undergoing treatment and, in some cases, by limiting access to those programs.  Complaint (Dkt. No. 1) ¶¶ 4-8, 104-05.  Plaintiff completed such a program while at Shawangunk in 2003.  *Id*. ¶ 8.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on April 2, 2007.[6]  Dkt. No. 1.  As

defendants, plaintiff's complaint names his medical providers at Attica – Dr.

O'Connell, Physician Assistant Robert Magee, Dr. Robert Takos, and Dr.

Thomas Edwards; his medical providers at Great Meadow – Physician

Assistant Ted Nesmith, Dr. Albert Paolano, and Dr. William Smith; and his

medical providers at Shawangunk – Dr. Anthony Forte, and Dr. Maryann

Genovese.  Dr. Lester N. Wright, Associate Commissioner and Chief

Medical Officer of the DOCS, is also named as a defendant.

In his complaint, plaintiff claims that defendants 1) failed for nearly

ten years to inform him that he suffers from "a very potentially fatal

disease;" and 2) withheld evaluation and appropriate treatment for his

disease between 1995 and 2005, in violation of his Eighth and Fourteenth

Amendment rights.  Plaintiff also claims that the defendants' conduct

---

[6]    This action was commenced in the Western District of New York, but was
ordered transferred to this district on October 26, 2007 by District Judge David Larimer.
*See* Dkt. No. 22.  That transfer was sought by the plaintiff, who expressed his hope to
consolidate this case with actions pending in the Northern District which also raised
Eighth Amendment claims regarding the provision of HCV treatment to DOCS inmates.
Plaintiff's Motion to Change Venue (Dkt. No. 6) at p. 1.  Plaintiff identified *Norris v.
Wright*, 9:06-CV-0397 (DNH/GHL) and *Hilton v. Wright*, 9:05-CV-1038 (DNH/DEP), both
of which were pending in this district at the time, as two such actions.   Since the
transfer, however, plaintiff has taken no steps to seek consolidation of this action with
any other pending case.

violated his rights guaranteed by the ADA and the Rehabilitation Act, as well as under state tort law.

On March 6, 2009, following the joinder of issue and completion of pretrial discovery, defendants Genovese, Wright, Magee, Edwards, Nesmith, Paolano, Smith and O'Connell moved for summary judgment dismissing plaintiff's complaint.[7]  Dkt. No. 60.  In their motion, defendants argue that 1) plaintiff's Eighth Amendment claims are substantively deficient, in that the record reveals plaintiff's medical needs were adequately met by DOCS medical personnel; 2) any claims against defendants O'Connell, Magee, Edwards, Nesmith, Paolano, and Smith are barred by the statute of limitations; and 3) plaintiff's state law claims are precluded by New York Correction Law § 24, and should therefore be dismissed.[8]  *Id.*  Plaintiff has since submitted papers in opposition to defendants' motion.  Dkt. No. 63.

Defendants' motion, which is now ripe for determination, has been

---

[7]    Defendants Takos and Forte have not been served with process and are therefore not involved in the pending motion.  As is discussed later in this report, I am recommending the dismissal of plaintiff's claims against those defendants in accordance with Federal Rule of Civil Procedure 4(m). *See* pp. 30-31, *post.*

[8]    Defendants' motion does not seek summary judgment dismissing plaintiff's claims under the ADA and the Rehabilitation Act.  Accordingly, I have not addressed the sufficiency of those claims in this report.

referred to me for the issuance of a report and recommendation, pursuant

to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule

72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

    A.   Summary Judgment Standard

    Summary judgment is governed by Rule 56 of the Federal Rules of

Civil Procedure.  Under that provision, the entry of summary judgment is

warranted when "the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317,

322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of*

*Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82 (2d Cir. 2004).

A fact is "material", for purposes of this inquiry, if it "might affect the

outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248,

106 S.Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549,

553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute

"if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

A moving party bears the initial burden of demonstrating that there is

no genuine dispute of material fact to be decided with respect to any

essential element of the claim in issue; the failure to meet this burden

warrants denial of the motion. *Celotex,* 477 U.S. at 323 n. 4, 106 S.Ct. at

2553; *Security Ins.*, 391 F.3d at 83. In meeting this burden, the moving

party "bears the initial responsibility of informing the district court of the

basis for its motion, and identifying those portions of 'the pleadings,

depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any,' which it believes demonstrate the absence of a

genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553

(quoting Fed. R. Civ. P. 56(c)).

In the event this initial burden is met, the opposing party must show,

through affidavits or otherwise, that there is a material issue of fact for trial.

Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553;

*Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are

entitled to special latitude when defending against summary judgment

motions, they must establish more than mere "metaphysical doubt as to

the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. <u>Eighth Amendment</u>

Claims that prison officials have intentionally disregarded an inmate's medical needs are encompassed within the Eighth Amendment's prohibition of cruel and unusual punishment. *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976). The Eighth Amendment's

13

prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.; see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084 (1986) (citing, *inter alia, Estelle).* While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement - the conditions must be "sufficiently serious" from an objective point of view, and plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F. Supp.2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 297-98, 111 S.Ct. 2321, 2323-24 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. & Homer, M.J.); *see also,*

*generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321.[9]  Deliberate indifference

exists if an official "knows of and disregards an excessive risk to inmate

health or safety; the official must both be aware of facts from which the

inference could be drawn that a substantial risk of serious harm exists, and

he must also draw the inference."  *Farmer,* 511 U.S. at 837, 114 S.Ct. at

1979; *Leach,* 103 F. Supp.2d at 546 (*citing Farmer,* 511 U.S. at 837, 114

S.Ct. at 1979); *Waldo,* 1998 WL 713809, at *2 (citing *Farmer*, 511 U.S. at

837, 114 S.Ct. at 1979).

### 1.   Serious Medical Need

In order to meet the objective prong of the governing Eighth

Amendment test in a medical indifference case, a plaintiff must first allege

a deprivation involving a medical need which is, in objective terms,

"'sufficiently serious.'"  *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir. 1994)

(quoting *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub*

*nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995).  A

medical need is serious for constitutional purposes if it presents "'a

condition of urgency' that may result in 'degeneration' or 'extreme pain'."

*Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998) (citations omitted).

---

[9]  Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

A serious medical need can also exist where "'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain'"; since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the facts.  *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir. 2000) (quoting, *inter alia, Chance,* 143 F.3d at 702).  Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "'reasonable doctor or patient would find important and worthy of comment or treatment'", a condition that "'significantly affects'" a prisoner's daily activities, or "'the existence of chronic and substantial pain.'"  *Chance,* 143 F.3d at 702 (citation omitted); *LaFave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

It is not altogether clear from defendants' motion papers whether they contend that no reasonable factfinder could conclude plaintiff suffered from a serious medical need at the relevant times.[10]  In their analysis of plaintiff's Eighth Amendment claim, defendants point to the declaration of

_____

[10]  Plaintiff, with considerable justification, reads defendants' motion papers to concede that the objective prong has been established for purposes of the present motion.  Plaintiff's Memorandum (Dkt. No. 63-2) at p. 7.

Dr. Maryann Genovese, which summarily chronicles the medical treatment which Crosby has received from the DOCS over the years, and states in conclusory fashion that "it is clear that plaintiff received appropriate and proper medical care and his medical needs were properly treated", adding that "[a]dditionally, the plaintiff's care was, at all times, competent and professional."  Defendants' Memorandum (Dkt. No. 60-6) at p. 4. Defendants go on to state that assuming for the sake of argument plaintiff can satisfy the objective prong by establishing the existence of a serious medical need, his complaint nonetheless fails to reflect subjective culpability on the part of the defendants.  *Id.*

    I do not interpret plaintiff's complaint as quarreling with the treatment which he received for his various other medical conditions over time. Instead, plaintiff's complaint appears to challenge the failure on the part of DOCS medical personnel to inform him that as early as 1995 he tested positive for the Hepatitis C virus and, more importantly, to treat him appropriately for that condition.  Plaintiff has provided excerpts from his medical records upon which he relies to substantiate his claim that he tested positive for Hepatitis C in 1995.  A "Medilabs" report dated February 25, 1995 includes a handwritten note which appears to say "Need Hep C

17

report VDRL".  Complaint (Dkt. No. 1) Exh. A.  A "Medilabs" report dated

August 22, 1995 indicates a positive test result for Hepatitis C.  *Id*. Exh. B.

A patient referral form dated April 16, 1996 identifies Hepatitis C as part of

plaintiff's "Significant Past Medical/Surgical History."  Crosby Aff. (Dkt. No.

63-3) Exh. 1.

Defendants' motion appears to rest entirely upon Dr. Genovese's

conclusions, offered without citation to plaintiff's medical records, that

"there were no symptoms of life threatening hepatitis C;" "plaintiff was able

to function and carry out the routine activities of daily life, including

exercising;" and "plaintiff had not been suffering severe pain, deterioration

of his health or a permanent disability."[11]  Genovese Decl. (Dkt. No. 60-4)

¶¶ 4, 5, 28.  Defendants have not submitted a complete set of plaintiff's

DOCS medical records, nor have they identified any other portion of the

record which provides the factual basis for these conclusions.  A

reasonable factfinder could well conclude that in light of its known

debilitating affects, Hepatitis C constitutes a serious medical need

---

[11]   Notably missing from this recitation is an assessment of plaintiff's medical
conditions with reference to the third *Chance* factor – whether the condition(s) is one
which a "reasonable doctor or patient would find important and worthy of comment or
treatment."  *See Chance*, 143 F.3d at 702.

warranting treatment.[12]

Upon careful review of the record now before the court, I find that defendants have not met their initial burden on summary judgment to demonstrate that there is no genuine issue of material fact to be decided with respect to whether plaintiff's medical condition, and specifically his Hepatitis C, presented a serious medical need in a constitutional sense at the relevant times.

2.    Deliberate Indifference

In addition to establishing the existence of a serious medical need, to prevail on an Eighth Amendment claim a plaintiff must also establish indifference to that condition on the part of one or more of the defendants. *Leach,* 103 F. Supp.2d at 546.  Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,

---

[12]    Numerous courts have recognized Hepatitis C as a "serious medical condition" for purposes of Eighth Amendment deliberate indifference analysis.  *See, e.g. Motta v. Wright*, 9:06-CV-1047, 2009 WL 1437589, at *15 (N.D.N.Y. May 20, 2009) ("No one disputes that [Hepatitis C] is a 'serious medical condition.'"); *Muniz v. Goord*, 9:04-CV-0479, 2007 WL 2027912, at *8, n. 38 (N.D.N.Y. July 11, 2007) ("the bulk of district court decisions addressing the issue finds that Hepatitis C is a serious medical need.") (citing cases).

and he [or she] must also draw the inference."  *Farmer,* 511 U.S. at 837,

114 S.Ct. at 1979; *Leach,* 103 F. Supp.2d at 546 (citing *Farmer,* 511 U.S.

at 837, 114 S.Ct. at 1979); *Waldo,* 1998 WL 713809, at *2 (same).

A physician's mere negligence in treating or failing to treat a

prisoner's medical condition does not implicate the Eighth Amendment and

is not properly the subject of a § 1983 action.  *Estelle,* 429 U.S. at 105-06,

97 S.Ct. at 292; *Chance,* 143 F.3d at 703.  "Medical malpractice does not

become a constitutional violation merely because the victim is a prisoner."

*Estelle,* 429 U.S. at 106, 97 S.Ct. at 292.  Thus, a physician who "delay[s]

... treatment based on a bad diagnosis or erroneous calculus of risks and

costs" does not exhibit the mental state necessary for deliberate

indifference.  *Harrison,* 219 F.3d at 139.  Likewise, an inmate who

disagrees with the physician over the appropriate course of treatment has

no claim under § 1983 if the treatment provided is "adequate."  *Chance,*

143 F.3d at 703.  However, if prison officials consciously delay or otherwise

fail to treat an inmate's serious medical condition "as punishment or for

other invalid reasons," such conduct constitutes deliberate indifference.

*Harrison,* 219 F.3d at 138;  *Kearsey v. Williams,* 2005 WL 2125874, at *5

(S.D.N.Y. Sep. 1, 2005).

By their motion, defendants ask the court to find that no genuine issue of material fact exists with respect to their subjective assessment of and response to plaintiff's medical needs.  Once again, however, defendants have not identified to the court the portions of the record which they believe demonstrate that summary judgment is warranted. Defendants' Memorandum (Dkt. No. 60-6) at p. 6.  Rather, defendants simply assert that "[a]gainst this backdrop there could be no finding that any defendant acted with any wanton disregard to the plaintiff's health."  *Id.*

The "backdrop" of which I am aware does not admit of that conclusion.  It is undisputed that while plaintiff was diagnosed with Hepatitis C in 1995, and thereafter claims to have complained on a regular basis of symptoms consistent with that virus, and despite the availability of treatment for that disease, including through use of Pegylated Interferon, either alone or in combination with Ribavirin, he was not treated for the disease until some ten years later.[13]  Plaintiff's claim that no Hepatitis C

---

[13]    The limited record now before the court reveals a sharp contrast between plaintiff's contention regarding his reporting of symptomology consistent with Hepatitis C to prison officials at the three facilities at which he was confined during the relevant times, and defendants' position.  In her declaration Dr. Genovese states that plaintiff's medical records show "no complaints of loss of appetite, nausea, vomiting, migraine headaches, fatigue, abdominal pains or persistent flu symptoms."  Genovese Decl.

evaluation or treatment was provided for a period of approximately ten years following his diagnosis in 1995 is also unanswered by any of the defendants.[14]  Plaintiff alleges, and defendants do not dispute in their motion papers, that "[where treatment for Hepatitis C] is delayed, it becomes less effective because chronic Hepatitis C causes increased fibrosis, or scarring, of liver tissue and eventually cirrhosis of the liver." Complaint (Dkt. No. 1) ¶ 39.  Defendants have also chosen not to address plaintiff's claim that his Hepatitis C was ignored because DOCS medical policy promulgated under the direction of defendant Wright, encouraging or even requiring that the costs of providing inmates with Hepatitis C treatment be avoided.

     Simply stated, defendants have not identified record evidence which demonstrates that there is no genuine dispute of material fact to be

_____

(Dkt. No. 60-4) ¶ 8.  Conspicuously lacking from defendants' motion papers, however, are medical records which would permit the court to make an independent review and substantiate this statement.  In sharp contrast, plaintiff has alleged in his complaint that he complained of such symptoms on a regular basis at all three facilities.  *See, e.g.,* Complaint (Dkt. No. 1) ¶¶ 46, 53, 60, 67, 70, 71, 76, and 79; *see also* Crosby Aff. (Dkt. No. 63-1) ¶¶ 8, 10, 12, 14, 15.

[14]   The fact that Dr. Genovese considers plaintiff to have been "asymptomatic" for Hepatitis C does not address the question of why this diagnosis was not itself sufficient to warrant evaluation.  Significantly, plaintiff was evaluated and treated for Hepatitis C following the October, 2004, positive test result, even though defendants do not appear to claim that he was "symptomatic" for Hepatitis C at that time.

decided with respect to whether defendants knew of and disregarded an

excessive risk to plaintiff's health.  *See Farmer*, 511 U.S. at 837, 114 S.Ct.

at 1979.  I therefore recommend a finding that defendants have also failed

to meet their initial burden on summary judgment with respect to the

subjective prong of the Eighth Amendment analysis.  *Celotex,* 477 U.S. at

323, 106 S.Ct. at 2553.

In sum, because defendants have not met their burden on summary

judgment with respect to either prong of the Eighth Amendment analysis, I

recommend that defendants' motion for summary judgment dismissing

plaintiff's Eighth Amendment claims be denied.

C.    Statute of Limitations

In the pending motion, defendants O'Connell, Magee, Edwards,

Paolano, Smith and Nesmith also seek summary judgment dismissing

plaintiff's claims against them as time-barred.  Defendants' Memorandum

(Dkt. No. 60-6) at p. 5.  The moving defendants were responsible for

plaintiff's health care while he was confined at Attica, and later at Great

Meadow, all prior to August, 2001.  Defendants argue that "those

defendants who only had or could have only had some involvement in

plaintiff's medical care prior to April 2, 2004 should be dismissed since the

claims against them are time-barred."[15]  *Id.*

Plaintiff opposes the requested dismissal.  Relying on his claim that defendants "concealed" his Hepatitis C diagnosis from him, Crosby argues that his claim did not accrue, and the statute of limitations therefore did not start to run, until approximately February, 2006, when he first learned that he had tested positive for Hepatitis C in 1995.  Plaintiff's Memorandum (Dkt. No. 63-2) at pp. 9-11.

The statute of limitations governing § 1983 claims arising in New York is three years.  *See Owens v. Okure,* 488 U.S. 235, 251, 109 S.Ct. 573, 582 (1989); *see also Patterson v. County of Oneida,* 375 F.3d 206, 225 (2d Cir. 2004).  "Under federal law, which governs the [actual] accrual of claims brought under § 1983 ..., a claim generally accrues once the plaintiff knows or has reason to know of the injury which is the basis of his action."  *Cornwell v. Robinson,* 23 F.3d 694, 703 (2d Cir. 1994) (internal quotations and citations omitted).

---

[15]  Plaintiff's complaint, which was filed in the Western District of New York on April 2, 2007, is undated.  Dkt. Nos 1, 24.  While not relevant to the present motion, the court notes that plaintiff is entitled to the benefit of the "mailbox" rule, according to which plaintiff would be deemed to have filed this action when he gave his original complaint to prison officials for mailing.  *See Houston v. Lack,* 487 U.S. 266, 276, 108 S.Ct. 2379, 2385 (1988) (A *pro se* inmate's papers are deemed filed when the inmate gives the papers to prison officials for mailing).

Although the doctrine is not mentioned in defendants' motion papers, I find that the timeliness of plaintiff's claims against the moving defendants cannot be determined without consideration of the "concept of fraudulent concealment of a cause of action." *See Pearl v. City of Long Branch*, 296 F.3d 76, 80 (2d Cir. 2002). While this long-standing doctrine admits of differing articulations, as either a matter related to accrual of a cause of action or a form of equitable relief from a limitations bar,[16] *see id*., 296 F.3d at 83, federal courts have applied the fraudulent concealment doctrine to numerous federal causes of action. *See, e.g., Pearl*, 296 F.3d at 83-84 (police brutality); *Pinaud v. County of Suffolk,* 52 F.3d 1139, 1157-58 (2d Cir. 1995) (false arrest and malicious prosecution); *Cerbone v. International Ladies' Garment Workers' Union,* 768 F.2d 45, 48-49 (2d Cir. 1985) (age discrimination); *Keating v. Carey,* 706 F.2d 377, 381-82 (2d Cir. 1983) (discrimination based on political affiliation); *Barrett v. United States,* 689 F.2d 324, 327-30 (2d Cir. 1982) (Federal Tort Claims Act).

Defendants have not presented any evidence regarding the

---

[16]   The significance of this distinction, which is not relevant to the present motion, is that where the fraudulent concealment is understood to postpone the accrual of a cause of action, it is properly a matter of federal law, whereas if it is considered an example of equitable estoppel, it is one of the state tolling rules that federal courts borrow in section 1983 cases. *Pearl*, 296 F.3d at 83-84.

applicability of the fraudulent concealment in this case, nor have they discussed relevant case law.  Accordingly, I recommend that defendants' motion for summary judgment dismissing plaintiff's claims against O'Connell, Magee, Edwards, Paolano, Smith and Nesmith as time-barred be denied, based upon the existence of disputed issues of fact surrounding when plaintiff had reason to know of his injury, and whether defendants should be precluded under the fraudulent concealment doctrine from asserting a defense based on the statute of limitations.

D.   Violation of State Law

Defendants claim that they are entitled to summary judgment dismissing those of plaintiff's claims arising under state law.[17]  Defendants maintain that such claims are neither cognizable under 42 U.S.C. § 1983, nor are they maintainable in light of the restrictions imposed by N.Y. Correction Law § 24.  Defendants' Memorandum (Dkt. No. 60-6) at pp. 4-7.

To state a valid claim under section 1983, "a plaintiff must allege that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the

_____

[17]   While not broken out as separate causes of action, the state law claims intended by plaintiff to be included in his complaint appear to include both negligence and intentional torts of an unspecified nature.  *See, e.g.,* Complaint (Dkt. No. 1) ¶ 3.

plaintiff of a right guaranteed under the Constitution of the United States."
*Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999) (citing *Dwares v. City of New York*, 985 F.2d 94, 98 (2d Cir. 1993)).  "A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983."  *Cusamano v. Sobek*, 604 F. Supp.2d 416, 482 (N.D.N.Y. 2009) (Suddaby, J.) (collecting cases).

Plaintiff's complaint includes numerous allegations that the defendants' conduct with respect to his medical care constituted "gross negligence" in violation of his constitutional rights.[18]  Complaint (Dkt. No. 1) ¶¶ 106-07, 109-10.  Insofar as plaintiff's complaint seeks to assert state law negligence claims pursuant to section 1983, those clams are not cognizable, and I therefore  recommend that they be dismissed. *Cusamano*, 604 F. Supp.2d at 482.

Although not properly brought under section 1983,  plaintiff's negligence claims are appropriately asserted as pendent state law claims

---

[18]  Plaintiff claims that defendants committed "intentional and gross negligence" when they (i) directed him to undergo two "painful" surgeries to "remove the inflammation caused by the potentially fatal disease Hepatitis C," (ii) misdiagnosed him with high blood pressure, (iii) prescribed anti-inflammatory medication "when he was suffering from Hepatitis C," and (iv) failed to provide him with Hepatitis C treatment. Complaint (Dkt. No. 1) ¶¶ 106-07, 109-10.

over which the court could exercise supplemental jurisdiction under 28

U.S.C. § 1367.  When viewed in this light, however, plaintiff's claims

implicate a state law provision by which New York has immunized DOCS

employees from suits requiring them to personally answer state law claims

for damages based on activities falling within the scope of the statute,

providing that

> 1.    [n]o civil action shall be brought in any court of the
>        state, except by the attorney general on behalf of
>        the state, against any officer or employee of [the
>        DOCS], in his personal capacity, for damages
>        arising out of any act done or the failure to perform
>        any act within the scope of the employment and in
>        the discharge of the duties by such officer or
>        employee.
>
> 2.    Any claim for damages arising out of any act done or the
>        failure to perform any act within the scope of the
>        employment and in the discharge of the duties of any
>        officer or employee of DOCS shall be brought and
>        maintained in the court of claims as a claim against the
>        state.

N.Y. Correct. Law § 24; *see also Ierardi v. Sisco,* 119 F.3d 183, 186-87 (2d

Cir. 1997).[19]  Section 24 thus precludes claims against corrections officers

---

[19]   The immunity afforded under section 24 is not absolute; actions taken by
corrections workers occurring during the course of their employment but wholly outside
of their scope of employment, for example, lack the protection of that section.  The
circumstances presented in *Ierardi,* for example, involving a claim of sexual harassment
made by a special education teacher employed by DOCS against a corrections officer
assigned to the same facility, serve aptly to illustrate the type of situation in which

brought against them in any court in their personal capacities arising out of the discharge of their duties.  *Baker v. Coughlin*, 77 F.3d 12, 14-15 (2d Cir. 1996).

In *Haywood v. Drown*, __ U.S.__, 129 S.Ct. 2108 (2009), the Supreme Court recently held this provision unconstitutional to the extent it precludes inmates from pursuing § 1983 actions.  In the wake of *Haywood*, one court in this district has observed that "[a] claim brought pursuant to a state law does not implicate the Supremacy Clause, and therefore, the *Haywood* decision does not affect the question of whether this Court has proper jurisdiction to hear [a] pendent state law claim."  *May v. Donneli*, 9:06-cv-437, 2009 WL 3049613, at *5 (N.D.N.Y. Sept. 18, 2009) (Sharpe, J. & Treece, M.J.).  In that case, because the acts of the corrections officers, which were alleged to have violated New York Correction Law § 610, clearly fell within the scope of their employment, the court found that it lacked jurisdiction to hear such pendent state law claims.  *See id.*

In this case plaintiff's pendent state law claims, alleging negligence and intentional torts in violation of New York common law, indisputably arise from actions taken by the defendants in their roles as DOCS

---

section 24 would not afford protection.  *Ierardi*, 119 F.3d at 188-89.

employees.  These types of claims have consistently been treated as

giving rise to immunity from suit for pendent state law claims against

DOCS personnel in their individual capacities, whether in state or federal

court.  *See, e.g. Baker*, 77 F.3d at 15-16 (plaintiff's pendent state law

claims for intentional tort, negligence and malpractice were barred by

§ 24); *Tafari v. Stein*, No. 01CV0841, 2008 WL 1991039, at *8 (W.D.N.Y.

May 5, 2008) (negligence claims against DOCS medical providers barred

by § 24); *Ruffin v. Deperio*, 97 F. Supp.2d 346, 356 (W.D.N.Y. 2000)

(granting defendants' motion for summary judgment on pendent state law

claims for negligence and medical malpractice).

Because plaintiff's state law claims for negligence brought against

each of the individual defendants in their personal capacity are neither

cognizable under section 1983 nor permissible under section 24, I

recommend that they be dismissed.

E.    Status of Unserved Defendants

Defendants Takos and Forte, though named in plaintiff's complaint,

have not been served with process and therefore are not yet parties to this

action.  I note, moreover, that according to plaintiff's complaint Dr. Forte

died in approximately 2004, prior to the commencement of this action.

Complaint (Dkt. No. 1) ¶ 77.

By order filed May 30, 2007, District Judge Charles J. Siragusa of the Western District directed that summonses be issued and served on the defendants by the U.S. Marshals Service.  Dkt. No. 7.  In that order, Judge Siragusa noted that Dr. Forte was deceased and acknowledged the court's "obligation to assist an incarcerated *pro se* litigant to obtain discovery necessary to identify an unidentified individual defendant in order to avoid dismissal."  *Id.* at p. 2-3.  Acknowledgment of service forms forwarded by the United States Marshal's Service to defendants Forte and Takos were returned unexecuted in June and July of 2007.  Dkt. Nos. 8, 12.  Shortly thereafter, plaintiff requested assistance from the Western District with service on those defendants.  Dkt. Nos. 14, 16.

Upon transfer of this action to the Northern District of New York in October of 2007, those defendants remained unserved.[20]  By letter dated December 5, 2007, the clerk of the court requested the Office of DOCS Counsel to provide information it might have which could assist in locating

---

[20]   At the time of transfer, defendants Smith and O'Connell were also unserved. Those two defendants subsequently returned completed acknowledgment of service forms.  Dkt. Nos. 38, 39.

Dr. Takos or in identifying Dr. Forte's legal representative.[21]  Dkt. No. 31.

That inquiry was unproductive.  Dkt. No. 36.  At no time subsequent to the

transfer of this action to the Northern District in October of 2007 has

plaintiff communicated with the court regarding his desire to pursue this

action against defendants Forte and Takos.

    Rule 4(m) of the Federal Rules of Civil Procedure authorizes

dismissal of an action without prejudice where a summons and complaint

is not served within 120 days after filing of the complaint, absent a showing

of good cause.  Fed. R. Civ. P. 4(m).  Rule 4(m) authorizes dismissal upon

motion or *sua sponte*, provided that the court first gives notice to the

plaintiff.  *Id*.; *Shuster v. Nassau Cty*., No. 96 Civ. 3635, 1999 WL 9847, at

*1 (S.D.N.Y. Jan. 11, 1999).  The 120-day period for service of a summons

and complaint by a plaintiff under Fed. R. Civ. P. 4(m) applies to *pro se*

plaintiffs as well as those represented by counsel.  *Shuster,* 1999 WL

9847, at *1; *Romand v. Zimmerman*, 881 F. Supp. 806, 809 (N.D.N.Y.

---

    [21]   Because Dr. Forte died prior to being served with the summons and complaint,
he was never a party to this action and the procedure set forth in Rule 25 of the Federal
Rules of Civil Procedure was not available as a means to add Forte's legal
representative or successor as a party.  *See, e.g.  Mizukami v. Buras*, 419 F.2d 1319,
1320 (5th Cir. 1969)*; Davis v. Cawell*, 94 F.R.D. 306, 307 (D.Del. 1982); *Chorney v.
Callahan,* 135 F.Supp. 35, 36 (D.Mass. 1955); 6 *James Wm Moore, et al., MOORE'S
FEDERAL PRACTICE* § 25.10[1] (3d ed. 1997).  Plaintiff could, however, have filed a
motion seeking leave to file an amended complaint naming Dr. Forte's legal
representative as a defendant in the action.

1995) (McAvoy, C.J.).  In this regard, courts have generally recognized that the time period does not properly begin to run against a plaintiff proceeding *in forma pauperis* until the application has been acted upon.  *See Romand*, 881 F. Supp. at 809-10.

Based upon the foregoing, and because the record does not indicate that plaintiff requested the assistance of this court in obtaining jurisdiction over Dr. Takos and/or Dr. Forte's legal representative, and in light of the fact that more than two years have elapsed since plaintiff commenced this action and was granted *in forma pauperis* status, I recommend dismissal of plaintiff's claims against those defendants in accordance with Rule 4(m).[22]

## IV.  SUMMARY AND RECOMMENDATION

Having concluded that defendants have not met their initial burden to demonstrate that no genuine issues of material fact exist which respect to plaintiff's Eighth Amendment medical indifference claim, I therefore recommend that their motion for summary judgment seeking dismissal of that claim on the merits be denied.  I also recommend that the motion be

---

[22]   The issuance of this report and recommendation will provide notice to plaintiff of the recommended dismissal of his claims against the unserved defendants, and afford him an opportunity to argue in his objections to the assigned district judge that in his view dismissal is not appropriate, and if so why.

denied insofar as defendants O'Connell, Magee, Edwards, Paolano, Smith and Nesmith contend that plaintiff's claims against them are time-barred. Because allegations of state common law violations do not state a claim under section 1983, and when viewed as pendent tort claims they are precluded by New York Correction Law § 24, I recommend dismissal of all of plaintiff's claims that are premised upon violation of state law. Finally, I recommend that plaintiff's claims against defendants Takos and Forte be dismissed in accordance with Rule 4(m).

It is therefore hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 60) be GRANTED, in part, and that plaintiff's state law claims against defendants be dismissed, but that the motion be DENIED in all other respects; and it is further

RECOMMENDED, that plaintiff's claims against defendants Takos and Forte be dismissed *sua sponte*, in accordance with Federal Rule of Civil Procedure Rule 4(m).

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Objections shall be filed with the Clerk of the Court. FAILURE TO

OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL

PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.

6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

 The Clerk of the Court is directed to serve a copy of this report and

recommendation upon the parties in accordance with the court's local

rules.

David E. Peebles
U.S. Magistrate Judge


Dated:  February 22, 2010
    Syracuse, NY



Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

---

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. *See* Fed.R.Civ.P. 72(b), Advisory
Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

> FN1. This matter was referred to the undersigned
> pursuant to 28 U.S.C. § 636(b) and
> N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments. [FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff
and failed to provide adequate medical treatment for his
injuries and drug problem. Plaintiff seeks declaratory
relief and monetary damages. Presently pending is
defendants' motion to dismiss pursuant to Fed.R.Civ.P.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

> FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

### I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. *Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27-28.

### II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

### III. Discussion

#### A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

#### 1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl., ¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement

claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference can be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,*524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain

from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at \*3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at \*3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

           V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Karus LAFAVE, Plaintiff,
v.
CLINTON COUNTY, Defendants.
**No. CIV.9:00CV0744DNHGLS.**

April 3, 2002.

Karus Lafave, Plaintiff, Pro Se, Plattsburgh, for the Plaintiff.

Maynard, O'Connor Law Firm, Albany, Edwin J. Tobin, Jr., Esq., for the Defendants.

REPORT-RECOMMENDATION FN1

FN1. This matter was referred to the undersigned for Report-Recommendation by the Hon. David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and L.R. 72.3(c).

SHARPE, Magistrate J.

I. INTRODUCTION

*1 Plaintiff, *pro se,* Karus LaFave ("LaFave") originally filed this action in Clinton County Supreme Court. The defendant filed a Notice of Removal because the complaint presented a federal question concerning a violation of LaFave's Eighth Amendment rights (Dkt. No. 1). Currently before the court is the defendant's motion to dismiss made pursuant to Rule 12(b)(6) and in the alternative, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure (Dkt. No. 5). LaFave, in response, is requesting that the court deny the motion, excuse his inability to timely file several motions, and to permit the

matter to be bought before a jury FN2. After reviewing LaFave's claims and for the reasons set forth below, the defendant's converted motion for summary judgment should be granted.

FN2. It should be noted that the date for dispositive motions was February 16, 2001. The defendant's motion to dismiss was filed on September 29, 2000. On January 9, 2001, this court converted the defendant's motion to dismiss to a motion for summary judgment, and gave LaFave a month to respond. On April 16, 2001, after three months and four extensions, LaFave finally responded.

II. BACKGROUND

LaFave brings this action under 42 U.S.C. § 1983 claiming that the defendant violated his civil rights under the Eighth Amendment FN3. He alleges that the defendant failed to provide adequate medical and dental care causing three different teeth to be extracted.

FN3. LaFave does not specifically state that the defendant violated his Eighth Amendment rights but this conclusion is appropriate after reviewing the complaint.

III. FACTS FN4

FN4. While the defendant provided the court with a "statement of material facts not in issue" and LaFave provided the court with "statement of material facts genuine in issue," neither provided the court with the exact nature of the facts.

Between January and July of 1999, LaFave, on several occasions, requested dental treatment because he was experiencing severe pain with three of his teeth. After being seen on several occasions by a Clinton County

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

Correctional Facility ("Clinton") doctor, he was referred to a dentist. Initially, LaFave's mother had made an appointment for him to see a dentist, but he alleges that Nurse LaBarge ("LaBarge") did not permit him to be released to the dentist's office [FN5]. Subsequently, he was seen by Dr. Boule, D.D.S ., on two occasions for dental examinations and tooth extractions.

> FN5. This appears to be in dispute because the medical records show that LaFave at first stated that his mother was going to make arrangements, but later requested that the facility provide a dentist.

IV. DISCUSSION

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc ., 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); accord F.D.I.C. v. Giammettei, 34 F.3d 51, 54 (2d Cir.1994).* The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).* Once this burden is met, it shifts to the opposing party who, through affidavits or otherwise, must show that there is a material factual issue for trial. *Fed.R.Civ.P. 56(e); see Smythe v. American Red Cross Blood Services Northeastern New York Region, 797 F.Supp. 147, 151 (N.D.N.Y.1992).*

Finally, when considering summary judgment motions, *pro se* parties are held to a less stringent standard than attorneys. *Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); Haines v. Kerner, 404 U.S. 519, 520-21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972).* Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir.1990).* With this standard in mind, the court

now turns to the sufficiency of LaFave's claims.

B. *Eighth Amendment Claims*

**\*2** LaFave alleges that his Eighth Amendment rights were violated when the defendant failed to provide adequate medical care for his dental condition. The Eighth Amendment does not mandate comfortable prisons, yet it does not tolerate inhumane prisons either, and the conditions of an inmate's confinement are subject to examination under the Eighth Amendment. *Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1975, 128 L.Ed.2d 811 (1994).* Nevertheless, deprivations suffered by inmates as a result of their incarceration only become reprehensible to the Eighth Amendment when they deny the minimal civilized measure of life's necessities. *Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991)* (quoting *Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)).*

Moreover, the Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ..." against which penal measures must be evaluated. See *Estelle v. Gamble, 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d (1976).* Repugnant to the Amendment are punishments hostile to the standards of decency that " 'mark the progress of a maturing society.' " *Id.* (quoting *Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958)* (plurality opinion)). Also repugnant to the Amendment, are punishments that involve " 'unnecessary and wanton inflictions of pain." ' *Id. at 103,97 S.Ct. at 290* (quoting *Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)).*

In light of these elementary principles, a state has a constitutional obligation to provide inmates adequate medical care. See *West v. Atkins, 487 U.S. 42, 54, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988).* By virtue of their incarceration, inmates are utterly dependant upon prison authorities to treat their medical ills and are wholly powerless to help themselves if the state languishes in its obligation. See *Estelle, 429 U.S. at 103, 97 S.Ct. at 290.* The essence of an improper medical treatment claim lies in proof of "deliberate indifference to serious medical

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

needs." *Id.* at 104, 97 S.Ct. at 291. Deliberate indifference may be manifested by a prison doctor's response to an inmate's needs. *Id.* It may also be shown by a corrections officer denying or delaying an inmate's access to medical care or by intentionally interfering with an inmate's treatment. *Id.* at 104-105, 97 S.Ct. at 291.

The standard of deliberate indifference includes both subjective and objective components. The objective component requires the alleged deprivation to be sufficiently serious, while the subjective component requires the defendant to act with a sufficiently culpable state of mind. See *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A prison official acts with deliberate indifference when he " 'knows of and disregards an excessive risk to inmate health or safety.' " *Id.* (*quoting Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979). However, " 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.*

**\*3** However, an Eighth Amendment claim may be dismissed if there is no evidence that a defendant acted with deliberate indifference to a serious medical need. An inmate does not have a right to the treatment of his choice. See *Murphy v. Grabo,* 1998 WL 166840, at \*4 (N.D.N.Y. April 9, 1998) (*citation omitted* ). Also, mere disagreement with the prescribed course of treatment does not always rise to the level of a constitutional claim. See *Chance,* 143 F.3d at 703. Moreover, prison officials have broad discretion to determine the nature and character of medical treatment which is provided to inmates. See *Murphy,* 1998 WL 166840, at \*4 (*citation omitted* ).

While there is no exact definition of a "serious medical condition" in this circuit, the Second Circuit has indicated what injuries and medical conditions are serious enough to implicate the Eighth Amendment. See *Chance,* 143 F.3d at 702-703. In *Chance,* the Second Circuit held that an inmate complaining of a dental condition stated a serious medical need by showing that he suffered from great pain for six months. The inmate was also unable to chew food and lost several teeth. The Circuit also recognized that dental conditions, along with medical conditions, can vary in severity and may not all be severe. *Id.* at 702. The court acknowledged that while some injuries are not serious enough to violate a constitutional right, other very similar

injuries can violate a constitutional right under different factual circumstances. *Id.*

The Second Circuit provided some of the factors to be considered when determining if a serious medical condition exists. *Id.* at 702-703. The court stated that " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain' ' are highly relevant. *Id.* at 702-703 (*citation omitted* ). Moreover, when seeking to impose liability on a municipality, as LaFave does in this case, he must show that a municipal "policy" or "custom caused the deprivation." *Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 137 (2d Cir.1999).

In this case, the defendant maintains that the medical staff was not deliberately indifferent to his serious medical needs. As a basis for their assertion, they provide LaFave's medical records and an affidavit from Dr. Viqar Qudsi [FN6], M.D, who treated LaFave while he was incarcerated at Clinton. The medical records show that he was repeatedly seen, and prescribed medication for his pain. In addition, the record shows that on various occasions, LaFave refused medication because "he was too lazy" to get out of bed when the nurse with the medication came to his cell (*Def. ['s] Ex. A, P. 4*) .

FN6. Dr. Qudsi is not a party to this action.

According to the documents provided, Dr. Qudsi, examined LaFave on January 13, 1999, after LaFave reported to LaBarge that he had a headache and discomfort in his bottom left molar (*Qudsi Aff., P. 2*). Dr. Qudsi noted that a cavity was present in his left lower molar. *Id.* He prescribed Tylenol as needed for the pain and 500 milligrams ("mg") of erythromycin twice daily to prevent bacteria and infection. *Id.* On January 18, 19, and 20, 1999, the medical records show that LaFave refused his erythromycin medication (*Def. ['s] Ex. B, P. 1).*

**\*4** Between January 20, and April 12, 1999, LaFave made no complaints concerning his alleged mouth pain. On

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

April 12, 1999, LaFave was examined by LaBarge due to a complaint of pain in his lower left molar (*Def. ['s] Ex. A, P. 4* ). Dr. Qudsi examined him again on April 14, 1999. *Id.* He noted a cavity with pulp decay and slight swelling with no discharge. *Id.* He noted an abscess in his left lower molar and again prescribed 500 mg erythromycin tablets twice daily and 600 mg of Motrin three times daily for ten days with instructions to see the dentist. *Id.* On the same day, LaBarge made an appointment for LaFave to see an outside dentist that provides dental service to facility inmates, Dr. Boule *(Qudsi Aff., P. 3).*

On May 3, 1999, LaBarge was informed by LaFave that his mother would be making a dental appointment with their own dentist and that the family would pay for the treatment (*Def. ['s] Ex. A, P. 4* ). On that same day, Superintendent Major Smith authorized an outside dental visit. *Id.* On May 12, 1999, he was seen by LaBarge for an unrelated injury and he complained about his lower left molar (*Def .['s] Ex. A, P. 5* ). At that time, LaFave requested that LaBarge schedule a new appointment with Dr. Boule because the family had changed their mind about paying an outside dentist. *Id.* LaBarge noted that he was eating candy and informed him of the deleterious effects of candy on his dental condition. *Id.* Thereafter, LaBarge scheduled him for the next available date which was June 24, 1999, at noon. *Id.*

On June 2, 1999, LaFave again requested sick call complaining for the first time about tooth pain in his upper right molar and his other lower left molar (*Def. ['s] Ex. A, P. 6* ). He claimed that both molars caused him discomfort and bothered him most at night. *Id.* LaFave confirmed that he had received treatment from Dr. Boule for his first lower left molar one week before. *Id.* The area of his prior extraction was clean and dry. *Id.* There was no abscess, infection, swelling, drainage or foul odor noted. *Id.* LaBarge recommended Tylenol as needed for any further tooth discomfort. *Id.*

On June 21, 1999, LaFave again requested a sick call and was seen by LaBarge (*Def. ['s] Ex. A, P. 6* ). No swelling, drainage or infection was observed. *Id.* However, LaBarge noted cavities in LaFave's lower left molar and right lower molars. *Id.* LaBarge made arrangements for Dr. Qudsi to further assess LaFave. *Id.* On June 23, 1999, Dr. Qudsi examined his right lower molar and noted cavitation with

decay in that area (*Def. ['s] Ex. A, P. 7* ). In addition, he noted that LaFave had a cavity in his second left lower molar. *Id.* He prescribed 500 mg of erythromycin twice daily for 10 days and 600 mg of Motrin three times daily for 10 days, with instructions to see a dentist. *Id.*

On June 30, 1999, Officer Carroll reported that LaFave was again non-compliant with his medication regimen as he refused to get up to receive his medication (*Def. ['s] Ex. A, P. 8* ). On July 7, 1999, he again requested sick call complaining of a toothache in his lower right molar (*Def. ['s] Ex. A, P. 9* ). Again, LaFave was non-compliant as he had only taken his erythromycin for five days instead of the ten days prescribed. *Id.* During the examination, Dr. Qudsi informed LaFave that extraction of these teeth could be necessary if he did not respond to conservative treatment. *Id.* At that time, LaFave informed Dr. Qudsi that he was going to be transferred to another facility. *Id.* Dr. Qudsi advised LaFave to follow-up with a dentist when he arrived at the new facility. *Id.* Dr. Qudsi prescribed 500 mg Naproxin twice daily for thirty days with instructions to follow-up with him in two weeks if the pain increased. *Id.* The following day, LaFave requested sick call complaining to LaBarge that he had taken one dose of Naproxin and it was not relieving the pain. *Id.* He was advised that he needed to take more than one dose to allow the Naproxin to take effect. *Id.*

**\*5** On July 17, 1999, LaFave was again seen by Dr. Qudsi and he indicated that he did not believe he was benefitting from the prescribed course of conservative treatment with medication (*Def. ['s] Ex. A, P. 10* ). Subsequently, LaBarge made a dental appointment for him on July 23 [FN7], 1999, at 3:15 p.m. *Id.* On July 23, 1999, a second extraction was conducted. *Id.* On July 28, 1999, he was again seen by Dr. Qudsi, for an ulceration at the left angle of his mouth for which he prescribed bacitracin ointment. *Id.* At this time, LaFave continued to complain of tooth pain so he was prescribed 600 mg of Motrin three times daily. *Id.*

FN7. The medical records contain an error on the July 17, 1999, note which indicted that an appointment was set for June 23, 1999, however, it should have been recorded as July 23, 1999.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

On August 4, 1999, he was seen for feeling a sharp piece of bone residing in the area of his lower left molar (*Def. ['s] Ex. A, P. 11* ). Dr. Qudsi recommended observation and to follow-up with dental care if his condition continued. *Id.* The defendant maintains that given all of the documentation that he was seen when he requested to be seen and prescribed numerous medications, the medical staff was not deliberately indifferent to his serious medical needs. The defendant contends that at all times, professional and contentious dental and medical treatment were provided in regards to his various complaints.

In his response, LaFave disagrees alleging that the county had a custom or policy not to provide medical treatment to prisoners. However, LaFave does not allege in his complaint that the county had a "custom or policy" which deprived him of a right to adequate medical or dental care. In his response to the motion for summary judgment, for the first time, LaFave alleges that the county had a policy which deprived him of his rights. He maintains that his continued complaints of pain were ignored and although he was prescribed medication, it simply did not relieve his severe pain.

This court finds that the defendant was not deliberately indifferent to his serious dental and medical needs. Moreover, even if this court construed his complaint to state a viable claim against the county, LaFave has failed to show that the county provided inadequate medical and dental treatment. As previously stated, an inmate does not have the right to the treatment of his choice. The record shows that he was seen numerous times, and referred to a dentist on two occasions over a six month period. While LaFave argues that the dental appointments were untimely, the record shows that the initial delay occurred because he claimed that his mother was going to make the appointment but later changed her mind. In addition, the record demonstrates that he did not adhere to the prescribed medication regime. On various occasions, LaFave failed to get out of bed to obtain his medication in order to prevent infection in his mouth. Although it is apparent that LaFave disagreed with the treatment provided by Clinton, the record does not show that the defendant was deliberately indifferent to his serious medical needs. Accordingly, this court recommends that the defendant's motion for summary judgment should be granted.

*6 WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that the defendant's motion for summary judgment (Dkt. No. 5) be GRANTED in favor of the defendant in all respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2002.
Lafave v. Clinton County
Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Steven MOTTA, Plaintiff,
v.
Dr. Lester WRIGHT, Deputy Commissioner of Health
Services, NYS Docs; Dr. Syed Haider Shah, Marcy
Correctional Facility, Defendants.
**No. 9:06-CV-1047.**

May 20, 2009.

West KeySummary
**Prisons 310 ☞ 192**

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
                310k192 k. In General. Most Cited Cases

**Prisons 310 ☞ 194**

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
                310k194 k. Psychological Conditions and
Treatment. Most Cited Cases

**Sentencing and Punishment 350H ☞ 1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical Care and Treatment.
Most Cited Cases

**Sentencing and Punishment 350H ☞ 1547**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1547 k. Psychological and Psychiatric
Treatment. Most Cited Cases
In his § 1983 action, prisoner failed to state Eighth
Amendment claim against prison doctor who was
allegedly deliberately indifferent to prisoner's serious
medical needs because the doctor delayed prisoner's
hepatitis treatment from October of 2002 until June of
2006. There was no evidence that the delay was
substantially serious. Moreover, the doctor's explanation
for the delay in providing prisoner with the hepatitis
treatment was based upon the lack of a psychiatric
clearance between October 2002 and October 2005. The
hepatitis protocol clearly required a psychiatric clearance
for individuals who have a history of major depression or
other major psychiatric illness. U.S.C.A. Const.Amend. 8;
42 U.S.C.A. § 1983.

Steven Motta, Dannemora, NY, pro se.

Andrew M. Cuomo, Attorney General of the State of New
York, Office of the Attorney General, Charles J.
Quackenbush, Esq., Assistant Attorney General, of
Counsel, Albany, NY, for Defendants Haider Shah and
Wright.

***ORDER***

NORMAN A. MORDUE, Chief Judge.

**\*1** The above matter comes to me following a
Report-Recommendation by Magistrate Judge Gustave J.
DiBianco, duly filed on the 29th day of April 2009.
Following ten days from the service thereof, the Clerk has
sent me the file, including any and all objections filed by
the parties herein.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

After careful review of all of the papers herein, including the Magistrate Judge's Report-Recommendation, and no objections submitted thereto, it is

ORDERED that:

1. The Report-Recommendation is hereby adopted in its entirety.

2. The defendants' motion for summary judgment (Dkt. No. 29) is granted, and the complaint is dismissed in its entirety.

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

**REPORT-RECOMMENDATION**

GUSTAVE J. DiBIANCO, United States Magistrate Judge.

This matter has been referred to the undersigned for Report and Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In this civil rights complaint, plaintiff alleges that defendants denied him constitutionally adequate medical care from October 10, 2002 until June 1, 2006, while plaintiff was an inmate in the custody of the Department of Correctional Services (DOCS) at Marcy Correctional Facility (Marcy). Complaint (Dkt. No. 1). In the jurisdictional section of the complaint, in addition to 42 U.S.C. § 1983, plaintiff cites the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*; the Rehabilitation Act (RA), 29 U.S.C. § 794; and 42 U.S.C.

§§ 1985, 1988. Compl. ¶ 8. In the body of the complaint plaintiff also quotes the text of the ADA, RA, and sections 1985 and 1988.[FN1] Compl. ¶¶ 67, 68-69. Plaintiff's Causes of Action, however, do not mention these statutes. The complaint contains seven causes of action and all of them state that they are violations of the "Eighth and Fourteenth Amendments." Compl. ¶¶ 73-88. The complaint seeks declaratory and substantial monetary relief.[FN2] Compl. at 28.

> **FN1.** The jurisdictional section also mentions unspecified state law claims. Compl. ¶ 8.

> **FN2.** The complaint also requests "costs and disbursements," including "reasonable attorneys fees" and asks for permission to "be placed before District Court Judge David N. Hurd, who presides over the recently certified class action suit in *Hinton v. Wright,*" ...." Plaintiff is referring to *Hilton v. Wright,* 235 F.R.D. 40 (N.D.N.Y.2006). The court would point out that a *pro se* litigant is not entitled to attorneys fees under 42 U.S.C. § 1988. *See SEC v. Price Waterhouse,* 41 F.3d 805, 808 (2d Cir.1994). This would be true even it the *pro se* plaintiff were an attorney. *See Kay v. Ehrler,* 499 U.S. 432, 111 S.Ct. 1435, 113 L.Ed.2d 486 (1991). Thus, plaintiff would not be entitled to attorneys fees even if he were successful in the action. The court will discuss plaintiff's request regarding the class action later in this report.

Presently before this court is defendants' motion for summary judgment, pursuant to FED. R. CIV. P. 56. (Dkt. No. 29). Plaintiff has responded in opposition to the motion. (Dkt. No. 33). Although the docket sheet indicates that defendants have filed a "Reply," the document filed is simply "dated copies of signature pages from the Declarations of Dr. Haider Shah and Dr. Wright" that were originally filed in support of defendants' motion for summary judgment.[FN3] (Dkt. No. 34). For the following reasons, this court agrees with defendants and will recommend dismissing plaintiff's complaint.

> **FN3.** Plaintiff's first argument in opposition to the defendants' motion was that the defendants'

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

Declarations were unsigned and undated and, thus, not admissible in support of the motion. Plaintiff's Memorandum of Law at 2. (Dkt. No. 33). Defendants corrected their error by submitting copies of the appropriate signed and dated pages, together with a certificate of service on plaintiff, but this correction is docked as a "Reply." (Dkt. No. 34).

**DISCUSSION**

**1. *Summary Judgment***

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

*\*2* In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-movant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the non-movant's claims or (2) identifying those portions of the non-movant's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006) (citing *Celotex Corp.,* 477 U.S. at 23). The second method requires identifying evidentiary

insufficiency, not merely denying the opponent's pleadings. *Id.*

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.* A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Additionally, while a court " 'is not required to consider what the parties fail to point out,' " the court may in its discretion opt to conduct "an assiduous view of the record" even where a party fails to respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted). Plaintiff in this case has responded to defendants' motion, however, the court will still carefully review the entire record in making its determination.

**2. *Facts and Contentions***

In his complaint, plaintiff states that he has been in the custody of DOCS since 1982, and has Hepatitis-C (HCV).[FN4] Plaintiff's medical records show that he was diagnosed with HCV in December of 1995. Haider Shah Decl. ¶ 9 & Ex. A [FN5] at 503. The first several paragraphs of plaintiff's complaint are entitled "INTRODUCTION" and discuss plaintiff's allegations generally. Compl. ¶¶ 1-7. The complaint then contains a section entitled "ALLEGATIONS," containing a more specific statement of facts and chronology of plaintiff's claims. Compl. ¶¶ 25-63.

> FN4. Plaintiff disputes when he contracted the illness. Plaintiff states that he contracted the virus ***after*** he was incarcerated, and defendants state that plaintiff became infected sometime ***prior*** to his incarceration in 1982. This dispute is not relevant to the court's analysis since it is undisputed that he was not diagnosed with HCV until December of 1995.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

FN5. Defendant Haider Shah has submitted a declaration in support of defendants' motion for summary judgment. Exhibit A are plaintiff's medical records including his Ambulatory Health Record (AHR) and other relevant medical records. An inmate's AHR contains entries referring to medical visits on particular days, however, multiple visits are recorded on each day, with up to three visits from three dates recorded on one page. Exhibit A has been paginated, and the page numbers appear at the bottom. Thus, the court will cite to the page number of Exhibit A with further citation to the date of a particular entry of the AHR if necessary.

Plaintiff alleges that after he arrived at Marcy on October 10, 2002, defendant Dr. Haider Shah failed to monitor plaintiff's elevated liver function tests (LFT's) for nineteen months, in violation of the HCV "protocol" FN6 and failed to refer plaintiff to a liver specialist. Compl. ¶ 1. Plaintiff claims that defendant Haider Shah refused to give plaintiff HCV treatment "on a number of occasions" for improper reasons, including that plaintiff was too close to being paroled; needed psychiatric clearance; or "needed outside clearance." Compl. ¶ 2. Plaintiff states that defendant Haider Shah failed to order the prescribed liver biopsy on October 20, 2005 and failed to seek psychiatric clearance for plaintiff until October 20, 2005. Id. Plaintiff claims that once defendant Haider Shah obtained the psychiatric clearance in October of 2005, he delayed giving plaintiff the HCV treatment for another nine months. Id.

FN6. Plaintiff is referring to the DOCS Division of Health Services "protocol" entitled "Hepatitis C Primary Care Practice Guidelines ." (DOCS Guidelines). Defendants have submitted various revisions of the DOCS Guidelines, dated January 17, 2000; July 20, 2004; and October 13, 2005. Wright Decl. Ex. A-1-A-3

*3 Plaintiff states that he filed two grievances regarding his medical care. Compl. ¶¶ 3-4. Plaintiff claims that defendant Haider Shah did not order a genotype blood test until February 14, 2006, after plaintiff's second grievance was filed, and "after nineteen straight months of no blood tests at all." Compl. ¶ 4. Plaintiff states that only after he

filed his second grievance, did defendant Haider Shah begin to check plaintiff's liver function. On June 1, 2006, plaintiff claims that he vomited in front of a nurse, and that on the same day, plaintiff was examined by defendant Haider Shah, who had plaintiff sign a "Contract for Specialty Care" appointment, and requested medication for plaintiff from defendant Wright. Compl. ¶ 6. Plaintiff states that if it had not been for the vomiting incident, defendant Haider Shah never would have ordered the medication that eventually was started on June 9, 2006. Compl. ¶ 7.

In the complaint, plaintiff has listed a number of medical terms that are associated with HCV. Compl. ¶¶ 12-24. Plaintiff has filed a substantial number of documents in support of his complaint, including numerous medical records and other references concerning HCV. Compl. App. A-C. Plaintiff begins the "Allegations" portion of the complaint by outlining the facts surrounding the diagnosis and care of his condition since October 10, 1990, when a laboratory report of blood tests taken at Elmira Correctional Facility, showed that plaintiff tested positive for Hepatitis A FN7 (HAV) and B(HBV). Compl. ¶ 26 & App. B at 3-5.

FN7. Plaintiff states that the tests were positive for both A and B, but the pages he cites only show that the tests were positive for Hepatitis B. Compl. App. B at 3-5.

Plaintiff was diagnosed with HCV on December 12, 1995, while he was in Clinton Correctional Facility. Compl. ¶ 28. Plaintiff states that the tests showed an "out of control chronic Hepatitis C virus," and that although plaintiff complained of liver pain, dizziness, and nausea, he was not scheduled to see a "liver specialist." Id. The complaint discusses 1995 through 2002, stating that at various times, plaintiff complained about symptoms that he was experiencing. Compl. ¶¶ 29-34.

Plaintiff states that in June of 1999, he was incarcerated at Riverview Correctional Facility and experienced dizzy spells. Compl. ¶ 33. Plaintiff states that on June 15, 1999, Dr. R. Hentschel noted that plaintiff was positive for HCV and recommended a follow-up with a private physician, "Rx medication for hepatitis C, [and] lab monitoring." FN8

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

Compl. ¶ 33 (citing App. B at 40-45). Plaintiff states that when he was at Franklin Correctional Facility in April of 2002, he requested medication for HCV and signed consent forms. Compl. ¶ 34. Plaintiff's Ambulatory Health Record (AHR) indicates that he was interested in HCV treatment, and he signed consent forms in April of 2002. Pl.App. at 65 (AHR entries of 4/8 and 4/11/02).

> FN8. The court must point out that in the pages of the medical records cited by plaintiff there is no reference to "medication." Pl.App. B at 41. It is unclear what Dr. Hentschel wrote. The notation appears to be "Needs f/u private physician Rx of Hepatitis C. Lab monitoring." Pl.App. at 41.

Plaintiff was transferred to Marcy in October of 2002, and plaintiff states that on October 17, 2002, he requested HCV treatment again, and that defendant Haider Shah told plaintiff that he would review the policy and record to see if plaintiff met the criteria for medication. Compl. ¶ 35 (citing App. B at 71 AHR entry of 10/17/02). Plaintiff then states that on October 23, 2002, he requested HCV treatment and a "Nurse" told plaintiff that he needed psychiatric clearance.[FN9]Id. Plaintiff states that after the October 17, 2002 "examination," defendant Haider Shah failed to administer a course of treatment; send plaintiff to a private physician; and monitor his liver function every six months as ordered by Dr. Hentschel in 1999. Compl. ¶ 37.

> FN9. Plaintiff is again mistaken regarding his citation to the record. Pages 70 and 71 of plaintiff's appendix are copies of the same page. The *October 17, 2002* entry is written by Nurse K. Dooley. App. B at 70, 71. Nurse Dooley states that plaintiff is requesting treatment for HCV, and Nurse Dooley stated that she would consult P. Perrotta about reviewing the record to determine whether plaintiff met the criteria. The entry dated October 23, 2002 contains the notation of a variety of requests made by plaintiff, including vaccine for Hepatitis A and B; a lead-level test because of a gunshot wound; a memory test; and HCV treatment. Pl.App. B at 70, 71. The entry ends with the notation "Psych Clearance for Possible Hep C Rx." Id. Defendant

Haider Shah states in his declaration that **he** met with plaintiff on October 23, 2002. Haider Shah Decl. ¶ 11.

*4 Plaintiff states that he was examined by defendant Haider Shah on August 7, 2003 and told that he was not ready for medication because he was "too close to going home." Compl. ¶ 39. Plaintiff then cites various laboratory test results, showing that he had a high HCV viral load in 2003. Compl. ¶¶ 40-41. Plaintiff states that consistent with the high viral count, he went to sick call on August 13, 2003, January 7, 2004, and March 31, 2004. Compl. ¶ 42. Plaintiff claims that although he had serious symptoms, no medical action was taken. Id. Plaintiff then cites additional dates on which he was tested. Compl. ¶¶ 43-47.

Plaintiff states that on January 9, 2004, he had a liver function test, and the notation on the report stated that plaintiff "needs to be seen." Compl. ¶ 43. On October 20, 2004, defendant Haider Shah sent plaintiff for a CAT Scan of his abdomen to rule out a bile duct obstruction. Compl. ¶ 45. The CAT Scan was performed on November 5, 2004. Id. (citing App. B at 83). Plaintiff states that on October 13, 2005, defendant Lester Wright sent a memorandum, rescinding the DOCS policy that would prevent an inmate from having HCV treatment if he had not participated in the Alcohol and Substance Abuse Treatment (ASAT)/Residential and Substance Abuse Treatment (RSAT) programs. Compl. ¶ 48. At the same time, defendant Wright rescinded that policy prohibiting approval for HCV treatment if the inmate were going to be released prior to the completion of the treatment. Id. (citing Pl.App. A-HCV Guidelines dated 2/10/06).

Plaintiff states that on October 20, 2005, he asked again for the HCV treatment and discovered that he had not received psychiatric clearance. Compl. ¶ 49. Plaintiff states that the sick call nurse cited to the AHR dated 10/20/04, 6/25/04, 10/23/02 after she noted that there was no psychiatric clearance in the medical records. Compl. ¶ 49. Plaintiff claims that the main reason that he did not obtain his treatment was that he did not have psychiatric clearance, but maintains that no request had ever been made for the clearance. Id.

Plaintiff states that he the request was finally made on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

October 20, 2005, and he obtained the psychiatric clearance on the same day, using the same form upon which the request was written. Compl. ¶ 50 & App. B at 90. Plaintiff claims that on January 4, 2006, he complained to defendant Haider Shah about some of the symptoms plaintiff had been having. Compl. ¶ 52. Plaintiff alleges that during the examination, defendant Haider Shah was going through the medical records and "deliberately lied" about not receiving a reply from the Mental Health Department, when in fact the clearance had been sent on October 20, 2005. *Id.*

Plaintiff states that he wrote a grievance on January 14, 2006 that was consolidated with a prior grievance dated November 15, 2002. Compl. ¶ 53. Plaintiff states that he had an Inmate Grievance Resolution Committee (IGRC) hearing, but that the IGRC could not override a medical decision. *Id.* Plaintiff states that the Superintendent denied his grievance on January 30, 2006, in part because the medical department was waiting for the psychiatric clearance, and that when that clearance was obtained, the medical department would pursue the next step. Compl. ¶ 54. Plaintiff appealed the grievance, stating that he had already received the clearance, but that in any event, he had met the criteria "for years." Compl. ¶ 55.

**\*5** In the meantime, on February 15, 2006, defendant Haider Shah made a request for plaintiff to have a liver biopsy which was completed on March 27, 2006. Compl. ¶¶ 57-58. Plaintiff claims that on June 1, 2006, he reported for sick call and vomited in front of the nurse. Compl. ¶ 59. Plaintiff states that the nurse wrote in the AHR that plaintiff was seeking HCV treatment. *Id.* Plaintiff states that he was examined by defendant Haider Shah on the same day and that plaintiff signed the "Contract for a Specialty Care Appointment." Compl. ¶ 60. Plaintiff states that his HCV treatment began on June 9, 2006, however, if it had not been for the incident in which plaintiff vomited in front of the nurse, "Defendant Haider Shah would never have ordered the medication...." Compl. ¶ 61.

Finally, plaintiff states that on July 5, 2006, defendant Haider Shah informed plaintiff that the high "iron readings" on his liver function tests were the "number one **'killer,'** for him." Compl. ¶ 62 (emphasis in original). Plaintiff stated that his iron levels had always been high and asked defendant Haider Shah whether there was any medication that could bring plaintiff's iron levels down. *Id.* Plaintiff states that defendant Haider Shah told plaintiff that such medication existed, but that he did not believe that plaintiff needed it at the time. *Id.*

Essentially, plaintiff claims that the delay in his treatment caused him serious physical and emotional injury since plaintiff now has fibrosis of the liver that cannot be cured "except by way of liver transplant...." Compl. ¶ 63. Plaintiff alleges that defendant Wright may be held liable for failure to train and supervise his medical employees in the care of inmates such as plaintiff, who have been identified by their treating physicians as being in need of treatment for HCV. Compl. ¶ 70. Plaintiff also seeks to hold defendant Wright liable for establishing an unconstitutional policy and custom of refusing to administer treatment because inmates are too close to going home or because plaintiff did not complete a substance abuse program. Compl. ¶ 71.

The complaint contains seven causes of action, each referring **only** to the Eighth and Fourteenth Amendments and not to any statutory basis for relief. [FN10]

FN10. In any event, the court would point out that while the defendants must be sued in their individual capacities for purposes of section 1983, defendants may **not** be sued in their "individual" capacities for violations of the ADA or the RA. *Garcia v. S.U.N.Y. Health Science Center of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001). Thus, any suit for statutory relief would be against the defendants in their "official" capacities. Without discussing whether the Eleventh Amendment in this case would bar damage relief against the State (defendants in their "official" capacities), the court would merely note that plaintiff does not state a claim under the ADA or the RA. *See e.g. Carrion v. Wilkinson,* 309 F.Supp.2d 1007 (D.Ohio 2004).

In *Carrion,* the court specifically stated that the ADA and RA "afford disabled persons legal rights regarding access to programs and activities enjoyed by all, but do not provide them with a general federal cause of action for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

challenging the medical treatment of their underlying disabilities." *Id.* (quoting *Galvin v. Cook,* CV-00-29, 2000 U.S. Dist. LEXIS 15181, *19-20, 2000 WL 1520231 at *6 (D.Ore. Oct. 3, 2000)). Plaintiff in this case is only challenging the medical treatment of his underlying medical condition, thus, he could not proceed under either the ADA or the RA, even if this court were to interpret his complaint to raise those claims. The court will analyze this case under the Eighth and Fourteenth Amendment claims that plaintiff includes in his "Causes of Action." Compl. ¶¶ 73-88.

(1) Defendant Haider Shah violated plaintiff's Eighth and Fourteenth Amendment rights when he delayed plaintiff's HCV treatment from October 17, 2002 until June 1, 2006.

(2) Defendant Haider Shah was deliberately indifferent to plaintiff's serious medical needs when he delayed plaintiff's HCV treatments until June 1, 2006, even after he received the psychiatric clearance on October 20, 2005.

(3) Defendant Haider Shah was deliberately indifferent to plaintiff's serious medical needs when he departed from the "new" HCV Primary Care Guidelines from October 20, 2005 until June 1, 2006.

(4) Defendant Haider Shah was deliberately indifferent to plaintiff's serious medical needs when he failed to administer liver function tests every eight to twelve weeks.

*6 (5) Defendant Haider Shah was deliberately indifferent to plaintiff's serious medical needs when he ignored "numerous 'red flags' " regarding plaintiff's condition that indicated that plaintiff was in need of immediate treatment.

(6) Defendant Wright is responsible for the delay between October 23, 2002 and October 13, 2005, when he

changed the HCV policy.

(7) Defendants Wright and Haider Shah were deliberately indifferent to plaintiff's serious medical needs when defendant Haider Shah refused to administer HCV treatment on August 7, 2003 because plaintiff was "too close to going home."

Compl. ¶¶ 73-88.

Both defendants have submitted declarations in support of their motion for summary judgment. (Dkt.Nos.29-15, 29-16). Defendants have also submitted the declaration of John B. Rogers, M.D., whose primary area of practice is Gastroenterology. Rogers Decl. (Dkt. No. 29-21). Dr. Rogers has examined a copy of plaintiff's medical records, dating back to 1995. Rogers Decl. ¶¶ 4, 7 & Ex. B.

Defendant Haider Shah states that he is a clinical care physician with the Medical Department at Marcy, and he has been providing medical services to plaintiff since his arrival at Marcy in 2002 and during the time period relevant to this case. Haider Shah Decl. ¶¶ 2, 4. Defendant Haider Shah has also submitted copies of plaintiff's medical records as Exhibit A.[FN11] In his declaration, defendant Haider Shah gives a short description of HCV in general, stating that, while it is a serious infection, is progression is variable and generally slow. Haider Shah Decl. ¶ 10. Defendant Haider Shah states that HCV may go undetected for a number of years without physical signs or symptoms. *Id.* ¶ 7.

FN11. The medical records have been "traditionally filed" and are not part of the electronic docket. The court notes the medical records submitted by plaintiff are also contained in the defendants' exhibits, except for those records from prior to 1995 that plaintiff has submitted in his appendices. Defendants medical records are more extensive than those submitted by plaintiff.

Dr. Rogers states that HCV has the potential of producing cirrhosis of the liver and/or liver cancer. Rogers Decl. ¶

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

10. HCV is the leading cause of liver cancer in the United States, and thus, it is important to treat the disease "when possible." *Id*. Dr. Rogers states that advances in treatment during the past *six* years have been "particularly helpful," but notwithstanding these advancements, it is not yet possible to cure all individuals who are infected with HCV. *Id*.

The current drug treatment for HCV is a combination of two drugs, pegylated interferon and ribavarin. Rogers Decl. ¶ 11. Dr. Rogers states that treatment is often difficult for the patient because these drugs have many serious side effects, some of which can be considered life-threatening. *Id*. Thus, before starting this treatment, patients must be carefully evaluated to determine if they will have a good chance of tolerating the treatment itself. *Id*. Dr. Rogers states that it is also important to check patients for "coinfections" with Hepatitis B (HBV) or human immune deficiency virus (HIV) because the treatment "is very likely to fail" if the patient has either one of those viruses in addition to HCV. *Id*.

Because of all the above variables regarding whether the existing drug treatment is appropriate, and because of the great number of inmates infected with HCV, DOCS has developed a "protocol" to make certain that all of the necessary information is considered regarding each patient with HCV before starting the drug treatment. Rogers Decl. ¶ 11; Wright Decl. ¶¶ 4-7. Defendant Wright states that DOCS develops and regularly updates "Clinical Practice Guidelines" for various diseases in an effort to maintain the consistency of care and stay current with scientific advances. Wright Decl. ¶ 5. The "Hepatitis C Primary Care Practice Guideline" (the Guidelines) used by DOCS was initially approved on March 31, 1999 and revised December 17, 1999, December 13, 2000, July 20, 2004, and October 13, 2005. Wright Decl. ¶ 6. Copies of these Guidelines are included as Exhibits A-1 to A-3, attached to defendant Wright's declaration.

*7 Defendant Wright states that the Guidelines were developed by a task force of physicians and other health professionals, including DOCS practitioners, and experts from medical colleges and hospitals. Wright Decl. ¶ 5. The Guidelines are based upon many sources of information and research regarding HCV, including publications of the National Institutes of Health (NIH); the United States Centers for Disease Control; the New York State Department of Heath Bureau of Communicable Disease Control; the New England Journal of Medicine; and the Federal Bureau of Prisons Treatment Guidelines for Viral Hepatitis. Wright Decl. ¶¶ 7-8.

Dr. Rogers states that it is now possible to achieve a "cure" in almost fifty percent of the HCV cases after 24 to 48 weeks of treatment, "depending upon the genotype of the virus." Rogers Decl. ¶ 12. Dr. Rogers states that it is "well worth the risks and costs of therapy to prevent the development of cirrhosis of the liver and/or liver cancer which often develops in patients with untreated HCV." Rogers Decl. ¶ 12. If the patient's viral levels remain undetectable six months after completion of the drug therapy, it is considered a "sustained viral response" and the patient may be considered "cured," however, relapses have been reported. Rogers Decl. ¶ 13. The likelihood of a relapse depends upon "individualized" factors, including the virus genotype, the patient's ethnicity, gender, age, the duration of the disease, and alcohol use. *Id*.

The "current" treatment with pegylated interferon and ribavirin was approved by the United States Food and Drug Administration (FDA) in 2001. Wright Decl. ¶ 12. However, there are patients that do not achieve sustained suppression of the virus even after treatment, and they are referred to as "nonresponders." Wright Aff. ¶ 13. Defendant Wright states that at this time, there is no alternative treatment for these individuals. *Id*. There are also patients called "relapsers," who initially respond to the treatment, but experience a re-emergence of the virus. *Id*. In the case of a "relapser," it may be appropriate to explore re-treatment with variations on the duration of therapy and/or the dosage of the drugs. *Id*.

Defendant Haider Shah states that plaintiff was diagnosed with HCV in December of 1995, but was not transferred to Marcy until October of 2002. Haider Shah Decl. ¶¶ 8-9. In 1992, it had been determined that plaintiff had also been exposed to Hepatitis A and B, but had acquired immunity to those viruses. *Id*. ¶ 9. By the time that he was transferred to Marcy, plaintiff's HCV had already progressed to the "chronic" stage. *Id*. Defendant Haider Shah had no responsibility for plaintiff's care until he was transferred to Marcy in 2002.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

Defendant Haider Shah states that he met with plaintiff on October 23, 2002. [FN12] The medical records confirm that October 23, 2002 was the first time that defendant Haider Shah met with plaintiff at Marcy. Haider Shah Decl. Ex. A at 331. On October 17, 2002, plaintiff met with **Nurse Dooley,** and he told the nurse that he wanted a lead level test because he had metal fragments in his abdomen; [FN13] wanted a treatment plan for his HCV; wanted "injections" for his HAV and HBV; and had some concerns about his memory. *Id.*

> FN12. Although as stated above, plaintiff states that the October 17, 2002 AHR entry was based on an examination by defendant Haider Shah, it is clear that the October 17th entry was written by Nurse Dooley, and that defendant Haider Shah's entry is dated October 23rd. Haider Shah Decl. Ex. A at 331.

> FN13. These fragments were apparently the residue of a gunshot wound. Haider Shah Decl. Ex. A at 331.

**\*8** Nurse Dooley advised plaintiff of the "policy" regarding reviewing the record and determining whether plaintiff met the criteria for treatment. *Id.* Nurse Dooley also stated that there would be a follow up with Nurse Perrotta to "review for need." *Id.* Nurse Dooley also questioned the need for "injections" because the medical records indicated "immunity" for HAV and HBV. *Id.* Finally, Nurse Dooley wrote in the AHR entry that plaintiff had an "md" appointment on October 23, 2002. *Id.*

Dr. Haider Shah states that when he met with plaintiff on October 23, they discussed various medical issues. Haider Shah Decl. ¶ 11 & Ex. A at 331. Defendant Haider Shah told plaintiff that the vaccinations for HAV and HBV were not necessary [FN14] and the lead level testing was not necessary. *Id.* Defendant Haider Shah also noted that plaintiff was requesting treatment for HCV, and states in his declaration that he "made a notation on [plaintiff's] AHR requesting a psychiatric consultation ... this was the first of a series of such requests." Haider Shah Decl. ¶ 12 & Ex. A at 311.

> FN14. The reason that vaccinations were not necessary was that although plaintiff had been exposed to both HAV and HBV, the tests showed that his body had already developed an immunity to both. *See* Pl.App. C at 29 ("medical conditions").

Defendant Haider Shah states that some of the risks involved in the HCV treatment include suppression of the bone marrow; damage to the thyroid gland; damage to the heart and kidneys; and depression that can lead to suicide. Haider Shah Decl. ¶ 16. Dr. Haider Shah states that due to the risks, the slow rate of the disease's progression, and the moderate success of the current treatment, "very often it is most reasonable to refrain from drug therapy entirely and await the next innovation in treatment." Haider Shah Decl. ¶ 17.

Defendant Haider Shah states that when an inmate/patient has a history of depression or other serious mental disorder, he must be examined by a psychiatrist and issued a clearance to proceed with the drug therapy for HCV. *Id.* ¶ 21. The drugs may sometimes trigger depression even in those who have no prior psychiatric history, but those who do have such a history are "particularly susceptible." *Id.* Thus, before a DOCS treating physician will submit an HCV treatment request to Albany, [FN15] a psychiatric clearance must be obtained for the inmate. *Id.* A psychiatric clearance is obtained by the DOCS physician submitting a referral/consultation request to the Office of Mental Health (OMH), which oversees the provision of mental hygiene services to DOCS inmates. Haider Shah Decl. ¶ 22. Defendant Haider Shah states that OMH processes and fulfills the request "in due course." *Id* .

> FN15. Before an inmate may be treated for HCV, the treating physician must submit a request for treatment to defendant Wright, the Chief Medical Officer of DOCS. Haider Shah Decl. ¶ 20.

Defendant Haider Shah states that prior to 2002 and during the following years, plaintiff had a "significant history" of clinical depression, was seen by a psychiatrist, and was prescribed medication on a number of occasions. Haider Shah Decl. ¶ 23. Defendant Haider Shah states that "we submitted multiple requests for psychiatric

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

evaluations between October of 2002 and October of 2005, when the clearance was finally obtained. *Id.* ¶ 24 (citing Ex. A at 331 (10/23/02 request); 261 (10/29/04 request); 245-47 (8/5/05 request); and 239 (10/20/05 request)); Pl.App. B at 89-92. Defendant Haider Shah speculates that "it may well be" that the psychiatrists did not clear plaintiff for treatment earlier because between 2002 and 2005, plaintiff was reporting symptoms of depression and was receiving medication off and on for the condition. *Id.* ¶ 25 (citing Ex. A at 293-94 (4/8/04 consult/treatment for depression)).

**\*9** On October 30, 2002, plaintiff had laboratory tests related to his HCV diagnosis. Haider Shah Decl. Ex. A at 325-27. Between 2002 and 2005, testing was done in August of 2003; in January of 2004; February of 2004; in April of 2004; in June of 2004; in July of 2004; in August of 2004; and in May of 2005. Haider Shah Decl, Ex. A at 312-15; FN16 Pl.App. B at 77; Haider Shah Decl. Ex. A at 305-309; 290; 284-85; 278; 273-74; and 250. Plaintiff had laboratory testing in February of 2006 FN17 and twice in March of 2006. Haider Shah Decl. Ex. A at 220-23; 207-208. After plaintiff started his treatments in June of 2006, he was receiving regular laboratory testing to monitor his blood levels. Ex. A at 226 (chart of lab testing). *See also* Pl.App. B at 109 (AHR of June 22, 2006-HCV tracking note regarding the frequency of lab testing).

> FN16. Plaintiff's August 13, 2003 AHR entry has a "Lab" notation, and the following AHR entry for what appears to be February 2004 states "Last Labs 8/03." Pl.Ex. B at 75.

> FN17. The record indicates that on February 11 and 15, 2006. plaintiff did not show up for his laboratory testing, and the tests had to be rescheduled. Haider Shah Decl. Ex. A at 227.

It appears from the medical records that as of January 4, 2006, defendant Haider Shah did not know that the psychiatric clearance had been obtained. Haider Shah Decl. Ex. A at 235 (AHR dated January 4, 2006). However, by February 15, 2006, defendant Haider Shah had requested a referral to a gastroenterologist to approve the HCV treatment and for a liver biopsy, noting that the

psychiatric clearance had been obtained. Haider Shah Decl. Ex. A at 190 (Referral dated February 15, 2006). On March 20, 2006, plaintiff's history and physical were done in anticipation of his liver biopsy. Haider Shah Decl. Ex. A at 210. Plaintiff had the biopsy on March 27, 2006. *Id.* Ex. A at 195 (surgical pathology report of biopsy) FN18. The biopsy report indicated that plaintiff's diagnosis was "chronic hepatitis with stage 3 fibrosis." Haider Shah Decl. ¶ 33 & Ex. A at 195. Defendant Haider Shah states that they then obtained additional blood chemistry tests, including a thyroid hormone analysis. *Id.* & Ex. A at 186. On June 1, 2006, defendant Haider Shah requested a repeat CT Scan based on the plaintiff's complaints of nausea and pain in the area of the lesion. Haider Shah Decl. Ex. A at 180. Defendant Haider Shah states that after considering all the available information, including the biopsy result, he determined that it was appropriate to proceed with the drug therapy requested by plaintiff. Haider Shah Decl. ¶ 33. Final approval was requested from DOCS, and plaintiff obtained his first of a twenty four week dose of HCV medication on June 6, 2006. *Id.*

> FN18. Page 197 of Ex. A is a copy of the biopsy report.

After plaintiff began his drug treatment, the medical records show constant monitoring. In July of 2006, plaintiff complained of abdominal pain, and another CT Scan was performed on July 21, 2006. Haider Shah Decl. Ex. A at 160. On August 3, 2006, plaintiff was noted to be continuing his treatment without complaints. *Id.* at 157. However, on August 6, 2006, plaintiff was "agitated" and wanted to be referred to the mental health department. *Id.* at 155-56. Plaintiff was crying and wringing his hands, but denied thoughts of self-harm or harm to others. *Id.*

**\*10** There are approximately eight entries in plaintiff's medical records in August 2006 alone. *Id.* at 142-53. Plaintiff had laboratory tests and was examined for complaints of headaches. *Id* . The monitoring continued through September and October. *Id.* at 122-42. In November of 2006, plaintiff had an abnormal thyroid and platelet count. *Id.* at 112-16. Plaintiff completed his HCV treatment on December 11, 2006 after 24 weeks. *Id.* at 105. Defendant Haider Shah states that upon completion of the treatment, plaintiff's virus had dropped to undetectable levels. Haider Shah Decl. ¶ 34. However, the

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

virus has re-emerged. *Id.* Both defendant Haider Shah and Dr. Rogers state that the timing of the treatment was not related to the re-emergence of the virus, and that it was unlikely that drug therapy in 2002 would have been any more successful. Haider Shah Decl. ¶ 34; Rogers Decl. ¶ 14. Defendant Haider Shah states that the viral response to the drug therapy depended upon the effect of the drugs upon plaintiff's particular virus and not upon the timing of the drugs. *Id.* ¶ 34.

Plaintiff filed this action on August 29, 2006, during the time that he was receiving his drug treatment. (Dkt. No. 1). Defendants have submitted a great deal of medical records relating to plaintiff's medical care, even after he filed this complaint. A CT Scan performed on January 3, 2007 showed that the lesion in plaintiff's liver had increased in size from 8 by 13 millimeters to 13 by 15 millimeters. Haider Shah Decl. Ex. A at 91. His monitoring continued, however, most of the AHR entries for January and part of February of 2007 are unrelated to plaintiff's HCV. *Id* . at 84-88. Plaintiff was transferred to Elmira Correctional Facility (Elmira) on February 15, 2007. *Id.* at 79-84.

Although plaintiff received laboratory tests while at Elmira, most of the AHR entries are unrelated to plaintiff's HCV. *Id.* at 61-76. Plaintiff was transferred to Clinton Correctional Facility in June of 2007. *Id.* at 58-61. On March 4, 2008, while still at Clinton, plaintiff was examined by an endocrinologist for abnormal thyroid function. *Id.* at 20. The consultant stated that plaintiff's abnormal thyroid readings were likely due to the HCV, however, the consultant stated that plaintiff "[d]oes not need treatment as Interferon is known to be able to cause ... abnormalities in thyroid function...." *Id.* The doctor suggested another test in six to eight months. *Id.* at 9, 20.

### 3. *Personal Involvement*

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986), the Second Circuit detailed the various ways in which a

defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

**\*11** A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.* *See Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)).

In this case, it is clear that defendant Wright, who is the Chief Medical Officer of DOCS, was not involved in plaintiff's day-to-day medical care and was in no way involved in plaintiff's case. Wright Decl. ¶ 3. The only "involvement" by defendant Wright would have been when defendant Haider Shah made the request for the approval of plaintiff's treatment and ordered the medications. Haider Shah Decl. Ex. A at 179, 181. Plaintiff is claiming that the delay in treating him for HCV was the unconstitutional conduct. To the extent that defendant Wright had any actual involvement at all, it was *after* the allegedly unconstitutional delay had occurred.

Plaintiff claims that he can establish personal responsibility either because defendant Wright created an unconstitutional policy or because he failed to properly train physicians such as defendant Haider Shah in the proper care of inmates with HCV. Compl. ¶¶ 70, 71. Plaintiff attempts to hold defendant Wright liable for the allegedly unconstitutional policy of denying inmates HCV treatment if they are within fifteen months of parole, or the policy of denying inmates HCV treatment if they have not participated in a drug treatment program.

The court would first point out that prior to 2005, the HCV Guidelines contained a provision stating that the inmate's "anticipated incarceration" had to be adequate to complete the evaluation and treatment. Wright Decl. Ex. A-2, June 20, 2004 Guidelines at p. 4 (Criteria for

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

Treatment No. 13). The length of anticipated incarceration required was different for different genotypes of the virus: nine months for genotypes 2 and 3 and fifteen months for genotypes 1 and 4, from the time of referral, including the 24-48 week treatment course. *Id.* This section provided that inmates who would not be able to complete a course of treatment due to their time of incarceration would receive a baseline evaluation and be referred for medical follow-up and treatment upon release. *Id.* Additionally, inmates who had a substance abuse history were required to successfully complete or be enrolled in a substance abuse program. *Id.* (Criteria for Treatment No. 11).

In October 2005, the Guidelines were revised, and the above requirements were amended. Wright Decl. Ex. A-1 at p. 2. Instead of requiring the substance abuse program, the new Guidelines "strongly encouraged" inmates with a history of substance abuse to complete the program "since dealing with alcohol or substance use issues is an essential part of their Hepatitis C/liver treatment and protection program." *Id.* (Criteria for Treatment No. 11). Finally, if the inmate does not have an anticipated incarceration adequate to complete the evaluation and treatment, the new Guidelines provide that he could begin the treatment, and he would be followed ***after release*** through the "Continuity Program," as long as the inmate agreed to the conditions of the program. *Id.* (Criteria for Treatment No. 13).

**\*12** While defendant Wright might be responsible for helping to create these guidelines, plaintiff in this case was ***never*** denied treatment ***because of*** the failure to take the substance abuse program since he completed the program in 2000, long before he requested the treatment that became available in ***2002.****See* Haider Shah Decl. Ex. A at 350. Thus, even if defendant Wright were responsible for the "policy," plaintiff was never denied treatment based on this policy.

Plaintiff somehow claims that he also may have been denied the HCV treatment because of the pre-2005 policy limiting treatment based on an inmate's anticipated length of incarceration. There are some notations in the record, indicating that he was going to be paroled in the near future. On August 7, 2003, a nurse noted on plaintiff's AHR that plaintiff "goes home in 30-60 days." *See* Haider Shah Decl. Ex. A at 321. On August 5, 2005, Nurse

Perrotta wrote in the AHR that plaintiff "states [sic] is paroling soon-needs psych eval." *Id.* at 247. Based upon plaintiff's August 5, 2005 statement, on the same day, Nurse Perrotta completed a "Request and Report of Consultation Form," with a similar notation that plaintiff "states [sic] paroling soon-mandatory psy. eval. needed." *Id.* at 245.

Neither of these notations indicates that plaintiff was being denied HCV treatment because he was not going to be incarcerated long enough.[FN19] In any event, by October 13, 2005, DOCS had removed the anticipated length of incarceration requirement from the Guidelines. Although plaintiff states that on August 7, 2003, defendant Haider Shah told plaintiff that "he was too close to going home, '30-60 days', 'not ready for medication,' " plaintiff cites the AHR entry written by Nurse Dooley, ***not*** by defendant Haider Shah. *See* Haider Shah Decl. Ex. A at 321; Pl.Ex. B at 72. In any event, plaintiff was clearly ***not*** being released within 30-60 days of August 7, 2003, nor was "paroling soon" in 2005 when the note was written by Nurse Perrotta. Thus, plaintiff was not subjected to either "policy" that he claims was unconstitutional.

> FN19. In fact, the court notes that the only time that plaintiff's length of incarceration was mentioned in conjunction with HCV treatment was in April of 2002, while plaintiff was still at Franklin, and a Hepatitis Consult Request was completed. Haider Shah Decl. Ex. A at 350. At that time, the older guidelines required at least 15 months, and the individual completing the form stated that plaintiff ***met the criteria.****Id.*

The court notes that in *Hilton v. Vasquez,* 235 F.R.D. 40 (N.D.N.Y.2006), District Judge David N. Hurd certified a class of inmates who had been denied HCV treatment based upon their failure to complete a DOCS-sponsored substance abuse program. *Id.* at 50-54. By memorandum, defendant Wright had voluntarily rescinded the requirement, however, the court was concerned that the plaintiff class would not be assured of the appropriate relief. *Id.* at 46-50. The parties entered into an interim settlement agreement in July of 2007, and on January 2, 2008, Judge Hurd approved the interim agreement as a final settlement agreement. *Hilton v. Vasquez,* 9:05-CV1038, 2008 U.S. Dist. LEXIS 461, 2008 WL

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

53670 (N.D.N.Y. Jan. 2, 2008). The settlement required DOCS to reevaluate any prisoner who was denied treatment for HCV *because of* the ASAT program. *Id.* at *3.

*13 Plaintiff was not, and clearly is not a class member in *Hilton*. Plaintiff in this case has obtained his treatment, and thus, only has a claim for damages. Plaintiff was *never* denied treatment because he failed to participate in a substance abuse program. Nor does the record support that he was ever denied treatment because he was being paroled "soon." [FN20] Thus, plaintiff cannot show that he was denied treatment due to any "policy" that was created or condoned by defendant Wright.

> FN20. The court notes that the amended complaint in *Hilton* also alleged that it was difficult to enroll in the programs due to the number of inmates who took the programs. (Dkt. No. 11 at ¶ 4) (*Hilton* ). The amended complaint further alleged that even if an inmate finally had the opportunity to enroll in the substance abuse program, he would be denied participation in the program if the inmate were going to be released on parole before finishing the program. *Id.* ¶ 5. There was no challenge, however, to the requirement that an inmate had to have enough time remaining on their sentence before they were allowed to get treatment. There were various *other* issues related to the requirement that inmates participate in the substance abuse programs, and one of the important allegations was that the DOCS policy did not allow for individualized assessments of an inmate's drug history or medical condition prior to imposing this requirement. *Id.* ¶ 3.

Plaintiff's HCV drug treatment was delayed because of the requirement that an individual with a prior psychiatric history must be cleared by a psychologist or a psychiatrist prior to beginning the treatment. Although this requirement is one of the criteria for treatment [FN21] and is, thus, part of the DOCS "policy," plaintiff is not challenging the "policy" or the requirement. Plaintiff is claiming that defendant Haider Shah "failed to seek the psychiatric clearance until October 20, 2005," and "failed to acknowledge" that plaintiff was cleared for treatment

for six months after he was cleared, causing an unconstitutional delay in treatment. Compl. ¶ 2.

> FN21.*See* Hepatitis C Primary Care Guidelines dated October 13, 2005, Criteria for Treatment No. 10. Wright Decl. Ex. A-1 at p. 6.

Plaintiff claims that defendant Wright may be held liable because he failed to train and supervise employees such as defendant Haider Shah in the care of inmates who are identified by their treating physicians as being in need of HCV treatment. Compl. ¶ 70. Defendant Wright is the Chief Medical Officer of DOCS and is not located at any particular correctional facility. Because the allegedly unconstitutional policies plaintiff has cited as created by defendant Wright were not applied to plaintiff, plaintiff would now have to show that defendant Wright was "grossly negligent" in supervising defendant Haider Shah. *Colon,* 58 F.3d at 873.

Plaintiff does not claim that defendant Wright had notice of the alleged improper delay in plaintiff's case. Thus, it is unclear how defendant Wright would be "grossly negligent" in supervising defendant Haider Shah, given that the adequacy of the general policy of requiring psychiatric clearances for HCV treatment is *not in dispute.* Thus, plaintiff has failed to show that defendant Wright was personally involved in plaintiff's alleged denial of constitutionally adequate medical care, and any claim for damages may be dismissed as against defendant Wright. The court may proceed to consider plaintiff's medical care claims as against defendant Haider Shah.

**4. *Medical Care***

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

## A. Objective Element

**\*14** In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (citing *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.* The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer,* 511 U.S. at 844-47).

The second part of the objective test asks whether the ***inadequacy*** in the medical care is "sufficiently serious." *Id.* at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id.* (citing *Helling v. McKinney,* 509 U.S. 25, 32-33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)). If the "unreasonable care" consists of a failure to provide ***any*** treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter,* 316 F.3d 178, 185-86 (2d Cir.2003)). However, in cases such as this one, where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the plaintiff is receiving ongoing treatment, and the issue is an unreasonable delay or interruption of the treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith,* 316 F.3d at 185). Thus, the court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for an Eighth Amendment claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* at 280.

## B. Subjective Element

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter,* 501 U.S. 294, 300, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Id.* (citing *Farmer,* 511 U.S. at 835-37). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.* Deliberate indifference is equivalent to subjective recklessness. *Id.* (citing *Farmer,* 511 U.S. at 839-40).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance,* 143 F.3d at 702). The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). The defendant must be subjectively aware that his or her conduct creates the risk, however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer,* 511 U.S. at 844. Thus, the court stated in *Salahuddin,* that the defendant's believe that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin* 467 F.3d at 28.

**\*15** Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques,

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams,* 474 U.S. 327, 332, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

**C. Application**

In this case, plaintiff essentially claims that defendant Haider Shah was deliberately indifferent to plaintiff's serious medical needs because the doctor delayed plaintiff's HCV treatment from October of 2002 until June of 2006 for a series of improper reasons. Plaintiff's other claims, alleging that defendant Haider Shah also failed to "monitor plaintiff's elevated liver functions tests (LFT's), for nineteen straight months, when the HCV protocol called for monitoring every 8-12 weeks; failed to refer plaintiff to a liver specialist; and failed to order a "prescribed" liver biopsy are related to the delay.

No one disputes that HCV is a "serious medical condition." However, since a review of the plaintiff's medical records in this action show that plaintiff received **substantial** medical care for his illness, this court must analyze the Eighth Amendment claim with reference to whether the "delay" was sufficiently serious. The Second Circuit opinion in *Salahuddin* is instructive in this regard. The plaintiff in *Salahuddin* also had HCV, and the defendant doctor cancelled plaintiff's liver biopsy, postponing the procedure for a period of five months. 467 F.3d at 281. The court stated that it could not determine as a matter of law that it was "reasonable" for a prison official to postpone the plaintiff's course of treatment for HCV "because of the possibility of parole without an individualized assessment of the inmate's actual chances of parole." *Id.* The court then assumed that the five-month delay was "objectively serious" because the defendants did not address the issue on appeal.[FN22]

FN22. The Second Circuit pointed out that the defendants incorrectly believed that the objective prong turned upon the severity of plaintiff's HCV, rather than the severity of the delay. *Salahuddin,* 467 F.3d at 281 n. 7. The court relied on the defendants' forfeiture of the argument.

**\*16** The delay in this case was approximately three and one half years, according to plaintiff.[FN23] The court first finds that plaintiff has not raised a material issue of fact regarding the objective factor in the Eighth Amendment analysis. There is no evidence that the delay was "substantially serious." It is clear that on October 23, 2002, defendant Haider Shah's entry in plaintiff's AHR "ordered" a psychiatric clearance. In *Salahuddin,* the defendants did not present any evidence regarding the "seriousness" of the harm caused by the five month delay. 467 F.3d at 281. Unlike defendants in *Salahuddin,* the defendants in this case have presented evidence that the delay was not "substantially serious." Both defendants and Dr. Rogers state in their declarations that because HCV progresses so slowly, the three year delay was "unremarkable." Wright Decl. ¶ 35; Haider Shah Decl. ¶ 34; Rogers Decl. ¶ 14.[FN24] Dr. Rogers states that "it is unlikely that drug therapy in 2002 or 2003 would have been any more successful than the course of therapy [plaintiff] received in 2006." Rogers Decl. ¶ 14. Thus, plaintiff has not raised a genuine issue regarding the objective prong of the test. In any event, assuming that the delay were substantially serious, the court will proceed to analyze the subjective prong of the test.

FN23. As stated above, plaintiff complains about the delay between October of 2002 and June 1, 2006, whereas defendants interpret the "delay" as beginning in October 2002, but ending on October 30, 2005, when plaintiff's psychiatric clearance was obtained.

FN24. Dr. Rogers actually states that "four years is not a particularly long period in the course of a Hepatitis C progression." Rogers Decl. ¶ 14.

Again, reference is made to the analysis in *Salahuddin.* Notwithstanding the question of fact regarding the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

reasonableness of the defendant's actions in *Salahuddin,* the court granted summary judgment for the defendant doctor based upon the subjective element of the analysis. *Id.* at 281-82. The court found that the doctor had written a letter expressing his belief that because "Hepatitis C leads to cirrhosis only over 20 to 30 years, Salahuddin 'is in no immediate danger' and that 'f[ro]m a medical standpoint [,] there is no urgency for [the cancelled liver biopsy].' " *Id.* at 282 (alteration in original). The court stated that while the assumption could have been "unsound" absent an investigation into the progression of the plaintiff's HCV, the doctor's letter was "direct evidence that he was not aware of a substantial risk that postponing the liver biopsy would cause serious harm." *Id.*

The court in *Salahuddin* stated that there was no circumstantial evidence to contradict the doctor's conclusion, distinguishing the court's own decision in *Johnson v. Wright,* 412 F.3d 398 (2d Cir.2005). *See Salahuddin,* 467 F.3d at 282. In *Johnson,* another HCV case, the Second Circuit denied summary judgment because there was evidence raising a genuine issue of material fact surrounding the defendant's decision to administer one drug over another, based upon other treating physicians' recommendations of the rejected medication. *Id.* The court stated that *Johnson* involved a case of "willful blindness," and the idea of "willful blindness" would have required that someone arouse the defendant's suspicion that postponing Salahuddin's biopsy would be seriously harmful. *Id.* (distinguishing *Johnson,* 412 F.3d at 404-05).

*\*17* In this case, defendant Haider Shah's explanation for the delay in providing plaintiff with the HCV treatment is based upon the lack of a psychiatric "clearance" between October 2002 and October 2005. The HCV protocol clearly requires a psychiatric clearance for individuals who have a history of "major depression or other major psychiatric illness." Wright Decl. Ex. A-1, Criteria for Treatment No. 10. The requirement itself is a medical judgment that is not in dispute in this case. In any event, there appears to be no question that one of the side effects of the HCV treatment is "depression with associated suicidal feelings," making the requirement of psychiatric clearance reasonable. *See* Rogers Decl. ¶ 18. Dr. Rogers states that some inmates who receive the HCV treatment "will need to be followed by psychiatry and treated with mood altering drugs." *Id.* ¶ 20.

Defendant Haider Shah states that "multiple requests" were submitted for psychiatric evaluations of plaintiff. Haider Shah Decl. ¶ 24. Plaintiff's October 23, 2002 AHR shows that defendant Haider Shah noted the need for a psychiatric clearance for "possible" HCV treatment. Haider Shah Decl. Ex. A at 331. In his declaration, defendant Haider Shah cites this notation in the AHR as one of the multiple "requests" that were "submitted" for "psychiatric evaluations" between October 2002 and October of 2005. Haider Shah Decl. ¶ 24. The other dates cited by defendant Haider Shah are October 29, 2004; August 5, 2005; and October 20, 2005, the date that clearance was finally obtained. *Id.* (citing Ex. A at 262; 245-47; 239).

A review of the above "requests" shows that the first is a "notation" in the AHR. The second request is a "Mental Health Referral" form, dated October 29, 2004. Haider Shah Decl. Ex. A at 261. The form states that plaintiff was requesting to resume the psychiatric medications that he had refused two months before because of increased "frustration, anxiety, and sleeplessness." *Id.* The AHR contains a nurse's entry, dated October 29, 2004 stating that plaintiff was requesting to resume his Paxil and Vistaril. *Id.* at 263.

The third request consists of an AHR entry and a "Request and Report of Consultation," dated August 5, 2005. Haider Shah Decl. Ex. A at 245, 247. This entry on the AHR is made by a nurse and follows the notation that plaintiff "states" he is paroling soon. *Id.* at 245. The top of the "Request and Report of Consultation" form is also completed by the nurse and states that plaintiff told the nurse that he was paroling soon, and the nurse wrote that plaintiff needed a mandatory psychiatric evaluation. *Id* . at 247. The bottom of the form is blank, indicating that the evaluation was never performed.[FN25]*Id.*

> FN25. It is possible that the evaluation was never performed because plaintiff was *not* paroling soon. It appears from other portions of the plaintiff's medical records that psychiatric evaluations may be required for parole purposes. *See* Haider Shah Decl. Ex. A at 383-84 (Mental Health Status Report for Division of Parole,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

dated August 20, 2001).

The final request is the October 20, 2005 "Request and Report of Consultation," and the AHR entry dated the same day, referencing the HCV treatment as the reason for the request. *Id.* at 239, 240. The bottom of the form was completed on the same day, stating that plaintiff was only treated briefly for "a few months for depression" after the death of a family member and stating that there was no contraindication for the treatment. *Id.* at 239. The AHR entry states that on October 30, 2005, plaintiff was "asking" about the HCV treatment, and defendant Haider Shah referred to all the requests for psychiatric consultation listed above and stated that there had been "no psych. clearance." *Id.* at 240.

**\*18** In the October 30, 2005 AHR entry, defendant Haider Shah refers to another prior request, dated June 25, 2004. *Id.* A review of the June 25, 2004 AHR entry shows that one of defendant Haider Shah's "orders" on that date was a "note to tracking nurse" to check for the "Hep C tx." *Id.* at 286. The entry also states "Ret if not written." *Id.* On October 30, 2005, defendant Haider Shah ordered "Psych. Clearance" and "GI Consult." *Id.* There is a notation by the nurse indicating that she "so noted" the ordered section of the entry.[FN26] *Id.* The October 29, 2004 and August 5, 2005 requests, however, do not reference HCV or HCV treatment as the reason for the referral.

> [FN26.] This notation also appears on the October 23, 2002 entry. Haider Shah Decl. Ex. A at 331.

Interestingly, the record contains various versions of the October 30, 2005 request for psychiatric clearance. Plaintiff himself has submitted four such versions. Pl.App. B at 88-92. One of these versions is simply the referral form with only the top portion (the request) completed. *Id.* at 91. The second has the top portion and the bottom portion (the clearance) completed. *Id.* at 88, 90 (two copies). The third document contains a notation at the bottom, written by defendant Haider Shah, which appears to be dated June 1, 2006, but the notation is very difficult to read. *Id.* at 92. It appears to state "How did it get ... without ... us ... seeing." *Id.* Defendants' exhibit contains the same notation. Haider Shah Decl. Ex. A at 239.

Finally and most interestingly, ***plaintiff's appendix*** contains a version of the document with what appears to be a note copied onto the top left corner of the document, written by Dr. L. Kalias, the doctor who signed the clearance at the bottom. Pl.App. B at 89. The note states "Sorry this took so long-Also FYI-Gave MH approval for Hep C tx today." *Id.* It is unclear why Dr. Kalias would be apologizing for taking "so long," when the form request and the clearance are dated the same day, unless, there had in fact been prior requests that had gone unanswered. This version does not appear in the defendants' exhibits.

It thus appears that although plaintiff seeks to blame defendant Haider Shah for the delay, it may not be completely attributable to this defendant. Defendant Haider Shah also states in his declaration that plaintiff may not have been cleared sooner because between 2002 and 2005, he was reporting symptoms of depression and was receiving medication for the condition. Haider Shah Decl. ¶ 25. The records ***do*** show that plaintiff had periods of psychiatric treatment. Plaintiff had signs of depression as early as January 1995, while he was incarcerated at Collins Correctional Facility. Haider Shah Decl. Ex. A at 534. However, in 1999, plaintiff was psychiatrically evaluated by Dr. David Goldman at Riverview Correctional Facility for the Parole Board, and there were "no current psychiatric problems." *Id.* at 420-23. Dr. Goldman had the same opinion in 2001 when he performed another psychiatric review for the Parole Board.[FN27] *Id.* at 383-85.

> [FN27.] It is clear from these documents that each time an inmate is considered for parole, there is a mandatory psychiatric examination.

**\*19** On February 25, 2002, plaintiff was again examined by Dr. Goldman, who wrote a report, changing plaintiff's OMH level to Level III [FN28] and prescribing Zyprexa. *Id.* at 372. Dr. Goldman wrote a second report the next day, February 26, 2002, continuing plaintiff's OMH level as III. *Id.* at 368-69. Plaintiff was still taking the psychiatric medication when he was transferred to Franklin on March 15, 2002. *Id.* at 365, 368. The medications were discontinued by plaintiff's own request on March 30, 2002. *Id .* at 358-59. His OMH Level was changed to 6 on September 13, 2002. *Id.* at 335.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

FN28. Mental Health Service Level 3 indicates that the inmate needs short term chemotherapy for disorders such as anxiety, moderate depression, or adjustment disorders. Haider Shah Ex. A at 444. (listing of levels). Level 6 is an inmate who does not need Mental Health Services. *Id.* The medical providers use roman numerals and arabic numbers interchangeably to refer to these levels.

Although there was no discussion of plaintiff's mental status in the 2003 medical records, in plaintiff's April 8, 2004 AHR entry, there is a notation that plaintiff was complaining of being depressed, that a relative was dying, and that he wanted to resume his psychiatric medication. Haider Shah Decl. Ex. A at 294. An urgent mental health referral was made. *Id.* at 293. Plaintiff was prescribed his Paxil and Vistaril on April 12, 2004. *Id.* at 291. Although plaintiff stopped taking this medication in June of 2004, he resumed the medication in October of 2004. *Id.* at 261, 263, 283. The court notes that plaintiff did experience some psychiatric problems on August 6, 2006, during the course of his HCV treatment. *Id.* at 155-56.

Defendant Haider Shah also states that aside from plaintiff's psychiatric history, there were physical conditions to consider prior to beginning the HCV treatment. Haider Shah Decl. ¶ 27. The medical personnel were concerned about the risk to plaintiff's thyroid and the scarring of plaintiff's internal organs due to a gunshot wound. *Id.* Defendant Haider Shah points out that plaintiff did experience some thyroid problems as a result of the treatment. *See* Haider Shah Decl. ¶ 27 & Ex. A at 9, 17, 20, 23-24. Plaintiff was referred to a specialist for evaluation. Ex. A at 20.

Although plaintiff in this case complains about the "delay" between October of 2005 and June of 2006 when he began his treatment, there is no evidence of "delay." Dr. Rogers and defendant Wright state that even after the psychiatric clearance was obtained, further evaluation was required, and "significant medical steps" had to be taken before the administration of the treatment. Rogers Decl. ¶ 22; Wright Decl. ¶ 34. Beginning in January of 2004, plaintiff had laboratory tests more frequently.FN29 After the psychiatric clearance was obtained in October 2005, plaintiff was referred to a gastroenterologist, and had a liver biopsy

prior to beginning his treatment in June of 2006. Haider Shah Decl. Ex. A at 192-93 (biopsy report). Plaintiff's extensive medical care continued throughout his HCV treatment and afterward.

FN29. Plaintiff had laboratory testing for liver function done twice in January 2004; July; and October of 2004. Haider Shah Decl. Ex. A at 306, 308-09, 278-81, 268. On October 20, 2004, defendant Haider Shah made a request for a CT scan of plaintiff's abdomen to rule out a possible obstruction of plaintiff's bile duct because plaintiff was complaining of vomiting and weight loss. *Id.* at 260, 269. The CT scan was performed on November 5, 2004. Plaintiff had laboratory tests again on May 25, 2005; February 14, 2006; March 7, 2006; March 16, 2006; and April 4, 2006. *Id.* at 250, 220-23, 217, 211-12, 186.

Defendant Haider Shah states that upon completion of the HCV therapy, plaintiff's viral levels had become almost undetectable, however, the virus reemerged. Haider Shah Decl. ¶ 34. Defendant Haider Shah states that this reemergence was not related to the delay in treatment, but rather due to the effectiveness of the drugs on plaintiff's particular virus. *Id.* Defendant Wright states that by the time that plaintiff had his liver biopsy on March 27, 2006, the fibrosis in his liver had progressed to Stage 3, a severe degeneration, falling short of cirrhosis. Wright Decl. ¶ 27.

**\*20** There is no evidence in this case that defendant Haider Shah was "deliberately indifferent" to plaintiff's condition. At worst the failure of defendant Haider Shah to follow up on the request for psychiatric clearance was inadvertence or negligence,FN30 and it is unclear whether the delay was attributable to defendant Haider Shah since the notation on plaintiff's exhibit from Dr. Kalias contains an apology that the clearance "took so long." The delay appears to have been due to a possible misunderstanding regarding the request for psychiatric clearance.

FN30. The court in no way states this as a "finding."

According to Dr. Rogers, the delay was based on a

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

"combination of legitimate factors." Rogers Decl. ¶ 30. These factors were based on medical reasons, and any delay between obtaining the psychiatric clearance in October of 2005 and the eventual commencement of the treatment in June of 2006 was due to plaintiff undergoing the required tests prior to the administration of the drugs, including plaintiff's biopsy in March of 2006. Rogers Decl. ¶ 31. As in *Salahuddin,* since all of the doctors in this case have indicated that it is their medical judgment that the disease progresses so slowly that even a four year delay would not affect the efficacy of plaintiff's treatment,[FN31] there is no evidence to show that defendant Haider Shah was deliberately indifferent to a serious risk to plaintiff.

> [FN31.] As stated above, although plaintiff initially responded to the treatment, the virus has reemerged. All the doctors state, however, that the re-emergence of the virus is not due to any delay in treatment, but rather due to the type of virus. The doctors state that because plaintiff is a "relapser," the virus would have re-emerged whether he had the treatment in 2002 or 2006. Haider Shah Decl. ¶ 34; Wright Decl. ¶ 27. *See also* Rogers Decl. ¶ 28 ("the likelihood of a different response to the same drugs is not high").

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 29) be **GRANTED,** and the complaint be **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2009.
Motta v. Wright
Slip Copy, 2009 WL 1437589 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)
(Cite as: 2007 WL 2027912 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Efrain J. MUNIZ, Plaintiff,
v.
Glenn S. GOORD, et al., Defendants.
**No. 9:04-CV-0479.**

July 11, 2007.

Efrain J. Muniz, Gouverneur, NY, pro se.

Steven H. Schwartz, Esq., Assistant Attorney General, of
Counsel, Hon. Andrew M. Cuomo, Attorney General for
the State of New York, Albany, NY, for Defendants.

### *DECISION and ORDER*

THOMAS J. McAVOY, United States District Judge.

***1** This matter brought pursuant to 42 U.S.C. § 1983 was
referred to the Hon. George H. Lowe, United States
Magistrate Judge, for a Report-Recommendation pursuant
to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

No objections to the May 2, 2007
Report-Recommendation have been raised. After
examining the record, this Court has determined that the
Report-Recommendation is not subject to attack for plain
error or manifest injustice. Accordingly, this Court adopts
the Report-Recommendation for the reasons stated therein.
It is, therefore, Ordered that:

(1) Defendants' motion for judgment on the pleadings is
    DENIED;

(2) Plaintiff's claims under the Ninth Amendment is
    DISMISSED;

(3) Plaintiff's claims under the Fourteenth Amendment are
    DISMISSED; and

(4) The claims against Defendant Taylor are DISMISSED.

IT IS SO ORDERED.

### *REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This action has been referred to me for Report and
Recommendation by the Honorable Thomas J. McAvoy,
Senior United States District Judge, pursuant to Local
Rule 72.3(c) and 28 U.S.C. § 636(b). Efrain J. Muniz
("Plaintiff") commenced this *pro se* civil rights action
pursuant to 42 U.S.C. § 1983 against three employees of
the New York State Department of Correctional Services
("DOCS")-DOCS Commissioner Glenn S. Goord, DOCS
Chief Medical Officer Dr. Lester Wright, and Gouverneur
Correctional Facility ("Gouverneur C.F.") Superintendent
Justin Taylor. (Dkt. No. 1.) Generally, Plaintiff alleges
that Defendants violated his rights under the Eighth, Ninth
and Fourteenth Amendments by denying him medical
treatment for, and routine testing with regard to the
progress of, his Hepatitis C medical condition because he
refused, in or around October and November of 2003, to
participate in the Residential Substance Abuse Treatment
("RSAT") Program at Gouverneur C.F. (*See generally*
Dkt. No. 1 and Exs. A-D; Dkt. No. 29, Rebuttal Mem. of
Law, ¶ 3.) Currently before the Court is Defendants'
motion for judgment on the pleadings pursuant to
Fed.R.Civ.P. 12(c). (Dkt. No. 27.) For the reasons that
follow, I recommend that Defendants' motion be denied,
but that Plaintiff's Ninth Amendment claim and Fourteenth
Amendment claim should be *sua sponte* dismissed
pursuant to the Court's authority under 28 U.S.C. §
1915(e)(2)(B)(ii), 28 U.S.C. § 1915A, and Rule 12(h)(3)
of the Federal Rules of Civil Procedure.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)
(Cite as: 2007 WL 2027912 (N.D.N.Y.))

## I. STANDARD OF REVIEW

Rule 12(c) of the Federal Rules of Civil Procedure provides, in pertinent part: "After the pleadings are closed ... any party may move for judgment on the pleadings." Fed.R.Civ.P. 12(c). "In deciding a Rule 12(c) motion, [courts] apply the same standard as that applicable to a motion under Rule 12(b)(6)." [FN1]

> FN1. *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.), *cert. denied,* 513 U.S. 816 (1994) (citations omitted); *accord, Patel v. Contemporary Classics of Beverly Hills,* 259 F.3d 123, 126 (2d Cir.2001) ("The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim.").

A defendant may move to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). To prevail on a motion to dismiss under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted," a defendant must show "beyond doubt that the plaintiff can prove no set of facts in support of his claim [that] would entitle him to relief," [FN2] or the defendant must show that the plaintiff's claim "fails as a matter of law." [FN3] Thus, a defendant may base a Rule 12(b)(6) motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Rule 8(a)(2); [FN4] or (2) a challenge to the legal cognizability of the claim. [FN5]

> FN2. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957) (citations omitted); *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998); *see also Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002) ("[A] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.") (internal quotations and citation omitted).

> FN3. *Phelps v. Kapnolis,* 308 F.3d 180, 187 (2d Cir.2002) (citing *Estelle v. Gamble,* 429 U.S. 97, 108, n. 16 [1976].)

> FN4. *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") (citations omitted); *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

> FN5. *See Swierkiewicz* 534 U.S. at 514 ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") (citation omitted); *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b] [6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig .,* 2005 U.S. Dist. LEXIS 6686 (S.D.N.Y. Apr. 20, 2005) ("Although Rule 8 does not require plaintiffs to plead a theory of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)
(Cite as: 2007 WL 2027912 (N.D.N.Y.))

causation, it does not protect a legally insufficient claim.") (citation omitted); *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, *4-5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01 Civ. 4430, 2002 U.S. Dist. LEXIS 1658, *6-7 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b][6] motion-one aimed at the sufficiency of the pleadings under Rule 8[a], and the other aimed at the legal sufficiency of the claims).

**\*2** Rule 8(a)(2) requires that a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Although Rule 8(a)(2) does not require a pleading to state the elements of a prima facie case,[FN6] it does require the pleading to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."[FN7] The purpose of this rule is to "facilitate a proper decision on the merits."[FN8] A complaint that fails to comply with this rule "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims."[FN9]

FN6. *See Swierkiewicz,* 534 U.S. at 511-512, 515.

FN7. *Dura Pharmaceuticals, Inc. v. Broudo,* 125 S.Ct. 1627, 1634 (2005) (holding that the complaint failed to meet this test) (quoting *Conley,* 355 U.S. at 47); *see also Swierkiewicz,* 534 U.S. at 512 (quoting *Conley,* 355 U.S. at 47); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168 (1993) (quoting *Conley,* 355 U.S. at 47).

FN8. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002) (quoting *Conley,* 355 U.S. at 48).

FN9. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

The Supreme Court has characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has rejected judicially established pleading requirements that exceed this liberal requirement. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 513-514 (2002) (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake."). However, even this liberal notice pleading standard "has its limits."[FN10]

FN10. 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003); *see, e.g., Dura Pharmaceuticals,* 125 S.Ct. at 1634-1635 (pleading did not meet Rule 8[a][2]'s liberal requirement), *accord, Christopher v. Harbury,* 536 U.S. 403, 416-422 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr. 26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)
(Cite as: 2007 WL 2027912 (N.D.N.Y.))

continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft, 352 F.3d 521, 525 (2d Cir.2003)* (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." [FN11] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*"[FN12] Indeed, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [FN13]

> FN11.*Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) (citation omitted); *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

> FN12.*Hernandez,* 18 F.3d at 136 (citation omitted); *see also Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) (citations omitted); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) (citation omitted).

> FN13.*Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

Moreover, when addressing a *pro se* complaint, generally a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [FN14] However, "all normal rules of pleading are not absolutely suspended." [FN15] For example, an opportunity to amend should be denied where "the problem with

[plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [FN16]

> FN14.*Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also*Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires"). Of course, granting a *pro se* plaintiff an opportunity to amend is not required where the plaintiff has already been given a chance to amend his pleading.

> FN15.*Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980) (citations omitted), *accord, Gil v. Vogilano,* 131 F.Supp.2d 486, 491 (S.D.N.Y.2001).

> FN16.*Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) (citation omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) (citation omitted).

Finally, as with a Rule 12(b)(6) motion, Rule 12(c) motions are limited to the facts alleged in the complaint and must be converted into a motion for summary judgment if the court considers materials outside the pleadings. [FN17] Having said that, it should be emphasized that, on a motion to dismiss, the court may, without converting the motion to dismiss into a motion for summary judgment, consider (1) any documents relied on and/or referenced in the complaint (even if those documents are not attached to the complaint, if those documents are provided by defendants in their motion to dismiss), [FN18] and (2) any documents provided by the plaintiff in opposition to defendants' motion to dismiss, to the extent those documents are consistent with the allegations in the complaint.[FN19]

> FN17.*See*Fed.R.Civ.P. 12(c) ("If, on a motion for judgment on the pleadings, matters outside

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)
(Cite as: 2007 WL 2027912 (N.D.N.Y.))

the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.").

FN18.*See* *Chambers v. Time Warner,* 282 F.3d 147, 153 & n. 3 (2d Cir.2002) (district court's consideration of certain contracts attached to defendant's motion to dismiss was appropriate where plaintiff relied on documents in drafting his complaint) [collecting cases]; *Levy v. Southbrook Int'l Invest., Ltd.,* 263, F.3d 10, 13, n. 3 (2d Cir.2001) (noting that "it was appropriate for the district court to refer to documents attached to the motion to dismiss since the documents were referred to in the complaint") [citation omitted]; *San LeandroEmergency Med. Group v. Philip Morris Co., Inc.,* 75 F.3d 801, 808 (2d Cir.1996) (a document that is "integral" to the complaint may be considered by the district court on a motion to dismiss "despite the fact that the complaint only contains limited quotations from that document") [collecting cases]; *Harsco Corp. v. Segui,* 91 F.3d 337, 341, n. 1 (2d Cir.1996) ("This letter, though cited to and described in the complaint, was not attached to the complaint. We may nonetheless review the letter in its entirety [in deciding defendants' motion to dismiss].") [citation omitted]; *Cortec Indus., Inc. v. Sum Holding LP,* 949 F.2d 42, 48 (2d Cir.1991) ("When plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated."); *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.,* 936 F.2d 759, 762 (2d Cir.1991) ("We ... decline to close our eyes to the contents of the prospectus and to create a rule permitting a plaintiff to evade a properly argued motion to dismiss simply because plaintiff has chosen not to attach the prospectus to the complaint or to incorporate it by reference.") [citations omitted].

FN19. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96 Civ. 7544, 1997 WL 714878, *1, n. 2 (S.D.N.Y. Nov. 17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) (citations omitted), *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004).

## II. ANALYSIS

### A. Failure to Exhaust Administrative Remedies

**\*3** Defendants argue that Plaintiff's action should be dismissed because his Complaint acknowledges that he failed to exhaust his available administrative remedies before filing suit in April of 2004. (Dkt. No. 27, Part 3.) Specifically, Defendants argue that Plaintiff's Complaint alleges that the "final result" of Plaintiff's Inmate Grievance Complaint regarding the matters in question (i.e., Grievance No. GOV-10351/03) was that the Gouverneur C.F. Inmate Grievance Resolution Committee's ("IGRC's") denial of that grievance was, on appeal, affirmed by Defendant Taylor. (*Id.*) Defendants argue that, through this allegation, Plaintiff implicitly concedes that he subsequently failed to appeal Defendant Taylor's decision to DOCS' Central Office Review Committee ("CORC"), as required by the Prison Litigation Reform Act of 1996. (*Id.*) Finally, Defendants argue that, because Plaintiff had been (at the time in question) an inmate within DOCS for 26 years, it is inconceivable that he was unaware of his right to appeal to CORC (which fact was, incidentally, stated on the written decision issued by Defendant Taylor). (*Id.*)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)
(Cite as: 2007 WL 2027912 (N.D.N.Y.))

Liberally construed, Plaintiff's response asserts what is, in essence, a four-prong argument. First, he argues, it would have been "fruitless" (or futile) to appeal to CORC since Defendant Wright's policy pre-determined the outcome of any grievance regarding prison officials' failure to provide Hepatitis C treatment due to the prisoner's failure to participate in a RSAT or ASAT (although Plaintiff concedes that on February 10, 2006, Defendant Wright ceased requiring such participation in a RSAT or ASAT). (Dkt. No. 29, Rebuttal Mem. of Law, ¶ 3.) Second, Plaintiff argues, he was not able to appeal to CORC due to the fact that he was suffering from the effects of Hepatitis C. (Id. at ¶ 3.) Third, he argues, he "reasonably" and "sincerely" believed that he was excused from having to appeal to CORC due to the health effects of his Hepatitis C condition (even if that belief was, ultimately, mistaken). (Id. at ¶¶ 4-5.) Fourth, he argues, any "technical mistakes" committed by him during the exhaustion process should be excused due to the special leniency that is to be afforded pro se litigants such as Plaintiff, who is "a layman in matters of law." (Id. at ¶¶ 1, 4-5.)

Defendants' reply asserts two arguments. First, argue Defendants, Plaintiff's response should be disregarded because it was filed and served between 15 and 17 days late, in violation of Local Rule 7.1(b)(1), (the "return date" of Defendants' motion being December 11, 2006, the date of filing of Plaintiff's response being December 8, 2006, and the date of service of Plaintiff's response being December 11, 2006). (Dkt. No. 28, Part 1.) Second, argue Defendants, Plaintiff's implication that his poor health precluded him from appealing Defendant Taylor's decision to CORC during the days following that decision (on November 26, 2003) is "disingenuous at best," given that Plaintiff's health was good enough for him to file a lengthy, coherent, and typed Complaint (complete with six exhibits) five months later, in April of 2004. (Id.)

*4 The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a person confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." FN20 DOCS has available a well-established three-step grievance program:

FN20.42 U.S.C. § 1997e.

First, an inmate is to file a complaint with the Grievance Clerk. An inmate grievance resolution committee ("IGRC") representative has seven working days to informally resolve the issue. If there is no resolution, then the full IGRC conducts a hearing and documents the decision. Second, a grievant may appeal the IGRC decision to the superintendent, whose decision is documented. Third, a grievant may appeal to the central office review committee ("CORC"), which must render a decision within twenty working days of receiving the appeal, and this decision is documented.

White v. The State of New York, 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002) (citing N.Y. Comp.Codes R. & Regs. Tit. 7, § 701.7). Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. FN21

FN21.Rodriguez v. Hahn, 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); Reyes v. Punzal, 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. See Hemphill v. State of New York, 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." Hemphill, 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." Id. (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)
(Cite as: 2007 WL 2027912 (N.D.N.Y.))

administrative procedural requirements." *Id.* (citations and internal quotations omitted).

Here, the parties' arguments raise several issues falling under Parts 1 and 3 of the above-described three-part test.[FN22] I note that no issue appears to exist under Part 2 of that test since (1) Defendants have preserved their affirmative defense of non-exhaustion by raising it in their Answer (Dkt. No. 16, Part 1, ¶ 16), and (2) no allegation (or evidence) exists that any Defendant engaged in conduct that hindered or prevented Plaintiff from being able to appeal to CORC sufficient to estop that Defendant from raising this defense (*see* Dkt. No. 29, Rebuttal Mem. of Law, ¶ 3 [arguing that it would have been "fruitless" to appeal to CORC, not that any Defendant took actions preventing Plaintiff from appealing to CORC] ).

> FN22. I reject Defendants' argument that the Court should disregard Plaintiff's response papers as late, because of (1) Defendants' failure to show prejudice as a result of the lateness, and (2) Plaintiff's special status as a *pro se* civil rights litigant (who was, during the time in which he was supposed to file his response papers, allegedly sick).

*5 The issue that falls under Part 1 of the above-described test is created by Plaintiff's argument that it would have been futile to appeal to CORC since Defendant Wright's policy pre-determined the outcome of any grievance regarding prison officials' failure to provide Hepatitis C treatment due to the prisoner's failure to participate in a RSAT or ASAT. I reject this argument for two reasons. First, Plaintiff confuses a prisoner's *ability* to appeal to CORC with a prisoner's *chances of success* during such an appeal. Simply because a prisoner might not stand a realistic chance of success during an appeal does not mean that the administrative appellate process is not "available" to the prisoner. (If so, then any prisoner with an unmeritorious or frivolous claim would not have the administrative appellate process "available" to him.) Second, Plaintiff concedes that on February 10, 2006, Defendant Wright ceased requiring such participation in a RSAT or ASAT. As a result, Plaintiff has alleged facts indicating that, in fact, it might not have been futile for him to appeal to CORC.

The issues that fall under Part 3 of the above-described test are created by Plaintiff's remaining three arguments-(1) that he was not physically able to appeal to CORC due to the fact that he was suffering from the effects of Hepatitis C, (2) that he "reasonably" and "sincerely" believed that he was excused from having to appeal to CORC due to his Hepatitis C condition (even if that belief was, ultimately, mistaken), and (3) that any "technical mistakes" committed by him during the exhaustion process should be excused due to the special leniency that is to be afforded *pro se* litigants such as Plaintiff.

Taking the arguments out of order, I reject the second argument for three reasons. First, the test in question is not whether Plaintiff "sincerely" believed that he was excused from having to appeal to CORC due to his Hepatitis C condition but whether he "reasonably" believed he was so excused (i.e., the test is an objective one, not a subjective one). Second, Plaintiff does not allege any facts whatsoever indicating why he "reasonably" believed that he was excused from having to appeal to CORC due to his Hepatitis C condition. For example, Plaintiff does not allege any facts indicating that any New York State DOCS regulations were confusing.[FN23] Indeed, the regulation in question rather clearly provides that, if mitigating circumstances exist, a prisoner may request an exception to the time limit for filing an appeal to CORC (not that he be excused from having to file an appeal to CORC). *See* DOCS Directive No. 4040 § V(A)(1) (Aug. 22, 2003), codified at 7 N.Y.C.R.R. § 701.6(g) (2007) (formerly codified at 7 N.Y.C.R.R. § 701.7[a], which was repealed and amended on June 28, 2006). Third, Plaintiff's Complaint alleges facts indicating that he believed it necessary to file a grievance with the Gouverneur C.F. IGRC and to appeal the denial of that grievance to the Gouverneur C.F. Superintendent. Why would he not also believe it necessary to take the next step in the exhaustion process and appeal the Superintendent's decision to CORC? Simply stated, I can imagine no factual circumstances, consistent with the allegations of Plaintiff's Complaint (and his response papers), in which he reasonably believed that he was excused from having to appeal to CORC due to his Hepatitis C condition.

> FN23.*See Giano v. Goord,* 380 F.3d 670, 676, 678-679 & n. 9 (2d Cir.2004) (it was reasonable for plaintiff to have raised his complaints through

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)
(Cite as: 2007 WL 2027912 (N.D.N.Y.))

disciplinary appeals process rather than by filing a separate grievance because the relevant DOCS regulations permitted such conduct or were confusing, for example, being misinterpreted by "a learned federal district court judge not long ago"); *Hemphill v. New York Dep't of Corr. Servs.*, 380 F.3d 680, 690-691 (2d Cir.2004) (remanding to district court to determine, *inter alia,* whether the allegedly confusing nature of New York DOCS regulations justified plaintiff's failure to file a grievance in manner that DOCS officials may prescribe); *Johnson v. Testman,* 380 F.3d 691, 696-697 (2d Cir.2004) (remanding to district court to determine, *inter alia,* "whether ... the BOP grievance regulations were sufficiently confusing so that a prisoner like Johnson might reasonably have believed that he could raise his claim against Testman as part of his defense in disciplinary proceedings.").

*6 Moreover, I reject the third argument for two reasons. First, while special leniency might be sufficient to overcome a certain lack of specificity in a pleading and/or to excuse certain minor procedural mistakes, I am aware of no authority suggesting that it is sufficient to excuse a failure to comply with a federal statute such as the PLRA.[FN24] Second, special leniency is normally afforded *pro se* litigants because of their *inexperience* (or lack of familiarity with legal procedures or terminology).[FN25] However, here, Plaintiff has some experience,[FN26] especially when it comes to court actions in which he is alleged to have not exhausted his available administrative remedies prior to filing suit .[FN27] Moreover, I note that Plaintiff's papers in this action have been fairly good-being organized and cogent, and often being typed, supported by exhibits, affidavits, and memorandum of law. (*See* Dkt. Nos. 1, 2, 19, 23.) Indeed, Plaintiff knew enough about court procedure to apply for and receive both an order dismissing the current proceeding without prejudice and an order reopening the proceeding. (*See* Dkt. Nos. 19, 22, 23, 26.) Clearly, Plaintiff is a litigant of at least some level of experience and sophistication.[FN28] While I do not believe that Plaintiff's experience is so extensive that it warrants altogether *revoking* the special status normally afforded pro se civil rights litigants,[FN29] I believe that his experience warrants somewhat *diminishing* his special status.[FN30] Moreover, I believe that this special leniency should be diminished as a sanction due to his apparent lack of candor with the Court. Specifically, Plaintiff

apparently made a material misrepresentation to the Court in his Verified Complaint, wherein he made a sworn assertion that he had never "filed any other lawsuits in any state [or] federal court relating to [his] imprisonment" (Dkt. No. 1, ¶ 5[a] ), when, in fact, as of the date of the signing of his Complaint (April 28, 2004), Plaintiff had apparently done so.[FN31] Numerous cases exist from within the Third Circuit for sanctioning *pro se* litigants for abusing the litigation process, as well as some cases from within the Second Circuit.[FN32]

FN24.*See Houze v. Segarra,* 217 F.Supp.2d 394, 395-396 (S.D.N.Y.2002) (dismissing prisoner's complaint for failure to exhaust administrative remedies, as required by PLRA, after acknowledging that prisoner, as *pro se* litigant, is afforded special leniency); *see also Smith v. Keane,* 96-CV-1629, 1998 U.S. Dist. LEXIS 3702, at *6, 9-18 (S.D.N.Y.1998) (dismissing prisoner's complaint for failure to comply with applicable statute of limitations, after acknowledging that prisoner, as pro se litigant, is afforded special leniency); *Turner v. Johnson,* 177 F.3d 390, 391-392 (5th Cir.1999) ("[N]either a party's unfamiliarity with the legal process nor his lack of representation during the applicable filing period merits [excusing the party's failure to comply with a statute of limitations].").

FN25.*See Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994) (affording special leniency to "a *pro se* litigant unfamiliar with the requirements of the legal system"); *Salahuddin v. Coughlin,* 781 F.2d 24, 29 (2d Cir.1986) (liberally construing *pro se* complaints benefits persons "unfamiliar with the lawyerlike method of pleading claims"); *Edwards v. Selsky,* 04-CV-1054, 2007 WL 748442, at *2-3 (N.D.N.Y. March 6, 2007) (M o r d u e, C.J., a d o p t i n g Report-Recommendation of Lowe, M.J.) (stating that pro se litigants' "lack of [experience] is the reason for conferring the special status upon *pro se* litigants); *see also Korsunskiy v. Gonzales,* 461 F.3d 847, 850 (7th Cir.2006); *Int'l Bus. Prop. v. ITT Sheraton Corp.,* 65 F.3d 175, at *2 (9th Cir.1995); *Collins v. Cundy,* 603 F.2d 825, 827 (10th Cir.1979); *Zaczek v. Fauquier County,*

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)
(Cite as: 2007 WL 2027912 (N.D.N.Y.))

764 F.Supp. 1071, 1078 (E.D.Va.1991); *Life Science Church v. U.S.,* 607 F.Supp. 1037, 1039 (N.D.Ohio 1985); John C. Rothermich, *Ethical and Procedural Implications of 'Ghostwriting' for Pro Se Litigants: Toward Increased Access to Civil Justice,* 67 FORDHAM L.REV. 2687, 2697 (Apr.1999) [citing cases].

FN26. Specifically, it appears that Plaintiff has filed between two and eight state court actions or appeals. *See, infra,* note 31 of this Report-Recommendation.

FN27. *Muniz v. David,* No. 96428, Memorandum and Order at 2 (N.Y.App.Div., 3d Dept., March 24, 2005) (indicating that defendants in that action had argued before the trial court, at some point before the issuance of its judgment on June 4, 2004, that Plaintiff had "failed to exhaust the administrative remedies through the available grievance procedures or establish any exceptions thereto").

FN28. When assessing a *pro se* litigant's experience for purposes of deciding whether or not to revoke his special status, courts sometimes examine things such as (1) the quality of his pleadings (e .g., whether they are typed, crafted in accordance with the relevant rules of civil procedure, etc.), (2) the cogency of his motion papers (e.g., whether they are supported by applicable legal authorities, filed in accordance with court rules, etc.), and (3) the ultimate success of any motions, actions or appeals he has previously filed (or the failure of any motions he has previously opposed). *See, e.g., Edwards,* 2007 WL 748442, at *3; *Rolle v. Garcia,* 04-CV-0312, 2007 WL 969576 (N.D.N.Y. March 28, 2007) (McAvoy, J.), adopting Report-Recommendation, 2007 WL 672679, at *4 (N.D.N.Y. Feb. 28, 2007) (Lowe, M.J.); *Sledge v. Kooi,* 04-CV-1311, 2007 WL 951447, at *3-4 (N.D.N.Y. Feb. 12, 2007) (McAvoy, J., adopting Report-Recommendation of Lowe, M.J.); *Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *2 & n. 11 (N.D.N.Y. Oct. 18, 2 0 0 6 )  ( H u r d ,  J . ,  a d o p t i n g

Report-Recommendation of Lowe, M.J.); *see also Farmer v. Haas,* 990 F.2d 319, 322 (7th Cir.1993); *Ab v. Sekendur,* 03-CV-4723, 2004 WL 2434220, at *5 (N.D.Ill. Oct. 28, 2004). Such a practice seems appropriate in that it is consistent with the standard often used by courts to decide whether or not to appoint counsel to a *pro se* litigant. *See, e.g., Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir.1986); *see also Tabron v. Grace,* 6 F.3d 147, 155-156 (3d Cir.1993); *Farmer,* 990 F.2d at 322; *Terrell v. Brewer,* 935 F.2d 1015, 1017 (9th Cir.1991); *Long v. Shillinger,* 927 F.2d 525, 527 (10th Cir.1991).

FN29. *See, e.g., Johnson v. Eggersdorf,* 8 Fed. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, *2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994); *Gill v. Pidylpchak,* 02-CV-1460, 2006 WL 3751340, at *2 (N.D.N.Y. Dec. 19, 2006) (Scullin, J., adopting report-recommendation of Treece, M.J.); *Davidson v. Talbot,* 01-CV-0473, 2005 U.S. Dist. LEXIS 39576, at *20 (N.D.N.Y. March 31, 2005) (Treece, M.J.), *adopted by* 2006 U.S. Dist. LEXIS 47554 (N.D.N.Y. July 5, 2006) (Scullin, J.); *Gill v. Riddick,* 03-CV-1456, 2005 U.S. Dist. LEXIS 5394, at *7 (N.D.N.Y. March 31, 2005) (Treece, M.J.); *Yip v. Bd. of Tr. of SUNY,* 03-CV-0959, 2004 WL 2202594, at *3 (W.D.N.Y. Sept. 29, 2004); *Davidson v. Dean,* 204 F.R.D. 251, 257 & n. 5 (S.D.N.Y.2001); *Santiago v. C.O. Campisi,* 91 F.Supp.2d 665, 670 (S.D.N.Y.2000); *McGann v. U.S.,* 98-CV-2192, 1999 WL 173596, at *2 (S.D.N.Y. March 29, 1999); *Hussein v. Pitta,* 88-CV-2549, 1991 WL 221033, at *4 (S.D.N.Y. Oct. 11, 1991).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)
(Cite as: 2007 WL 2027912 (N.D.N.Y.))

FN30. My review of the applicable law suggests that courts need not treat special status as an "all or nothing" benefit but may confer special status to a semi-experienced *pro se* litigant on a "sliding scale," treating the litigant more leniently than represented litigants but not as leniently as wholly inexperienced *pro se* litigants. *See, e.g., Kilkenny v. Greenberg Traurig, LLP,* 05-CV-6578, 2006 23399, at *18 (S.D.N.Y. Apr. 26, 2006) ("While plaintiff's *pro se* status does not insulate him from the imposition of sanctions under Rule 11 ..., *pro se* litigants are held to a more lenient standard, and the application of Rule 11 may be determined on a sliding scale according to the litigant's level of sophistication.") [citations and internal quotation marks omitted]; *Holsey v. Bass,* 519 F.Supp. 395, 407 n. 27 (D.Md.1981) ("This Court is of the opinion that it is proper to apply a sliding scale of liberality in construing a *pro se* complaint.") [citation omitted]; *see also* Julie M. Bradlow, *Procedural Due Process Rights of Pro se Civil Litigants,* 55 U. CHI. L.REV.. 659, 660 (Spring 1988) (asserting that, in *pro se* civil litigation, a "sliding scale" of due process should be employed by judges to ensure that they give "such leniency and special attention as the particular case merits").

FN31.*See, e.g., Efraim Muniz v. David,* No. 96428, Memorandum and Order (N.Y.App.Div., 3d Dept., March 24, 2005) (stating, "This proceeding was commenced in October 2003"). I note that the plaintiff in the aforementioned prisoner action-"Efraim Muniz" of Governor C.F.-bears the same name of record as the prisoner of record bearing New York State DOCS Inmate Number 80-A-0959, the inmate number claimed by Plaintiff in the current action. I note also that, according to the New York DOCS Inmate Locator System, no other prisoner in the New York State DOCS has ever been named "Efraim Muniz." In other words, either the DOCS Inmate Locator System contains a typographical error for Plaintiff's record entry or Plaintiff answers to both names.

Finally, I note that it is unclear whether several

other prisoner actions and appeals were also brought by Plaintiff or the one other "Efrain Muniz" who has ever been incarcerated by the New York State DOCS. *See, e.g., Efrain J. Muniz v. N.Y.S. Div. of Parole,* 695 N.Y.S.2d 619 (N.Y.App.Div., 3d Dept., 1999); *Efrain Muniz v. Selsky,* No. 91967, Memorandum and Judgment (N.Y.App.Div., 3d Dept., Jan. 9, 2003); *Efrain J. Muniz v. Goord,* 820 N.Y.S.2d 368 (N.Y.App.Div., 3d Dept., 2006).

FN32.*See, e.g., Iwachiw v. N.Y.S. Dept. of Motor Veh.,* 396 F.3d at 528-529 & n. 1 (2d Cir.2005); *McDonald v. Head Crim. Ct. Supervis. Officer,* 850 F.2d 121, 124-125 (2d Cir.1988); *Mora v. Bockelmann,* 03-CV-1217, 2007 WL 603410, at *4 (N.D.N.Y. Feb. 22, 2007) (Mordue, C.J., adopting Report-Recommendation of Homer, M.J.); *Mitchell v. Harriman,* 04-CV-0937, 2007 WL 499619, at *3 (N.D.N.Y. Feb. 13, 2007) (Sharpe, J., adopting Report-Recommendation of Homer, M.J.); *Tibbetts v. Robinson,* 97-CV-2682, 2005 WL 2146079, at *7 (D.Conn. Aug. 31, 2005).

Finally, I am skeptical of the first arguments for two reasons. First, Plaintiff does not allege specific facts indicating why he was not able (presumably, physically able) to file an appeal to CORC during the days or weeks following November 26, 2003. (For example, was it because he did not have the strength to think clearly or write, or was it because he did not have access to paper and legal materials for some reason? Was he housed in the prison's infirmary during this time period, and how long was he allegedly incapacitated?) I note that Plaintiff's allegation that he was unable to file an appeal to CORC during the days or weeks following November 26, 2003, appears undermined somewhat by Exhibit C to his Complaint, which indicates that, on January 12, 2004 (approximately six weeks after November 26, 2003), Plaintiff was in a good enough physical condition to write a letter to a DOCS official (apparently Brenda Tracy, a Nurse Administrator), regarding a doctor's decision to not prescribe vitamins for Plaintiff. (Dkt. No. 1, Ex. C.) [FN33] Second, Plaintiff does not allege facts indicating why he did not, or was not able to, request an exception to the time limit for filing an appeal to CORC due to the "mitigating circumstances" created by his illness (and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)
(Cite as: 2007 WL 2027912 (N.D.N.Y.))

then, if necessary, file a separate grievance regarding any denial of that request for an exception). *See* DOCS Directive No. 4040 § V(A)(1) (Aug. 22, 2003), codified at 7 N.Y.C.R.R. § 701.6(g) (2007) (formerly codified at 7 N .Y.C.R.R. § 701.7[a], which was repealed and amended on June 28, 2006).

> FN33. However, I am not persuaded by Defendants' argument that Plaintiff must have been physically able to file an appeal to CORC during the days or weeks following November 26, 2003, because Plaintiff was able to file his Complaint in this action approximately five months later, in April of 2004. Setting aside the issue of whether the Court's consideration of such a fact would arguably necessitate converting Defendants' motion into a motion for summary judgment, I note the lengthy time lag between the two dates.

*7 However, despite this skepticism about Plaintiff's first argument, I am reluctant to recommend dismissal of Plaintiff's Complaint based on a failure to exhaust his administrative remedies. Specifically, I am mindful of how low the pleading standard is under Rules 8 and 12 of the Federal Rules of Civil Procedure and various Supreme Court precedents. *See, supra,* Part I of this Report-Recommendation. Morever, I am mindful that, within the Second Circuit, "it may often be premature to decide the issue of exhaustion in the context of a motion to dismiss the complaint under Rule 12(b)(6); rather it may be necessary for the Court to address the issue at the summary judgment stage." *Flynn v. Wright,* 05-CV-1488, 2007 WL 241332, at *12 (S.D.N.Y. Jan. 26, 2007) (citing *Ziemba v. Wezner,* 366 F.3d 161, 163-164 [2d Cir.2004] [vacating magistrate judge's granting of defendants' motion for judgment on pleadings for failing to exhaust administrative remedies] ).FN34 Finally, I am mindful that, recently, the Supreme Court expressed disapproval of dismissing prisoner actions for failure to exhaust administrative remedies under a Rule 12(b)(6) analysis. *See Jones v. Block,* 127 S.Ct. 910, 919-923 (2007).

> FN34.*Accord, Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *8 (S.D.N.Y. Dec. 6, 2006).

More specifically, I find that Plaintiff's assertions, in his response papers, FN35 that, in light of his Hepatitis C condition, he "did the very best [his] ability and health allowed [him] at the time" to grieve the matters at issue in this action "plausibly alleges" the existence of "special circumstances" justifying his failure to appeal to CORC (as permitted by *Hemphill v. State of New York,* 380 F.3d 680 [2d Cir.2004] and its companion cases), and meets-albeit *barely*-the "modest" pleading threshold set by Rules 8 and 12 of the Federal Rules of Civil Procedure and Supreme Court precedent such as *Jones v. Block,* 127 S.Ct. 910 (2007), *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002), and *Leatherman v. Tarrant County Narc. and Intell. Coord. Unit,* 507 U.S. 163 (1993). I note that at least one analogous case exists, from within the Second Circuit, in which a prisoner was found to have plausibly alleged special circumstances due to physical incapacitation. FN36

> FN35. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov. 17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) (citations omitted), *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) (citations omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)
(Cite as: 2007 WL 2027912 (N.D.N.Y.))

FN36.*See Barad v. Comstock,* 03-CV-0736, 2005 U.S. Dist. LEXIS 38418, at \*10-11, 16-17, 21-23 (W.D.N.Y. June 30, 2005) (prisoner plausibly alleged special circumstances where he alleged, in part, that time to commence grievance had lapsed while he had been hospitalized due to kidney stones, although his complaint was ultimately dismissed under a summary judgment analysis); *cf. Bonilla v. Janovick,* 01-CV-3988, 2005 U.S. Dist. LEXIS 325, at \*6-7 (E.D.N.Y. Jan. 7, 2005) ("[P]laintiff's hospitalization and physical injuries may have prevented the filing of an administrative complaint, [necessitating] further discovery and additional depositions ... to determine whether the admitted failure to exhaust should nevertheless be excused [due to the 'special circumstances' exception]."

As a result, I recommend that the Court deny Defendants' motion for judgment on the pleadings. However, I express no opinion about whether Plaintiff would or would not be able to survive a motion for *summary judgment* (premised on a failure to exhaust administrative remedies), should Defendants choose to file such a motion.[FN37]

FN37.*See Barad,* 2005 U.S. Dist. LEXIS 38418, at \*21, 22, 25 (during summary judgment analysis, accepting defendants' argument that plaintiff "was physically able to file a grievance" during his fourteen-day hospitalization due to kidney stones because "plaintiff testified that he was able to write [and attend a program] during his hospitalization," although ultimately finding that plaintiff had established other special circumstances, i.e., [1] that the correctional facility's medical staff had erroneously told plaintiff that his time to commence a grievance had lapsed, and [2] that plaintiff had relied on Second Circuit law at that time [in 1999] which did not require exhaustion of administrative remedies for such deliberate indifference claims); *cf. Goldenberg v. St. Barnabas Hosp.,* 01-CV-7435, 2005 U.S. Dist. LEXIS 2730, at \*11-16 (S.D.N.Y. Feb. 22, 2005) (granting defendants' motion for summary judgment, in part because plaintiff adduced no evidence in

support of his claim that administrative remedies were not "available" to him [i.e., during an analysis of Part 1 of the Second Circuit's three-part test] insofar as he was, during the relevant time period, in a physically and mentally debilitated state).

**B. Duty of Court to *Sua Sponte* Analyze Pleading Sufficiency of Claims**

An analysis of Defendants' failure-to-exhaust argument does not end the Court's review of Plaintiff's claims. This is because, under 28 U.S.C. § 1915(e)(2)(B)(ii), 28 U.S.C. § 1915A, and Rule 12(h)(3) of the Federal Rules of Civil Procedure, the Court has the authority (and duty) to *sua sponte* dismiss prisoner claims that fail to state a claim upon which relief may be granted or over which the Court lacks subject-matter jurisdiction. As a result, I will analyze Plaintiff's Eight, Ninth and Fourteenth Amendment claims for such defects.

**1. Failure to State a Claim Under the Eighth Amendment**

**\*8** Generally, to state a claim of inadequate medical care under the Eighth Amendment, Plaintiff must allege facts indicating two things: (1) that he had a sufficiently serious medical need; and (2) that Defendants were deliberately indifferent to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). With regard to the second element, an official is "deliberately indifferent" (in other words, he has a sufficiently culpable state of mind) when he " 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Johnson v. Wright,* 412 F.3d 398, 403 (2d Cir.2005) (citing *Farmer v. Brennan,* 511 U.S. 825, 837 [1994] ).

Here, I will assume for the sake of argument that Plaintiff's Hepatitis C condition constitutes a "serious medical need" for purposes of the Eighth Amendment.[FN38] The more problematic question is whether Plaintiff has alleged facts

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)
(Cite as: 2007 WL 2027912 (N.D.N.Y.))

indicating the sort of culpable state of mind (which is akin to criminal recklessness) necessary for liability under the Eighth Amendment.[FN39] It is arguable that he has simply alleged facts indicating a disagreement with his prescribed medical care, or perhaps negligence, neither of which is enough to make a defendant liable to a plaintiff under the Eighth Amendment.[FN40] For example, the documents relied on and/or referenced in Plaintiff's Complaint (and thus deemed part of Plaintiff's Complaint) *appear* to suggest that, at the time that Plaintiff was denied medical treatment for Hepatitis C, it was not deemed medically appropriate for Plaintiff to engage in such medical treatment without having first enrolled in the RSAT Program, due to the increased risk of liver damage.[FN41] If those documents more clearly indicated a medical rationale for the requirement that Plaintiff participate in the RSAT Program, I would be inclined to conclude that Plaintiff has not alleged facts indicating a violation of the Eighth Amendment.[FN42] However, they do not do so. Moreover, again, I am mindful of how low the pleading standard is under Rules 8 and 12 of the Federal Rules of Civil Procedure. I am also mindful that, unlike many similar cases brought by prisoners, Plaintiff alleges not only a denial of treatment for Hepatitis C but of *testing* for the progress of that disease (which denial appears to be more difficult to justify under the rationale apparently proffered in Exhibits A2 and D to Plaintiff's Complaint).

FN38. Some district court decisions from within the Second Circuit have found Hepatitis C to not constitute a serious medical need. *See Vondette v. McDonald,* 00-CV-6874, 2001 WL 1551152, at *4-5 (S.D.N.Y. Dec. 5, 2001). However, it appears that the bulk of district court decisions addressing the issue finds that Hepatitis C is a serious medical need. *See Rose v. Alves,* 01-CV-0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept. 9, 2004); *Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan. 23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01-CV-6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99-CV-3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

FN39. " 'The required state of mind [for a deliberate indifference claim under the Eighth

Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.' " *Evering v. Rielly,* 98-CV-6718, 2001 U.S. Dist. LEXIS 15549, at *30 (S.D.N.Y. Sept. 28, 2001) (quoting *Hemmings v. Gorczyk,* 134 F.3d 104, 108 [2d Cir.1998] ).

FN40. *See Estelle,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Chance,* 143 F.3d at 703 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.").

FN41. (*See* Dkt. No. 1, Ex. A2 ["[T]he facility is acting in accordance with direction provided by Central Office. The policy regarding Hepatitis C Treatment/Substance Abuse Treatment is addressed in a memorandum dated January 8, 2002, which states in part: 'Any inmate who is diagnosed with Hepatitis C and requires medical treatment must have completed or have enrolled in an Alcohol Substance Abuse Treatment, Comprehensive Alcohol Substance Abuse Treatment, Resident Substance Abuse Treatment, or Pre-Treatment Workbook Program ....''']; Dkt. No. 1, Ex. D ["While to the general public hepatitis is simply a disease, the medical community views it more accurately as an inflamed liver.... Most new [Hepatitis C] infections are caused by intravenous drug use. Disease progression can ... occur more often if the person drinks alcohol."].)

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)
(Cite as: 2007 WL 2027912 (N.D.N.Y.))

FN42. *See Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *13-15 (N.D.N.Y. Jan. 23, 2007) (Kahn, J., adopting Report-Recommendation of Lowe, M.J.) (finding that prisoner's Eighth Amendment claim regarding denial of hepatitis treatment based on his non-participation in ASAT program should be dismissed on alternative ground that he failed to state a claim, given that the documents attached to prisoner's complaint and response papers clearly indicated that, at the time, it was not deemed medically appropriate for the plaintiff to engage in medical treatment for Hepatitis C without having first enrolled in the ASAT Program).

As a result, I am unable to conclude, without briefing by Defendants, that Plaintiff has failed to state an Eighth Amendment claim under the circumstances.[FN43] However, again, I express no opinion about whether Plaintiff would or would not be able to survive a motion for summary judgment (with respect to his Eighth Amendment claim), should Defendants choose to file such a motion. *See Lewis v. Alves,* 01-CV-0640, 2004 WL 941532, at *5-7 (W.D.N.Y. March 22, 2004) (granting defendants' motion for summary judgment with respect to plaintiff's Eighth Amendment claim alleging, *inter alia,* deliberate indifference to plaintiff's Hepatitis C condition due to his non-participation in an ASAT Program), *accord, Rose v. Alves,* 01-CV-0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept. 9, 2004); *cf. Graham v. Wright,* 01-CV-9613, 2003 U.S. Dist. LEXIS 16106, at *6 n. 5 (S.D.N.Y. Sept. 12, 2003) ("[W]e note that the portions of the [DOCS] Guidelines challenged by plaintiff, namely that the inmate must successfully complete an ASAT program ... [before he receives treatment for Hepatitis C] appear to be highly rational in light of the fact that severe side effects, including death, may result from treatment of the patient with interferon-apha-2b or 2a combined with ribavirin for 6-12 months, and that active substance abuse, including alcohol abuse, can cause life threatening consequences to a patient following the treatment regimen.").

FN43. *See McKenna v. Wright,* 386 F.3d 432, 434, 437 (2d. Cir.2004) (prisoner stated Eighth Amendment claim for deliberate indifference to his Hepatitis C based on his non-participation in ASAT program where he alleged that he had been deemed "ineligible for the [ASAT] program

because of his medical condition"); *Hatzfield v. Goord,* 04-CV-0159, 2007 WL 700961, at *1-5 (N.D.N.Y. Feb. 28, 2007) (Mordue, C.J., adopting Report-Recommendation of Homer, M.J.) (prisoner stated First, Eighth and Fourteenth Amendment claims with regard to defendants' failure to treat his Hepatitis C condition based on his non-participation in RSAT/ASAT program where he alleged that his participation in the RSAT/ASAT program would have violated his religious beliefs); *Hilton v. Wright,* 235 F.R.D. 40, 44-55 (N.D.N.Y. Feb. 27, 2006) (Hurd, J.) (assuming, without specifically deciding, that class of prisoners had stated a viable Section 1983 claim regarding DOCS' policy of requiring prisoners' participation in ASAT/RSAT program before prisoners could receive treatment for Hepatitis C).

**2. Failure to State a Claim Under the Ninth Amendment**

**\*9** In one paragraph of his Complaint, Plaintiff states that his claims are brought pursuant to, *inter alia,* the Ninth Amendment. (Dkt. No. 1, ¶ 7.3.) The Ninth Amendment to the United States Constitution provides, "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. Const., amend. IX. I can find no factual allegations in Plaintiff's Complaint in support of his Ninth Amendment claim. (*See generally* Dkt. Nos. 1, 29.) Moreover, I can imagine no set of factual circumstances, consistent with the allegations of Plaintiff's Complaint, in which such a Ninth Amendment claim might exist. (*Id.*) As explained by the Tenth Circuit:

Although the Ninth Amendment may restrict the activities of state actors ..., it has never been applied to prevent the denial of medical treatment to prisoners. Indeed, such an application would be inappropriate, since the Ninth Amendment only protects those rights not otherwise 'enumerat[ed] in the Constitution,' ... and the Eighth Amendment specifically addresses itself to the mistreatment of prisoners ....

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)
(Cite as: 2007 WL 2027912 (N.D.N.Y.))

*Parnisi v. Colo. State Hosp.,* No. 92-1368, 1993 U.S.App.
LEXIS 9128, at *2, 4-5 (10th Cir. Apr. 15, 1993)
(affirming district court's dismissal of prisoner's Ninth
Amendment claim, arising from allegedly inadequate
medical treatment) [citations omitted].[FN44] Courts from
within the Second Circuit have similarly recognized the
inapplicability of the Ninth Amendment to prisoner
Section 1983 claims. *See, e.g., Diaz v. City of New York,*
00-CV-2944, 2006 U .S. Dist. LEXIS 93923, at *21-22
(E.D.N.Y. Dec. 29, 2006) ("[T]he Ninth Amendment is a
rule of construction, not one that protects any specific
right, and so no independent constitutional protection is
recognized which derives from the Ninth Amendment and
which may support a § 1983 cause of action.") [internal
quotation marks and citations omitted], *accord, Bussey v.
Phillips,* 419 F.Supp.2d 569, 586 (S.D.N.Y.2006) [citing
case].

FN44.*See also Taylor v. Roper,* 83 F. App'x 142,
143 (8th Cir.2003) ("We also agree with the
district court that [the prisoner's] allegations
[regarding inadequate medical care] provided no
basis for his claims ... under ... the Ninth
Amendment ...."); *Gaberhart v. Chapleau,* No.
96-5050, 1997 U.S.App. LEXIS 6617, at *3 (6th
Cir. Apr. 4, 1997) (dismissing the prisoner's
Ninth Amendment claim, arising from allegedly
inadequate medical treatment, in part because he
"never explained the theory or at least the basis"
for that claim).

The closest that Plaintiff comes to stating such a Ninth
Amendment claim is when he alleges that prisoners are
being "denied mental health services for Hapatitis
C[-]related mental *disturbances* and anxiety," and that
their "confidentiality is being violated." (Dkt. No. 1,
"Third Cause of Action." [emphasis in original].) Granted,
the Ninth Amendment may, in some circumstances,
protect the disclosure of some personal information about
a prisoner (e.g., regarding the prisoner's mental health).
*See Morgan v. Rowland,* 01-CV-1107, 2006 U.S. Dist.
LEXIS 11081, at *28-30 (D.Conn. March 17, 2006)
(granting defendants' motion for summary judgment with
regard to such a claim); *see also Hunnictt v.. Armstrong,*
152 F. App'x 34 (2d Cir.2005) (unpublished decision),
*vacating in part,*305 F.Supp.2d 175, 187-188
(D.Conn.2004) (presuming that prisoner was not alleging
Ninth Amendment right-to-privacy claim).[FN45] However,

again, Plaintiff asserts no factual allegations in support of
this claim. For example, Plaintiff does not allege any facts
indicating that Defendants discussed Plaintiff's private or
personal mental health issues in front of other prisoners
and DOCS employees, violating either the
psychiatrist-patient privilege or psychologist-patient
privilege. (*See generally* Dkt. Nos. 1, 29.) Furthermore,
Plaintiff's request to litigate this matter as a class action
was denied; thus, it is not relevant, *for purposes of this
action,* what wrongs *other* prisoners (especially
unidentified prisoners) are allegedly experiencing.

FN45.*But see In re State Police Litig.,* 888
F.Supp. 1235, 1258 (D.Conn.1995) ("[T]he
[Ninth] [A]mendment does not guarantee any
constitutional right [e.g., to privacy] sufficient to
support a claim under 42 U.S.C. § 1983.")
[citations omitted], *appeal dismissed,*88 F.3d
127 (2d Cir.1996); *accord, Salaman v. Bullock,*
05-CV-0876, 2007 U.S. Dist. LEXIS 24432, at
*8 (D.Conn. March 15, 2007), *DeLeon v. Little,*
981 F.Supp. 728, 734 (D.Conn.1997), *Doe v.
Episcopal Soc. Servs.,* 94-CV-9171, 1996 U.S.
Dist. LEXIS 1278, at *3-4 (S.D.N.Y. Feb. 7,
1996).

*10 As a result, I recommend that the Court *sua sponte*
dismiss Plaintiff's Ninth Amendment claim. However,
because the defect in any right-to-privacy claim that
Plaintiff may be attempting to assert appears to be formal
instead of substantive, I recommend that the dismissal of
any such right-to-privacy claim be conditioned on
Plaintiff's failure to file an Amended Complaint asserting
a viable Ninth Amendment claim within 30 days of the
Court's final decision on Defendants' motion.

**3. Failure to State a Claim Under the Fourteenth
Amendment**

In one paragraph of his Complaint, Plaintiff states that his
claims are brought pursuant to, *inter alia,* the Fourteenth
Amendment. (Dkt. No. 1, ¶ 7.3.) Assuming that Plaintiff
is not simply relying on the Fourteenth Amendment to the
extent that it makes the Eighth Amendment applicable to
the states, the only conceivable claims to which Plaintiff
might be referring are his claims for a violation of his right

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)
(Cite as: 2007 WL 2027912 (N.D.N.Y.))

to substantive due process, procedural due process, or equal protection. However, I can find no factual allegations in support of any such claims.

Specifically, to the extent that Plaintiff is attempting to assert some sort of due process claim, any such claim is in actuality an Eighth Amendment claim, which I have already analyzed above in Part II.B.1. of this Report-Recommendation. *See Hatzfield v. Goord,* 04-CV-0159, 2007 WL 700961, at *1 n. 3 (N.D.N.Y. Feb. 28, 2007) (Mordue, C.J., adopting Report-Recommendation of Homer, M.J.) (citing *Pabon v. Wright,* 459 F.3d 241, 253 [2d Cir.2006] ); *McKenna v. Wright,* 01-CV-6571, 2002 WL 338375, at *9 (S.D.N.Y. March 4, 2002).

To the extent that Plaintiff is attempting to assert some sort of equal protection claim, he has not alleged facts indicating that either (1) he was treated differently than other people in similar circumstances or (2) the unequal treatment was the result of intentional and purposeful discrimination. *See, e.g., Verley,* 2004 WL 526740, at *20-21;*McKenna,* 2002 WL 338375, at *10-12. Furthermore, to the extent that Plaintiff is somehow implicitly alleging that he was treated differently than persons suffering from cancer or AIDS, I note that, as stated earlier, the exhibits to Plaintiff's own Complaint appear to suggest that, at the time that Plaintiff was denied medical treatment for Hepatitis C, he was being denied such treatment because of the possible damage such treatment would do to his liver (which was already being affected by Hepatitis C) if he was currently abusing alcohol or drugs. [FN46]

FN46. *See, supra,* note 41 of this Report-Recommendation.

As a result, I recommend that the Court *sua sponte* dismiss Plaintiff's Fourteenth Amendment claim. However, because the defect in any equal protection claim that Plaintiff may be attempting to assert appears to be formal instead of substantive, I recommend that the dismissal of any such equal protection claim be conditioned on Plaintiff's failure to file an Amended Complaint asserting a viable equal protection claim within 30 days of the Court's final decision on Defendants' motion.

**4. Lack of Personal Involvement**

*11 " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ).[FN47] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.[FN48] If the defendant is a supervisory official, such as a DOCS Commissioner or correctional facility superintendent, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN49] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN50] Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[FN51]

FN47.*Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,*434 U.S. 1087 (1978).

FN48.*See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN49.*Polk County v. Dodson,* 454 U.S. 312, 325 (1981);*Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501;*Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN50.*Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)
(Cite as: 2007 WL 2027912 (N.D.N.Y.))

FN51.*Richardson,* 347 F.3d at 435;*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright,* 21 F.3d at 501;*Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986) [citations omitted].

Here, liberally construed, Plaintiff's Complaint alleges that Defendant Goord (the DOCS Commissioner) and Defendant Wright (the DOCS Chief Medical Officer) approved and allowed the current policy of forced participation in RSAT prior to receiving treatment for Hepatitis C. (Dkt. No. 1, ¶ 6; Dkt. No. 29, Rebuttal Mem. of Law, ¶¶ 2-3.) More specifically, Plaintiff has alleged that Defendants Goord and Wright created an unconstitutional policy, or at least knowingly allowed such a policy to continue. (*Id.*) For these reasons, I am unable to conclude, without briefing by Defendants, that Plaintiff has failed to allege facts indicating the personal involvement of Defendants Goord and Wright in the constitutional violation(s) alleged. *See, e.g., Hatzfield,* 2007 WL 700961, at *3.

However, the same cannot be said of Plaintiff's allegations against Defendant Taylor. Plaintiff alleges that Defendant Taylor (the Gouverneur C.F. Superintendent) violated his constitutional rights when he affirmed the IGRC's denial of Plaintiff's grievance and upheld the policy of forced participation in RSAT before receiving treatment for Hepatitis C. (Dkt. No. 1, ¶ 4.b. & Exs. A, A1, A2.) Two problems exist with regard to Plaintiff's claim(s) against Defendant Taylor.

First, the documents attached to Plaintiff's Complaint (and thus incorporated into that Complaint, *see*Fed.R.Civ.P. 10[c] ) indicate that it was not Defendant Justin Taylor but someone else (either a deputy superintendent or an acting superintendent) who personally affirmed the IGRC's denial of Plaintiff's grievance. (Dkt. No. 1, Ex. A.2.) It is well-established that when a "supervisory official like [a] ... prison [s]uperintendent receives letters or similar complaints from an inmate and does not personally respond, the supervisor is not personally involved and hence not liable." *Walker v. Pataro,* 99-CV-4607, 2002 WL 664040, at *12 (S.D.N.Y. Apr. 23, 2002), *accord, Hatzfield,* 2007 WL 700961, at *3;*Ramos v. Artuz,*

00-CV-0149, 2001 WL 840131, at *8 (S.D.N.Y. July 25, 2001). "Thus, receipt of the grievance alone, without more, cannot suffice to allege personal involvement." *Hatzfield,* 2007 WL 700961, at *3.

**\*12** Second, even if Defendant Taylor had personally affirmed the IGRC's decision, a fair reading of the Complaint reveals that Plaintiff is alleging that the policy of denying medical treatment for Hepatitis C was DOCS-wide rather than Gouverneur C.F.-specific. (Dkt. No. 1, ¶ 6; Dkt. No. 29, Rebuttal Mem. of Law, ¶¶ 2-3.) "There can be, therefore, no claim that [the superintendent] either created the policy [denying medical treatment for Hepatitis C] or allowed it to continue as there is no allegation that he had the power to create or to terminate the policy." *Hatzfield,* 2007 WL 700961, at *3;*see also Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at *15-16 (S.D.N.Y. Jan. 23, 2004) (dismissing similar claims against prison superintendent based on failure to allege facts indicating personal involvement).

The closest Plaintiff comes to involving Defendant Taylor in the constitutional violations alleged is when Plaintiff alleges not simply a denial of medical *treatment* for his Hepatitis C condition but a denial of routine *testing* with regard to the progression of his Hepatitis C condition. Specifically, Plaintiff alleges that "routine testing" of Hepatitis C in "numerous inmates" is not being conducted by "medical staff" at Gouverneur C.F. (Dkt. No. 1, ¶ 6[c].) The problem is that this claim of a denial-of-testing was not raised in the grievance that Plaintiff appealed to Defendant Taylor. (Dkt. No. 1, Ex. A.) Thus, there are no factual allegations indicating that Defendant Taylor either knew of the practice in question or that he allowed it to continue. However, it is conceivable to me that Plaintiff *might* be able to assert such factual allegations. *See, e.g, Johnson v. Wright,* 234 F.Supp.2d 352, 364 (S.D.N.Y.2002).

As a result, I recommend that Plaintiff's claims against Defendant Taylor should be dismissed *sua sponte.* However, because the defect in Plaintiff's denial-of-testing claim against Defendant Taylor appears to be formal instead of substantive, I recommend that the dismissal of that claim be conditioned on Plaintiff's failure to file an Amended Complaint asserting a viable such claim within 30 days of the Court's final decision on Defendants'

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

me

me

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)
(Cite as: 2007 WL 2027912 (N.D.N.Y.))

motion.

**5. Mootness**

Plaintiff alleges that, on February 10, 2006 (after Plaintiff filed his Complaint on April 28, 2004), DOCS and Defendant Wright rescinded its policy of requiring that a prisoner participate in an ASAT/RSAT Program before receiving treatment for Hepatitis C. (Dkt. No. 29, Rebuttal Mem. of Law, ¶ 3.) [FN52]

> FN52. I note that, apparently, this decision was made as early as October 13, 2005. *See Hilton v. Wright,* 235 F.R.D. 40, 46 (N.D.N.Y. Feb. 27, 2006) (Hurd, J.) ("On October 13, 2005, Dr. Wright rescinded the ASAT/RSAT requirement from the [DOCS' Hepatitis C Primary Care Practice] Guideline.").

This factual allegation is significant because, as the relief requested in this action, Plaintiff seeks (1) "[i]mmediate comprehensive multi-vitamin treatment for those inmates that find themselves lacking the strength or ability to function normally due to their illness," (2) "[i]mmediate laboratory testing, and liver biopsies, etc ... to determine [the] stage of their illness, in accordance with Federal and National Institute of Health [requirements]," and (3) "[u]pon determination and diagnosis of the illness, immediate commencement of treatment without regard[ ] to any DOCS recommended program(s)." (Dkt. No. 1, ¶ 9.) In other words, Plaintiff does not seek any monetary relief. (*Id.*)

**\*13** However, given the Court's rather recent decision in *Wilton v. Wright,* 235 F.R.D. 40 (N.D.N.Y.2006) (Hurd, J.) (rejecting defendants' mootness argument under somewhat analogous circumstances), I am unable to conclude, without briefing by Defendants (and perhaps the occurrence of discovery), that Plaintiff's claims are mooted by DOCS' apparent decision to rescind the policy in question after Plaintiff filed suit. I note, however, that *Wilson* appears to be somewhat distinguishable from the instant case in that (1) the claims in *Wilson* were brought by a class of prisoners (including prisoners affected in the future), unlike the claims in this case, and (2) in any event,

the plaintiffs in *Wilson* sought monetary relief in addition to injunctive relief, unlike Plaintiff in this case.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for judgment on the pleadings (Dkt. No. 27) be ***DENIED;*** and it is

**RECOMMENDED** that, pursuant to the Court's authority under 28 U.S.C. § 1915(e)(2)(B)(ii), 28 U.S.C. § 1915A, and Rule 12(h)(3) of the Federal Rules of Civil Procedure,

(1) Plaintiff's Ninth Amendment inadequate-medical-care claim and Fourteenth Amendment due process claim be *sua sponte****DISMISSED* **with prejudice,**

(2) Plaintiff's Ninth Amendment right-to-privacy claim and his Fourteenth Amendment equal protection claim be *sua sponte****DISMISSED* **conditionally,** i.e., if Plaintiff fails to file an Amended Complaint asserting a viable right-to-privacy claim and equal protection claim within 30 days of the Court's final decision on Defendants' motion, and

(3) Plaintiff's claims against Defendant Taylor be *sua sponte****DISMISSED* **with prejudice** except his denial-of-testing claim, which should be *sua sponte****DISMISSED* **conditionally,** i.e., on the same condition as mentioned above; and it is

**ORDERED** that the Clerk's Office shall serve a copy of this Report-Recommendation on Plaintiff at his address of record in this action (listed in the caption on the docket) and **also** at his apparent actual current address (listed on Dkt. No. 27, Part 4, Dkt. No. 28, and Dkt. No. 29, Part 2, as well as on the New York State DOCS Inmate Locator System), which is **Oneida Correctional Facility, 6100 School Road, Rome, N.Y. 13440.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)
(Cite as: 2007 WL 2027912 (N.D.N.Y.))

be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2007.
Muniz v. Goord
Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Jamal KEARSEY, Plaintiff,
v.
Adeyemi WILLIAMS, Defendant.
No. 99 Civ. 8646 DAB.

Sept. 1, 2005.

*MEMORANDUM & ORDER*

BATTS, J.

**\*1** Plaintiff Jamal Kearsey, proceeding *prose,* has filed the above-captioned case against Defendant Dr. Adeyemi Williams ("Dr.Williams") pursuant to 42 U.S.C. § 1983 alleging that Dr. Williams violated Plaintiff's Eighth Amendment rights by being deliberately indifferent to Plaintiff's serious medical needs. Defendant has moved to dismiss the Complaint for failure to exhaust administrative remedies, for failure to state a claim, and because Defendant is shielded by qualified immunity.FN1 For the reasons stated herein, Defendant's Motion to Dismiss is DENIED.

> FN1. This Court granted Defendant's Motion to Dismiss for failure to exhaust administrative remedies in its June 6, 2002 Order but vacated that Order on September 20, 2004 upon Plaintiff's motion pursuant to Fed.R.Civ.P. 60(b). *SeeKearsey v. Williams,* No. 99 Civ. 8646, 2004 WL 2093548 (S.D.N.Y. Sept. 20, 2004).

I. BACKGROUND

In his Complaint, Plaintiff alleges that while he was

incarcerated at Rikers Island Correctional Facility ("Rikers"), Defendant, a doctor at Rikers, violated Plaintiff's Eighth Amendment rights by refusing to provide him with an asthma pump when Plaintiff experienced breathing difficulties. Specifically, on April 4, 1999, Plaintiff requested to speak with a doctor because the heat in his cell was aggravating his asthma. (Compl. at 3-4.) When Dr. Williams went to Plaintiff's cell, Plaintiff stated that his chest had "tighten[ed] up" and that he "couldn't breath[e]," and requested that Dr. Williams take him "downstairs" to get an asthma pump. (Id. at 4.) Dr. Williams declined to take Plaintiff downstairs but said that he would send a pump to Plaintiff's cell that evening. (Id.) After a period of time, a corrections officer called Dr. Williams and he also informed him of Plaintiff's medical condition. (Id.) Dr. Williams told the officer that he would bring the asthma pump. (Id.) Plaintiff alleges that Dr. Williams forgot to bring the pump. (Id.)

Plaintiff complained for a third time to Dr. Williams of his inability to breathe and stated that he was experiencing chest pain. (Id.) Once again, Dr. Williams responded by promising to send an asthma pump that evening. (Id.) Plaintiff subsequently asked for Defendant's name, to which Dr. Williams allegedly responded, "I won't send you anything now!" (Id.) Dr. Williams then handed Plaintiff a note with his name. (Id. at 5.) No pump was given to Plaintiff. Shortly after Dr. Williams left, Plaintiff borrowed an asthma pump from a fellow minute, although that pump was different from the one Plaintiff was used to. (Id.) Plaintiff complained of chest pains and breathing difficulties for the rest of the day. (Id.) On April 6, 1999, Plaintiff was having blood work done and spoke with a nurse about his medical condition. (Id.) The nurse ordered an emergency pump that arrived later in the day. (Id.)

On June 24, 1999, Plaintiff filed a Complaint pursuant to 42 U.S.C. § 1983 alleging that Defendant exhibited deliberate indifference to his serious medical needs in violation of Plaintiff's Eighth Amendment rights. Defendant has filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that Plaintiff failed to exhaust administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997(e), and, in particular, the exhaustion procedure established by N.Y. Comp.Codes R & Regs.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

tit. 7, § 701.7, that Plaintiff failed to state a cause of action for which relief can be granted, and that Defendant is shielded from liability based on the doctrine of qualified immunity. (Def.'s Mem. Law at 1, 3, 20.) On June 6, 2002, this Court issued an Order granting Defendant's Motion to Dismiss on the ground that Plaintiff failed to comply with the grievance procedures established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7. *Kearsey v. Williams,* No. 99 Civ. 8646, 2002 WL 1268014, at *2 (S.D.N.Y. June 6, 2002).

**\*2** Plaintiff filed a Motion for Relief from Judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure.[FN2] Plaintiff argued that the Court had erred in holding that he was required to exhaust the grievance procedures established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7, because those procedures are required only of inmates at state-run facilities, whereas Rikers, as a municipally-run facility, has different grievance procedures. *Kearsey,* No. 99 Civ. 8646, 2004 WL 2093548, at *2 (S.D.N.Y. Sept. 20, 2004). In its September 20, 2004 Order, the Court vacated its dismissal Order, finding Plaintiff was not required to exhaust the grievance procedures established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7. *Id.* at *4.

> FN2. Plaintiff was represented by counsel when he filed the 60(b) Motion.

Because the Court's June 6, 2002 Order did not reach the additional grounds in Defendant's Motion to Dismiss, the remaining motions were *subjudice.* In this Order, the Court considers Defendant's remaining arguments: that Plaintiff has failed to state a cause of action and that Defendant is entitled to qualified immunity.

## II. DISCUSSION

### A. Rule 12(b)(6) Standard

In a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court "must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Bolt*

*Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995) (citations omitted). "The district court should grant such a motion only if, after viewing [the] plaintiff's allegations in this favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). A court's review of such a motion is limited and "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Burnheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). In fact, it may appear to the court that "a recovery is very remote and unlikely but that is not the test." *Branham v. Meachum,* 72 F.3d 626, 628 (2d Cir.1996).

These liberal pleading standards "appl[y] with particular force where the plaintiff alleges civil rights violations or where the complaint is submitted *prose."Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998). It is well-settled that *prose* complaints are held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 521 (1972).

### B. Eighth Amendment

Defendant moves to dismiss the Complaint on the grounds that Plaintiff has failed to state a cause of action under 42 U.S.C. § 1983.

### 1. Standard for § 1983 deliberate indifference claim

Section 1983 of Title 42, United States Code, enables a plaintiff to bring a cause of action against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Thus, a plaintiff bringing a § 1983 action must demonstrate that "the conduct complained of was committed by a person acting under color of state law ... [and that] this conduct deprived a person of rights ... secured by the Constitution or laws of the United States." *Greenwich Citizens Committee, Inc. v. Counties of*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

*Warren and Washington Indus. Development Agency,* 77 F.3d 26, 29-30 (2d Cir.1996) (quoting *Parratt v. Taylor,* 451 U.S. 527, 535 (1981)) (internal quotations omitted). Section 1983 is not in itself "a source of substantive rights," but instead "provides a method for vindicating federal rights elsewhere conferred." *Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 225 (2d Cir.2004) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979)).

**3** One such source of federal rights is the Eighth Amendment of the Constitution, which states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. In *Estelle v. Gamble,* the Supreme Court held that prison employees' "deliberate indifference [to an inmate's] serious medical needs" violates the inmate's Eighth Amendment rights and is actionable under § 1983. *Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976). A plaintiff pursuing a § 1983 claim for deliberate indifference to serious medical needs must meet a two-prong standard by demonstrating a serious medical need (the objective prong) and by showing that the defendant employee possessed the requisite culpable mental state (the subjective prong). *SeeFarmer v. Brennan,* 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

2. Serious medical need

The objective prong of the deliberate indifference standard requires a showing of a "sufficiently serious" medical need. *Hathaway,* 99 F.3d at 553 (internal quotations and citations omitted). While "it is a far easier task to identify a few exemplars of conditions so plainly trivial and insignificant as to be outside the domain of Eighth Amendment concern than it is to articulate a workable standard for determining 'seriousness' at the pleading stage," several factors are helpful in determining the seriousness of a medical condition. *Chance,* 143 F.3d at 702-03 (quoting *Gutierrez v. Peters,* 111 F.3d 1364, 1372 (7th Cir.1997)).

A serious medical need is generally characterized by "a condition of urgency that may result in degeneration or extreme pain" or "the unnecessary and wanton infliction of pain." *Chance,* 143 F.3d at 702 (citation omitted).

Whether "a reasonable doctor or patient would find [the condition] important and worthy of comment or treatment" reflects on the seriousness of the medical need, as does the effect of the condition on the inmate's "daily activities" and the extent to which the condition causes "chronic and substantial pain." *Id.* (citation omitted). The refusal to treat a patient suffering from what ordinarily would not be considered a serious medical condition also raises Eighth Amendment concerns if the condition is easily treatable and degenerative. *SeeHarrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) (holding that "the refusal to treat an inmate's tooth cavity unless the inmate consents to extraction of another diseased tooth constitutes a violation of the Eighth Amendment"). The constitutional implications of a decision not to treat an inmate's medical condition depend on the specific facts of the case-"a prisoner with a hang-nail has no constitutional right to treatment, but ... prison officials [who] deliberately ignore an infected gash ... might well violate the Eighth Amendment." *Id.* at 137-37 (internal quotations and citations omitted).

**4** While the failure to treat an inmate's generalized asthmatic condition may not implicate the Eighth Amendment, "an actual asthma attack, depending on the severity, may be a serious medical condition." *Scott v. DelSignore,* No. 02 Civ. 029F, 2005 WL 425473, at *9 (W.D.N.Y. Feb. 18, 2005); *seealso Patterson v. Lilley,* No. 02 Civ. 6056, 2003 WL 21507345, at *3-4 (S.D.N.Y. June 30, 2003). Indeed, "it is common knowledge that a respiratory ailment, such as asthma, can be serious and life-threatening. *Whitley v. Westchester County,* No. 97 Civ. 0420, 1997 WL 659100, at *4 (S.D.N.Y. Oct. 22, 1997). An acute asthma attack is inarguably a "condition of urgency" that may cause "substantial pain" and that "reasonable doctor[s] or patient[s] would find important and worthy of comment or treatment." *Chance,* 143 F.3d at 702 (citation omitted); *seeWhitley,* No. 97 Civ. 0420(SS), 1997 WL 659100, at *4.

Plaintiff has alleged that on three separate occasions, he informed Defendant that he was unable to breathe. (Compl. at 4-5.) He also complained that his chest had "tighten[ed] up," and, later, that he was experiencing "chest pains." (Id.) Plaintiff resorted to using a fellow inmate's inhaler when Defendant refused to provide him with one, which suggests the seriousness of his need. (Id. at 5.) Moreover, by alleging in his Complaint that his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

asthma "started to act up," Plaintiff describes a time-specific incident more in line with an asthma attack than with a generalized asthmatic condition. (Id. at 4.)

Defendant cites *Reyes v. Corrections Officer Bay,* No. 97 Civ. 6419, 1999 WL 681490 (S.D.N.Y. Sept. 1, 1999), as a case similar to this one where the court found that the plaintiff did not allege a sufficiently serious medical condition. However, unlike the plaintiff in *Reyes,* who went ahead with his scheduled visit with his family after complaining of an asthma attack, Plaintiff continued to complain to officers of his condition. Plaintiff resorted to self-medication, by borrowing an asthma pump from a fellow inmate in order to alleviate his condition. In light of these facts, it can hardly be said that Plaintiff was merely suffering from "discomfort."

Accordingly, the Court finds that in his Complaint, Plaintiff alleges facts that he experienced an asthma attack, serious enough to constitute a sufficiently serious medical need for purposes of an Eighth Amendment claim.

3. Deliberate indifference

To satisfy the subjective prong of the deliberate indifference standard, Plaintiff must prove that the prison official was aware of, and consciously disregarded, the prisoner's medical condition. *Chance,* 143 F.3d at 703;*seealsoFarmer,* 511 U.S. at 837. The prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Chance,* 143 F.3d at 702 (quoting *Farmer,* 511 U.S. at 837). While purposefully refusing to treat a serious medical condition constitutes deliberate indifference, it need not be the official's purpose to harm the inmate; "a state of mind that is the equivalent of criminal recklessness" is sufficient. *Hathaway,* 37 F.3d at 553.

**\*5** A physician's mere negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a § 1983 action. *Estelle,* 429 U.S. at 105-06;*Chance,* 143 F.3d at 703. "Medical malpractice does not become a constitutional violation merely because the victim is a

prisoner." *Estelle,* 429 U.S. at 106. Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under § 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

In the instant case, Plaintiff informed Defendant on a number of occasions that he was unable to breathe and that he was experiencing chest pains. (Compl. at 4.) While Defendant's initial decision not to take Plaintiff downstairs for immediate treatment is the sort of prisoner-physician dispute regarding the particularities of medical care that is outside the scope of the Eighth Amendment, the unmistakable inference to be drawn from Plaintiff's allegation that Defendant refused to provide an asthma pump when Plaintiff asked for Defendant's name is that Defendant withheld medical care as retaliation or punishment for Plaintiff's conduct. (Id.) Because consciously delaying treatment in order to punish or retaliate against an inmate meets the subjective standard for deliberate indifference, the Court finds that the Complaint adequately alleges that Defendant acted with the requisite culpable mental state in refusing to treat Plaintiff's asthma attack.

C. Qualified Immunity

Defendant's final argument for dismissal is that, as a government official, Dr. Williams is entitled to qualified immunity.

At the outset, the Court notes that while a defendant may assert a qualified immunity defense on a Rule 12(b)(6) motion, "that defense faces a formidable hurdle when advanced on such a motion." *McKenna v. Wright,* 386 F.3d 432, 434 (2d Cir.2004). This is because "[n]ot only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Id.* (internal quotations and citations omitted). The plaintiff thus benefits from all reasonable inferences against the defendant's qualified immunity defense on a Rule 12(b)(6) motion. *Id.*

The defense of qualified immunity protects public officers, including prison physicians, from civil actions related to their conduct while they are acting in an official capacity so long as they do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ford v. McGinnis,* 352 F.3d 582, 596 (2d Cir.2003). Such a defense "serves important interests in our political system. It protects government officials from liability they might otherwise incur due to unforeseeable changes in the law governing their conduct." *Sound Aircraft Services, Inc. v. Town of East, 192 F.3d 329, 334 (2d Cir.1999).* Qualified immunity also serves the important public interest of "protecting public officials from the costs associated with the defense of damages action ... [including] the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from accepting public positions." *Crawford-El v. Britton,* 523 U.S. 574, 590 at fn. 12 (1998).

**\*6** Qualified immunity shields a defendant from liability "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Englarged Sch. Dist.,* 293 F.3d 246, 250 (2d Cir.2001); *Brosseau v. Haugen, 125 S.Ct. 596, 599 (2004)* ("Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted"); *see also Harlow,* 457 U.S. at 818-19.

"[A] court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne,* 526 U.S. 603, 609 (1999); *see also Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993).

Determining the constitutional question first serves two purposes: it spares the defendant of unwarranted demands and liability "customarily imposed upon those defending a long drawn-out lawsuit" and determining the constitutional question first "promotes clarity in the legal standards for official conduct, for the benefit of both the officers and the general public ." *Id.*

If a deprivation of a constitutional right has been alleged, a court must determine whether the constitutional right was clearly established by determining: (1) if the law was defined with reasonable clarity, (2) if the Supreme Court or the law of the Second Circuit affirmed the rule, and (3) whether a reasonable defendant would have understood from existing law that the conduct was lawful. *See Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998). "[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 634, 640 (1987).

As the Supreme Court made clear in *Saucier,* determining whether the right in question was clearly established requires particularized, case-specific analysis. *Id.* at 201-02. The case-specific nature of the inquiry does not mean that official conduct is protected by qualified immunity whenever "courts had not agreed on one verbal formulation of the controlling standard." *Id* . at 202-03. A "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct" even if courts have not ruled on the constitutionality of the specific act in question, and previously decided cases with comparable but not identical facts influence the clarity of the right in question. *Hope v. Pelzer,* 536 U.S. 730 at 741 (2002) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). The fundamental question is whether "the state of the law" at the time of the alleged violation gave the defendant "fair warning" that his conduct was unconstitutional. *Id.*

**\*7** Even if the right is clearly established, "defendants may nonetheless establish immunity by showing that reasonable persons in their position would not have understood that their conduct was within the scope of the established protection." *LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir.1998). "[R]easonableness is judged against the backdrop of the law at the time of the conduct.... [T]his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau,* 125 S.Ct. at 599.

In the present matter, the Court has already determined that Plaintiff's allegations, taken as true, indicate that Defendant violated Plaintiff's Eighth Amendment rights by refusing to treat Plaintiff's asthma attack in retaliation for Plaintiff's request for Defendant's name. *See supra* at 10-13.

With regard to whether the right allegedly violated was clearly established at the time of the violation, neither the Supreme Court nor the Second Circuit has held that an asthma attack constitutes a serious medical condition for purposes of a deliberate indifference claim. In considering whether Defendant nonetheless had fair warning of the unconstitutionality of the conduct he is alleged to have engaged in, the Court notes that the Second Circuit has repeatedly held as unlawful denials of treatment that "cause or perpetuate pain" falling short of torture and not resulting in death. *Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003). Among the conditions the Second Circuit has deemed serious for Eighth Amendment purposes are a tooth cavity, *Harrison,* 219 F.3d at 137; a degenerative hip condition, *Hathaway,* 99 F.3d 550, 551-52; a painful tissue growth, *Brock,* 315 F.3d at 161; a ruptured Achilles tendon that caused pain and swelling, *Hemmings v. Gorczyk,* 134 F.3d 104, 106-07 (2d Cir.1998); and an eye condition that led to blindness in one eye, *Koehl v. Dalsheim,* 85 F.3d 86, 87 (2d Cir.1996). These various conditions, held to be sufficiently serious, are not life-threatening, although they are painful. An asthma attack, however, can be both painful and fatal. Given the state of the law in the Second Circuit, Defendant had ample warning that the law prohibits a prison doctor from consciously withholding medical care from an inmate with a painful and potentially fatal medical condition.

The Court finds that at this early stage of litigation, Defendant has not shown that he is entitled to qualified immunity.

III. CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss is DENIED.

Defendant shall file an Answer to the Complaint within thirty (30) days of this Order.

SO ORDERED.

S.D.N.Y.,2005.
Kearsey v. Williams
Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 3049613 (N.D.N.Y.)
(Cite as: 2009 WL 3049613 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Charles MAY, Plaintiff,
v.
Superintendent DONNELI; Donaldson, Grievance
Coordinator; Dep. Stern; Imam Ahmed; Officer
Matthew; Deacon Bashaw; and James Jones,
Administration Sergeant, Defendants.
**Civil Action No. 9:06-cv-437 (GLS/RFT).**

Sept. 18, 2009.

West KeySummary
**Civil Rights 78 🔑 1463**

78 Civil Rights
    78III Federal Remedies in General
        78k1458 Monetary Relief in General
            78k1463 k. Mental Suffering, Emotional
Distress, Humiliation, or Embarrassment. Most Cited
Cases
A prisoner who did not suffer a physical injury was not
entitled to compensatory damages for mental or emotional
suffering for his § 1983 claim under the Religious Land
Use and Institutionalized Persons Act (PLRA). The
prisoner's alleged loss of weight and possible increase in
blood pressure was insufficient to constitute a physical
injury under the PLRA. The prisoner alleged that his First
Amendment rights were violated when he was denied the
opportunity to eat blessed food for seven days with his
fellow Nation of Islam members during the Holy Month of
Ramadan. Prison Litigation Reform Act of 1995, § 101(e),
42 U.S.C.A. § 1997e(e).

Charles May, Ray Brook, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, David L. Cochran, Assistant Attorney General,

of Counsel, Albany, NY, for the Defendants.

***ORDER***

GARY L. SHARPE, District Judge.

**\*1** The above-captioned matter comes to this court
following a Report-Recommendation by Magistrate Judge
Randolph F. Treece, duly filed August 25, 2009.
Following ten days from the service thereof, the Clerk has
sent the file, including any and all objections filed by the
parties herein.

No objections having been filed, and the court having
reviewed the Magistrate Judge's Report-Recommendation
for clear error, it is hereby

ORDERED, that the Report-Recommendation of
Magistrate Judge Randolph Treece filed August 25, 2009
is ACCEPTED in its entirety for the reasons state therein,
and it is further

ORDERED, that the defendants' motion for partial
summary judgment (Docket No. 57) is GRANTED in part
and DENIED in part, and it is further

ORDERED, that the Clerk of the court serve a copy of this
order upon the parties in accordance with this court's local
rules.

IT IS SO ORDERED.

***REPORT-RECOMMENDATION AND ORDER***

RANDOLPH F. TREECE, United States Magistrate
Judge.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3049613 (N.D.N.Y.)
(Cite as: 2009 WL 3049613 (N.D.N.Y.))

*Pro se* Plaintiff Charles May brings this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that his First Amendment rights were violated when he was denied the opportunity to eat blessed food for seven days with his fellow Nation of Islam members during the Holy Month of Ramadan. Dkt. No. 51, Am. Compl. at ¶ 1. In addition, Plaintiff asserts claims under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1, and New York Law State Corrections Law § 610. *Id.* at ¶ 37. Defendants move for Partial Summary Judgment, to which Plaintiff filed a Response in Opposition. Dkt. Nos. 57-58. Defendants contend that Plaintiff is (1) barred from bringing an action for mental or emotional injury under 42 U.S.C. § 1983 because he failed to allege the required showing of physical injury pursuant to 42 U.S.C. § 1997e(e); and (2) estopped from bringing a pendent state law claim pursuant to N.Y. CORR. LAWW § 24. Dkt. No. 57-5, Defs.' Mem. of Law at pp. 2-4. For the reasons that follow, it is recommended that the Defendants' Motion be **GRANTED in part** and **DENIED in part.**

## I. BACKGROUND

The following material facts are not, for purposes of this Motion, in dispute. Plaintiff alleges that in August 2005, approximately one month prior to the Islamic celebration of Ramadan, he was signed up as a member of the Nation of Islam in order to allow him to participate in Ramadan related activities. Dkt. No. 58, Pl.'s 7.1 Statement at p. 2. According to Plaintiff, during the Holy Month of Ramadan, Muslims are unable to eat during mess hall hours because they are required to fast during that time; the fast is then broken at night by eating blessed food. Am. Compl. at ¶ 16.[FN1] On October 5, 2005, Plaintiff fasted and then ate blessed food with his fellow Nation of Islam members. *Id.* at ¶ 13. Plaintiff alleges that on October 6, 2005, he was informed by Defendant Sergeant Jones, in the presence of Defendant Corrections Officer ("C.O.") Mathew, that the administration had him listed as a Sunni Muslim and he would therefore have to eat with them until the administration straightened things out. *Id.* Though Plaintiff was willing to eat with the Sunni Muslims temporarily, he alleges that when he attempted to enter the Masjid [FN2] on October 6th, he was denied access by C.O. Mathew because he was not on the list. *Id.* at ¶ 35. Plaintiff alleges that Defendant Sergeant Jones maliciously failed to put him on the Sunni Muslim list. *Id.* at ¶ 34. Ultimately, Plaintiff was unable to eat with either Muslim

sect for seven days until October 13, 2005, when he was permitted to eat with the Sunni Muslims. *Id.* at ¶ 19. During those seven days, Plaintiff observed the fasting strictures of Ramadan, but was unable to properly break his fast, thus resulting in a seven day fast. After informing Defendant Superintendent Donneli of the matter, Plaintiff was immediately placed with the Nation of Islam on October 18, 2005. *Id.* at ¶ 20.

FN1. Though Plaintiff submitted a "Material Fact" statement in accordance with N.D.N.Y.L.R. 7.1 (Dkt. No. 57), his statement is presented in an argumentative manner and does not clearly lay out all of his factual allegations. Therefore, the Court relies primarily on Plaintiff's Amended Complaint to discern his factual allegations.

FN2. A Masjid is a Muslim place of worship, commonly referred to in English as a Mosque.

*2 Though Plaintiff refrained from eating for seven days, he alleges no physical injury other than that he "lost a few pounds," was feeling lightheaded because of a possible increase in blood pressure, and suffered mental and emotional distress. Dkt. No. 58, Pl.'s Resp. in Opp'n to Defs.' Mot. (hereinafter "Pl.'s Resp.") at p. 2. In fact, Plaintiff stated candidly during his deposition that he did not suffer any physical injury. Dkt. No. 57-4, David L. Cochran, Esq., Affirm., dated Oct. 15, 2008, Ex. A, Pl.'s Dep., dated Jan. 22, 2008 (hereinafter "Pl.'s Dep.") at p. 2.

Plaintiff alleges a second violation of his constitutional right to freely exercise his religion when Defendants denied him the opportunity to have family visits during the Muslim festival of Eid-Ul-Adha. Am. Compl. at ¶ 22.

As a result of the aforementioned factual allegations Plaintiff claims he suffered emotional, mental, and physical distress, and seeks both compensatory and punitive damages for his alleged injuries. *Id.* at ¶¶ 22, 25 & 26.

## II. DISCUSSION

Slip Copy, 2009 WL 3049613 (N.D.N.Y.)
(Cite as: 2009 WL 3049613 (N.D.N.Y.))

**A. Summary Judgment Standard**

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In order for an issue of material fact to exist, it must relate to a disputed matter that "might affect the outcome of the suit," and the evidence is such that a "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

On a motion for summary judgment, the moving party bears the initial burden to demonstrate that there is no genuine issue as to any material fact, and therefore, they are entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the non-moving party must go beyond the pleadings and allege specific facts that present a genuine issue for trial. FED. R. CIV. P. 56(e). To that end, the non-movant cannot rest on "mere allegations or denials." *Id.*

When evaluating a motion for summary judgment, the court will draw all inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Moreover, when a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (cited in *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995)). Nevertheless, a party's "bald assertion," unsupported by evidence, is insufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

**B. Physical Injury Requirement**

**\*3** The Prison Litigation Reform Act of 1995 ("PLRA"),

codified in part at 42 U.S.C. § 1997e(e), states that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." The purpose of this physical injury requirement is to discourage frivolous suits commenced by inmates. *See Cox v. Malone,* 199 F.Supp.2d 135, 139-140 (S.D.N.Y.2002) ("Section 1997e(e) [ ... ] is a *substantive* limitation on the type of actions that can be brought by prisoners. Its purpose is to weed out frivolous claims where only emotional injuries are alleged.") (emphasis in original.) The Second Circuit Court of Appeals has held that the PLRA applies to alleged constitutional violations brought under 42 U.S.C. § 1983. *Thompson v. Carter,* 284 F.3d 411, 416 (2d Cir.2002).

In this case, the only physical injury that Plaintiff states he suffered was a loss of a few pounds and a possible increase in blood pressure. Pl.'s Resp. at p. 2. Furthermore, Plaintiff did not allege these injuries in his Amended Complaint, but rather, only after Defendants raised the PLRA defense in their Motion for Partial Summary Judgment. Prior to Defendants' Motion, Plaintiff stated at his deposition that he did not suffer any physical injury. Pl.'s Dep. at p. 2. Even assuming, *arguendo,* that Plaintiff had properly alleged a physical injury in his Amended Complaint, his allegations do not constitute physical injury for purposes of the PLRA.

Section 1997e(e) provides no definition of "physical injury." *Liner v. Goord,* 196 F.3d 132, 135 (2d Cir.1999). However, courts have held that in order to constitute a physical injury under 1997e(e), an injury must be more than *de minimis,* but need not be significant. *Id.* (citing *Siglar v. Hightower,* 112 F.3d 191, 193 (5th Cir.1997)); *Warren v. Westchester County Jail,* 106 F.Supp.2d 559, 570 (S.D.N.Y.2000) (citing *Siglar* ).

The issue is therefore whether Plaintiff's loss of a few pounds amounts to more than a *de minimis* injury for purposes of the PLRA. In short, it appears this question is answered in the negative. Loss of weight is generally not considered to be a physical injury for purposes of the PLRA, especially the loss of only a few pounds. *See Dawes v. Walker,* 1998 WL 59454, at *1 n. 1 (N.D.N.Y. Feb.9, 1998) ("It appears unlikely that lost weight is a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Slip Copy, 2009 WL 3049613 (N.D.N.Y.)
(Cite as: 2009 WL 3049613 (N.D.N.Y.))

physical injury within the meaning of Section 1997e(e)."); *see also* Porter v. Coombe, 1999 WL 587896, at *8 (S.D.N.Y. Aug.4, 1999) (plaintiff's loss of twenty-five pounds did not constitute a physical injury); *accord* Pearson v. Welborn, 471 F.3d 732, 744 (7th Cir.2006) (plaintiff's loss of fifty pounds did not constitute a physical injury). Similarly, Plaintiff's alleged increase in blood pressure does not amount to physical injury. *See* Jones v. H.H.C. Inc., 2003 WL 1960045, at *5 (S.D.N.Y. Apr.8, 2003); *accord* Davis v. District of Columbia, 158 F.3d 1342, 1349 (D.C.Cir.1998) (articulating that § 1997e(e) precludes reliance on somatic manifestations of emotional distress). Thus, Plaintiff has not alleged a sufficient physical injury pursuant to the PLRA.

**\*4** Although Plaintiff has not met his burden on the physical injury requirement of the PLRA, his failure to do so is not completely dispositive of his underlying constitutional claim. "The failure of prisoners to plead or establish a compensable actual injury in a § 1983 constitutional tort claim [ ... ] only precludes the recovery of compensatory damages, but does not lead to the dismissal of the underlying claim." *Dawes v. Walker,* 239 F.3d 489, 496 (2d Cir.2001). Plaintiff may still be entitled to injunctive or declaratory relief for a violation of his constitutional rights. *Thompson v. Carter,* 284 F.3d 411, 416-418 (2d Cir.2002). A plaintiff is not required to show physical injury in order to recover nominal damages, punitive damages, or declaratory relief. *Gill v. Hoadley,* 2007 WL 1341468, at *4 (N.D.N.Y. May 4, 2007). In fact, it is error for courts not to award nominal damages in § 1983 actions when a constitutional violation has been established. *See* Robinson v. Cattaraugus, 147 F.3d 153, 162 (2d Cir.1998).

In the instant case, Plaintiff has requested punitive damages. Am. Compl. at ¶ 26. Defendants do not challenge the merits of Plaintiff's underlying constitutional claim, therefore that issue is not before this Court. Due to Plaintiff's inability to demonstrate a physical injury under 1997e(e), compensatory damages for mental or emotional suffering are barred for his § 1983 claim, but it remains to be decided if Plaintiff is entitled to nominal damages, punitive damages, or declaratory relief.

**C. Plaintiff's Pendent State Law Claim**

Plaintiff also brings a pendent state law claim pursuant to N.Y. CORR. LAWW § 610, which guarantees inmates "the free exercise and enjoyment of religious profession and worship" while incarcerated. Am. Compl. at ¶ 37. A federal court exercising pendent jurisdiction must apply state law. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1996). "Thus, if state law does not recognize a plaintiff's right to bring an action in state court, a federal court, exercising pendent jurisdiction, sitting as a state court, must follow the state law limitation on jurisdiction." *Livingston v. Griffin,* 2007 WL 2437433, at *2 (N.D.N.Y. Aug.22, 2007) (citing Baker v. Coughlin, 77 F.3d 12, 15 (2d Cir.1996)).

Defendants argue that this claim is barred by N.Y. CORR. LAWW § 24, which reads:

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

**\*5** Thus, § 24 precludes "the assertion of claims against corrections officers [in their personal capacities] in any court, including the federal courts," by designating the New York State Court of Claims as the only available venue to bring a claim for damages arising out the acts committed by corrections officers within the scope of their employment. *Baker v. Coughlin,* 77 F.3d at 14-15. And, because the Court of Claims is a court of limited jurisdiction, hearing only claims against New York State and no other individual or entity, § 24 amounts to a grant of immunity for corrections officers sued in their personal capacities for claims arising out of the discharge of their duties. N.Y. CT. CLMS. LAW § 9.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3049613 (N.D.N.Y.)
(Cite as: 2009 WL 3049613 (N.D.N.Y.))

After the parties submitted their respective briefs on this Motion, the Supreme Court held in *Haywood v. Drown, --- U.S. ----, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009)* that § 24, when used to relegate to the Court of Claims civil rights actions brought pursuant to 42 U.S.C. § 1983, is inconsistent with the Supremacy Clause, U.S. Const. Art. VI, cl. 2, and therefore, unconstitutional. The *Haywood* Court held that New York State, having created courts of general jurisdiction that routinely hear § 1983 actions against all types of state actors, "is not at liberty to shut the courthouse door to federal claims [against corrections officers] that it considers at odds with its local policy." *Id.* at 2117. The Supreme Court found such selective treatment of § 1983 claims brought against corrections officers to be "contrary to Congress' judgment that *all* persons who violate federal rights while acting under color of state law shall be held liable for damages," and therefore, in violation of the Supremacy Clause. *Id.* at 2115 (emphasis in original).

In this case, Plaintiff has brought a state law claim pursuant to N.Y. CORR. LAWW § 610. Although the *Haywood* decision found § 24 to be in violation of the Supremacy Clause, it did so only with respect to claims brought under § 1983, a federal statute. A claim brought pursuant to a state law does not implicate the Supremacy Clause, and therefore, the *Haywood* decision does not affect the question of whether this Court has proper jurisdiction to hear this pendent state law claim.

Even after *Haywood,* a New York state court (other than the Court of Claims) would not have jurisdiction to hear Plaintiff's pendent claim pursuant to § 24 because Plaintiff has alleged acts that clearly fall within the scope of the Defendants' employment duties as corrections officers. Therefore, this Court does not have jurisdiction to hear this pendent state law claim brought pursuant to N.Y. CORR. LAWW § 610, and it is recommended that such claim be **dismissed.** *Baker v. Coughlin,* 77 F.3d at 14-16; *see also, e.g., Cancel v. Mazzuca,* 205 F.Supp.2d 128, 139 (S.D.N.Y.2002) (dismissing plaintiff's pendent state law claims pursuant to § 24).

### III. CONCLUSION

For the reasons stated therein, it is hereby

**\*6RECOMMENDED,** that the Defendants' Motion for Partial Summary Judgment (Dkt. No. 57) be **GRANTED in part and DENIED in part;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also*28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2009.
May v. Donneli
Slip Copy, 2009 WL 3049613 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 1991039 (W.D.N.Y.)
(Cite as: 2008 WL 1991039 (W.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Injah TAFARI, Plaintiff,
v.
Sheldon STEIN, et al., Defendants.
**No. 01CV0841.**

May 5, 2008.

Injah Tafari, Dannemora, NY, pro se.

Delia Dianna Cadle, Ann C. Williams, New York State Attorney General's Office, Buffalo, NY, for Defendants.

**Decision & Order**

HUGH B. SCOTT, United States Magistrate Judge.

**\*1** Before the Court is the defendants' motion for summary judgment (Docket No. 39) and Plaintiff's motion for appointment of counsel (Docket Nos. 73 and 74).[FN1]

> FN1. The parties have consented to proceed before the undersigned as Magistrate Judge pursuant to 28 U.S.C. § 636(c) (Docket No. 43). The defendants' motion for summary judgment was revived following the plaintiff's motion for reconsideration (Docket No. 63). This Court granted the plaintiff's motion and ordered the defendants to reply to the plaintiff's opposition (Docket No. 66). The defendants filed a reply (Docket No. 71), and the plaintiff served a surreply (Docket No. 75).

**BACKGROUND**

On October 19, 2001, Plaintiff, Injah Tafari ("Plaintiff"), then incarcerated at Southport Correctional Facility,[FN2] commenced this action *pro se*, seeking relief under 42 U.S.C. § 1983 and New York State tort law, against defendants Greenhaven Correctional Facility ("Greenhaven") Dr. Norman H. Selwin, Dr. Harry Mamis; Lakeview Correctional Facility ("Lakeview") Dr. Jose Galindo, Dr. Jacob Piazza; Southport Correctional Facility ("Southport") Dr. John Alves; Clinton Correctional Facility ("Clinton") Kang Lee and I. Ellen; Attica Correctional Facility ("Attica") Sheldon Stein, Robert Takos and Stephen Laskowski; and New York State Department of Correctional Services ("DOCS") Medical Director Lester Wright and Commissioner Glenn S. Goord, all sued in their personal and official capacity.[FN3] (Docket No. 1) The plaintiff claims that the defendants violated his Eight Amendment right to be free from cruel and unusual punishment by failing to provide adequate medical treatment for the pain caused by a broken surgical screw in his left shoulder, or alternatively that the defendants' failure to act constituted negligence. (*Compl.* ¶¶ 44, 45, 46.)

> FN2. The plaintiff is currently an inmate of Five Points Correctional Facility, Romulus, New York. *See* Plaintiff's letter to this Court dated April 12, 2007.

> FN3. Plaintiff initially moved for *in forma pauperis* status, which was granted. The Court, in granting that status, dismissed certain claims and defendants from the Complaint (Docket No. 6).

The plaintiff alleges that in 1984, while under the custody of DOCS, he underwent a surgery to repair his left shoulder, which required the insertion of a surgical screw into the shoulder. (*Compl.* ¶ 15.) On November 16, 1998, Dr. Mamis sent the plaintiff, then incarcerated at Greenhaven, to an outside orthopedic specialist based on the plaintiff's complaints that he was experiencing pain in his left shoulder. (*Compl.* ¶ 16.) In his request for consultation, Dr. Mamis stated that the plaintiff's x-rays

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 1991039 (W.D.N.Y.)
(Cite as: 2008 WL 1991039 (W.D.N.Y.))

showed that the screw was broken through its mid-portion. (Pl.'s Ex. I-7 (Docket No. 57.)) The orthopedic specialist noted that the plaintiff "retained (painful) hardware," and further stated "recommend arthroscopy of left shoulder, removal of screw ... recommend surgery." (*Compl.* ¶ 16; Pl.'s Ex. I-7 (Docket No. 57.)) The plaintiff was then transferred to Lakeview on January 20, 1999. (*Compl.* ¶ 17.) While there, an x-ray ordered by Dr. Galindo showed that "the screw is fractured approximately in half." (Pl.'s Ex. I-8 (Docket No. 57.)) Another x-ray ordered by Dr. Piazza showed "a broken, single, orthopedic screw ... in the inferior glenoid rim." (Pl.'s Ex. I-9 (Docket No. 57.)) On May 13, 1999, the plaintiff was sent to Southport; then to Clinton on June 5, 2000. (*Compl.* ¶ 17.) An x-ray requested by Dr. Kang Lee while the plaintiff was detained at Clinton showed "a screw through the inferior glenoid which is fractured." (Pl.'s Ex. I-11 (Docket No. 57.)) On October 2, 2000, the plaintiff was transferred to Attica, where an x-ray ordered by Dr. Laskowski again showed "a fractured screw along the inferior glenoid fossa region." (Pl.'s Ex. I-12 and I-13 (Docket No. 57.)) the plaintiff was then sent back to Southport on July 20, 2001, without surgery being performed. (*Compl.* ¶ 17.) Thereafter, the plaintiff filed this Complaint seeking an injunction directing the defendants to arrange for a surgery to remove the broken screw from the plaintiff's shoulder, and to provide physical therapy or other follow-up treatment; the plaintiff also seeks compensatory and punitive damages. (*Compl.* at 13-16.)

**\*2** This Court previously granted the defendants' motion based upon the rescinding of the plaintiff's *in forma pauperis* status (Docket No. 58), ("IFP"). Subsequently, the plaintiff filed a motion seeking reconsideration of the summary judgment Order (Docket No. 63). The defendants withdrew the portion of their motion attacking Tafari's *in forma pauperis* status. The Court vacated the order dismissing the complaint and directed the defendants to file a reply to the plaintiff's initial Declaration. *Id.* The plaintiff also filed a motion to amend the complaint (Docket No. 68). The defendants filed a reply to the plaintiff's opposition to their summary judgment motion (Docket No. 71, Defs.' Reply Memo.), also opposing the plaintiff's request to amend the complaint. The plaintiff filed a reply in which he withdrew his motion to amend the complaint. (Docket No. 75.) As such, the Court need not address the issues relating to the motion to amend the complaint.

In the motion presently before the Court, individual defendants Selwin, Mamis, Galindo, and Piazza seek summary judgment on the plaintiff's § 1983 medical indifference claims on the basis that plaintiff failed to exhaust administrative remedies relative to such claims (Docket No. 71, Defs.' Reply Memo. at 2); all defendants further argue that the Eleventh Amendment's doctrine of sovereign immunity prohibits § 1983 and state law negligence claims from being brought against state employees in their official capacity (Docket No. 71, Defs.' Reply Memo. at 17); moreover, all defendants contend that this Court lacks subject matter jurisdiction on the negligence claims brought against them in their personal capacity (Docket No. 71, Defs.' Reply Memo. at 18); lastly, all defendants argue that any claim for injunctive relief is moot because at the time he filed his reply declaration, the plaintiff had already been transferred to the Auburn Correctional Facility ("Auburn"), a different facility from the ones mentioned in the Complaint (Docket No. 71, Defs.' Reply Memo. at 19).

The plaintiff argues that genuine issues of material fact exist as to whether he has exhausted administrative remedies as to his § 1983 claims and, as such, the defendants' motion for summary judgment should be denied (Docket No. 75, Pl.'s Reply Decl. at 5-6).[FN4] Further, the plaintiff moves the Court to appoint counsel to represent him in this action (Docket Nos. 73 and 74).

FN4. In his reply declaration in opposition to the defendants' motion, the plaintiff does not address the defendants' other grounds for summary judgment.

As discussed below, the record before the Court establishes that: (1) the plaintiff has failed to exhaust administrative remedies as to his § 1983 claims against defendants Selwin, Mamis, Galindo, and Piazza; (2) the Eleventh Amendment bars § 1983 and state law negligence claims for money damages against all defendants in their official capacity; (3) New York law precludes pendent state law claims for negligence against all defendants in their personal capacities; and (4) any claim for injunctive relief is moot.

**DISCUSSION**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 1991039 (W.D.N.Y.)
(Cite as: 2008 WL 1991039 (W.D.N.Y.))

**Motion for Summary Judgment**

**\*3** Summary judgment is appropriate where there are no issues of material fact in dispute, and the moving party is entitled to judgment as a matter of law. *See Trans Port, Inc. v. Starter Sportswear, Inc.,* 964 F.2d 186, 188 (2d Cir.1992) (*citing Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991).* The Court must draw all reasonable inferences in favor of the non-moving party and grant summary judgment only if no reasonable trier of fact could find in favor of the non-moving party. *See Taggart v. Time, Inc.,* 924 F.2d 43, 46 (2d Cir.1991); *Howley v. Town of Stratford,* 217 F.3d 141 (2nd Cir.2000). However, the non-moving party must, "demonstrate to the court the existence of a genuine issue of material fact." *Lendino v. Trans Union Credit Information, Co.,* 970 F.2d 1110, 1112 (2d Cir.1992) (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). A fact is material:

> when its resolution would "affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."

*General Electric Company v. New York State Department of Labor,* 936 F.2d 1448, 1452 (2d Cir.1991) (*quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "The non-moving party must come forward with enough evidence to support a jury verdict ... and the ... motion will not be defeated merely ... on the basis of conjecture or surmise." *Trans Sport,* 964 F.2d at 188 (*citing Bryant v. Maffucci,* 923 F.2d at 982). If undisputed material facts are properly placed before the court by the moving party, those facts will be deemed admitted, unless they are properly controverted by the non-moving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992) (*citing Dusanenko v. Maloney,* 726 F.2d 82 (2d Cir.1984). The Court's responsibility in addressing a summary judgment motion is identifying factual issues, not resolving them. *See Burger King Corp. v. Horn & Hardart Co.,* 893 F.2d 525, 528 (2d Cir.1990). However, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving

party." *Nippon Fire & Marine Ins. Co., Ltd. v. Skyway Freight Systems, Inc.,* 235 F.3d 53 (2d Cir.2000) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**Exhaustion of Administrative Remedies as to Individual Defendants Selwin, Mamis, Galindo, and Piazza.**

**The PLRA's Exhaustion Requirement.**

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), provides that "[n]o action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id.* It is well settled that the PLRA's exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), *rev'g, Nussle v. Willette,* 224 F.3d 95 (2d Cir.2000). In enacting the PLRA, Congress intended to "reduce the quantity and improve the quality of prisoner suits" by affording prison officials an opportunity to deal with inmates complaints through internal processes. *Id. at 534-25.* The act's "dominant concern [is] to promote administrative redress, filter out groundless claims, and foster better prepared litigation of claims aired in court." *Id. at 528.* The intent of the PLRA is to restrict inmate litigation where they had, but failed, to use all of their internal administrative remedies before commencing a federal civil rights action. *See Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001); *Evan v. Manos,* 336 F.Supp.2d 255, 258 (W.D.N.Y.2004) (Larimer, J.) Further, the statute requires a prisoner to exhaust the grievance procedures offered regardless of the type of relief they provide, since "one 'exhausts' processes, not forms of relief." *Booth v. Churner,* 532 U.S. 731, 739, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001) (exhaustion mandated even when the inmate sought monetary relief and the administrative process offered none); *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004).

**\*4** There is often a dispute as to whether a plaintiff has

Not Reported in F.Supp.2d, 2008 WL 1991039 (W.D.N.Y.)
(Cite as: 2008 WL 1991039 (W.D.N.Y.))

exhausted his administrative remedies. In the wake of *Porter,* the Second Circuit has articulated a three-part inquiry for district courts to follow when "a prisoner plaintiff plausibly seeks to counter defendants' contention that the prisoner has failed to exhaust available administrative remedies as required by the PLRA, 42 U. S.C. § 1997e(a)." *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004). Specifically, the Court must ask:

whether administrative remedies were in fact 'available' to the prisoner. The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense. If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their nonexhaustion defense, but that the plaintiff nevertheless did not exhaust administrative remedies, the court should consider whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements.

*Hemphill,* 380 F.3d at 686 (internal citations and quotations omitted). Special circumstances justifying an inmate's failure to exhaust include a reasonable misunderstanding of the grievance procedure. *Hemphill,* 380 F.3d at 689;*Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004).

Moreover, the Second Circuit has observed that administrative remedies may be "informally" exhausted where "the regulations advise inmates 'to attempt to resolve a problem on [their] own' before resorting to formal procedures." *Hemphill,* 380 F.3d at 682 n. 4 (*quoting* 7 N.Y.C.R.R. § 701.3(a)). "An inmate who obtains a favorable resolution of his complaint through informal processes has exhausted available administrative remedies under the DOCS scheme." *Hemphill,* 380 F.3d at 682 n. 4 (*citing Marvin v. Goord,* 255 F.3d 40, 43 n. 3 (2d Cir.2001) (per curiam)).

Finally, it is well established in the Second Circuit that

total exhaustion is not necessary with respect to § 1983 complaints. *Ortiz v. McBride,* 380 F.3d 649, 663 (2d Cir.2004). Where a complaint includes both exhausted and unexhausted claims, the Court may dismiss the unexhausted claims and proceed with the exhausted claims. In such cases, the Second Circuit contemplated that in the ordinary case the Court would proceed to decide the exhausted claims "without waiting for the plaintiff to attempt to exhaust available remedies with respect to the dismissed claims." *Ortiz,* 380 F.3d at 663.

**DOCS' Grievance Procedure.**

The rules and regulations of New York State Department of Correctional Services ("DOCS") provide that inmates within the custody of DOCS may avail themselves of an administrative grievance procedure called the Inmate Grievance Program ("IGP"). *See* 7 N.Y.C.R.R. Part 701 (2006).[FN5] The IGP provides a three-step process whereby an inmate's complaints are first reviewed by the Inmate Grievance Resolution Committee ("IGRC"), a facility committee comprised of elected inmate representatives and appointed staff members. 7 N.Y.C.R.R. § 701.4. To file a grievance with the IGRC, an inmate must initially:

> FN5. Some portions of the regulations have been repealed and amended effective on June 28, 2006. Since the amendments made are not material to the disposition of the issues in this case, the provisions cited herein reflect the more recent version of the regulation.

**\*5** submit a complaint to the [grievance] clerk within 21 calendar days of an alleged occurrence on an inmate grievance complaint form (form # 2131). If this form is not readily available, a complaint may be submitted on plain paper.... *Note:* Exceptions to this time limit or any appeal time limits may be approved by IGP supervisor under section 701.6(g) of this part.

7 N.Y.C.R.R. § 701.5(a)(1).[FN6] To obtain an exception to the time limit for filing a grievance, an inmate must submit a request in writing to the grievance clerk. 7 N.Y.C.R.R. § 701.6(g)(1)(i). Thereafter,

> FN6. "Within fourteen working days of an

Not Reported in F.Supp.2d, 2008 WL 1991039 (W.D.N.Y.)
(Cite as: 2008 WL 1991039 (W.D.N.Y.))

alleged occurrence" under the regulations as effective at the time of the facts alleged (Docket No. 71, Defs.' Reply Memo. at 4).

[t]he IGP supervisor may grant an exception to the time limit for filing a grievance based on mitigating circumstances (*e.g.,* timely attempts to resolve a complaint informally by the inmate, etc .). An exception to the time limit may not be granted if the request was made more than 45 days after an alleged occurrence. 7 N.Y.C.R.R. § 701.6(g)(1)(i)(a).

If an inmate is not satisfied with the IGRC's resolution of the complaint, he or she may file an appeal with the superintendent within seven calendar days after receipt of the IGRC's written response. 7 N.Y.C.R.R. § 701.5(c)(1). Finally, an inmate may appeal the superintendent's action to the Central Office Review Committee ("CORC") within seven calendar days after receipt of the superintendent's written response to the grievance. 7 N.Y.C.R.R. § 701.5(d)(1).

**Plaintiff's Exhaustion as to Individual Defendants Selwin, Mamis, Galindo, and Piazza.**

In the instant case, defendants Selwin, Mamis, Galindo, and Piazza argue that the plaintiff has failed to exhaust administrative remedies as to the § 1983 medical indifference claims brought against them. The defendants point out that the plaintiff's claims against Selwin and Mamis arise in a period of time between November 1998 to on or about January 20, 1999, while the plaintiff was incarcerated at Greenhaven; and, that the plaintiff's claims against Galindo and Piazza arise during the plaintiff's incarceration at Lakeview, between January 20, 1999 to on or about May 13, 1999. The defendants allege that the plaintiff has not filed any grievances against them while at Greenhaven or Lakeview. In support of their allegations, the defendants submit the Declaration of Thomas G. Eagen, Director of the IGP for DOCS (Docket No. 40), attesting that a search of IGP records does not reveal any formal grievance filed by the plaintiff while at Greenhaven or Lakeview regarding the medical care provided to the plaintiff by Selwin, Mamis, Galindo, and Piazza.

In opposition, the plaintiff argues that he has exhausted administrative remedies by first attempting to resolve his grievances informally through the medical department at both Greenhaven and Lakeview. Specifically, the plaintiff alleges that he made repeated complaints regarding the pain that the broken screw was causing in his shoulder and requested surgery to have that screw removed. (Docket No. 75, Pl.'s Reply Decl. at 4.) Further, the plaintiff submits that he later presented his grievances in a formal manner, and points to several letters and grievance complaints where he stated that he was experiencing excruciating pain in his left shoulder and requested surgery to remove the broken screw. (Pl.'s Ex. J-1-J-58 (Docket No. 57).) The plaintiff relies on DOCS Directive 4040 § V(A)(1), codified at 7 N.Y.C.R.R. § 701.6(g), providing for an extension to the time limit for filing a complaint, for the argument that his attempts to resolve his grievances informally constitute mitigating circumstances justifying his late filing of several grievance complaints though the formal grievance procedure.

**\*6** There is no merit to the plaintiff's assertions that he has either informally or formally exhausted his administrative remedies with respect to the medical indifference claims against defendants Selwin, Mamis, Galindo, and Piazza. First, the Court finds that the plaintiff's attempts to resolve his grievances informally did not exhaust administrative remedies because the plaintiff, contrary to his assertions, has not availed himself of DOCS Directive 4040 § V(A)(1); 7 N.Y.C.R.R. § 701.6(g). Under DOCS Directive 4040 § V(A) (1), an inmate must actively request the IGP supervisor to grant an exception to file a late complaint; a late filing will be allowed based on mitigating circumstances such as an inmate's previous timely attempts to resolve a complaint informally. Here, the plaintiff has not alleged nor provided any evidence that he requested and received permission by the supervisor to file a late complaint.

Moreover, The plaintiff filed his first formal grievance complaint lamenting pain in his shoulder and requesting surgery on February 21, 2001, while he was incarcerated at Attica, almost two years after having been transferred out of Lakeview. (Pl.'s Ex. J-8-J-18 (Docket No. 57).) In that grievance, the plaintiff did not mention any of the individual moving defendants. The plaintiff filed another grievance dated April 19, 2002, when he was confined at Southport. In that grievance, the plaintiff mentioned

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 1991039 (W.D.N.Y.)
(Cite as: 2008 WL 1991039 (W.D.N.Y.))

Selwin, Mamis, Galindo, and Piazza, while recounting the history of his complaints about his shoulder pain. (Pl.'s Ex. J-33-J-40 (Docket No. 57.)) The claims in that grievance, however, focused on the alleged failures of Southport's medical staff and was filed almost three years after the plaintiff had ceased to be under the care of Selwin, Mamis, Galindo, and Piazza.[FN7] Inasmuch as that grievance mentions Selwin, Mamis, Galindo, and Piazza only incidentally and it was filed well past the "21 calendar days," 7 N.Y.C.R.R. § 701.5(a)(1), or "14 working days" under the previous regulations, *see* Defs.' Reply Memo. at 4, of any alleged occurrence involving these individual defendants, the plaintiff has failed to show that he formally exhausted his remedies as mandated by the PLRA. *See Williams v. Comstock,* 425 F.3d 175 (2d Cir.2005) (prisoner failed to exhaust PLRA's administrative remedies when he filed a grievance in 2003 against a DOCS nurse for failing to provide adequate medical care at the time he had a stroke in 2001).

> FN7. The IGRC recommended that the grievance be denied (Pl.'s Ex. J-41 (Docket No. 57.)) Thereafter, the superintendent denied the plaintiff's grievance based on the fact that in January 2001, the plaintiff was seen by a specialist who recommended the broken screw did not have to be removed. (Pl.'s Ex. J-42 (Docket No. 57.)) The plaintiff then appealed to CORC which again denied the plaintiff's request for surgery. (Pl.'s Ex. J-43 (Docket No. 57.))

The plaintiff's informal exhaustion argument fails also under the Second Circuit's analysis of 7 N.Y.C.R.R. § 701.3(a). *Hemphill,* 380 F.3d at 682. Section 701.3(a) encourages inmates to attempt to resolve a problem informally before resorting to the formal grievance procedure. Consequently, the Second Circuit held that an inmate who obtains a positive outcome through informal processes will be deemed to have exhausted his administrative remedies. *Hemphill,* 380 F.3d at 682. Here, the plaintiff has not alleged that his informal grievances ever resulted in a statement by the defendants that a surgery would be scheduled for him. Moreover, the record does not reflect that the moving defendants ever agreed with the plaintiff that he needed a surgery.

*7 Having found that the plaintiff has not exhausted

administrative remedies either informally or formally, the Court applies the three-step analysis laid out in *Hemphill* to determine whether the plaintiff was justified in failing to meet the PLRA's exhaustion requirement. In the instant case, neither party disputes that a formal procedure existed for an inmate to seek relief for a grievance at DOCS's facilities and that those processes were available to the plaintiff while at both Greenhaven and Lakeview. Further, the plaintiff does not allege that defendants prevented him from availing himself of the grievance procedure. Inasmuch as the defendants have raised nonexhaustion as a defense in their summary judgment motion, the issue turns onto whether there were 'special circumstances' that justified the plaintiff's failure to file a grievance complaint against these defendants. In his reply declaration, the plaintiff has not alleged any facts or events that prevented him from filing a formal grievance while at Greenhaven and Lakeview. Moreover, the plaintiff's grievance complaints filed while at Attica and Southport suggest that the plaintiff was familiar with DOCS' grievance procedures but did not resort to them while at Greenhaven and Lakeview.

In light of the above, the Court concludes that the plaintiff has not demonstrated that a material question of fact exists as to whether he has exhausted administrative remedies either informally or formally, or whether he was justified in failing to do so. Accordingly, summary judgment is granted on the § 1983 medical indifference claims with respect to defendants Selwin, Mamis, Galindo, and Piazza.

A determination that the plaintiff has failed to exhaust certain claims does not warrant dismissal of the complaint in its entirety. *See Ortiz,* 380 F.3d at 663. Therefore, the Court will not dismiss those claims where exhaustion has not been raised as a defense.

**Eleventh Amendment Bar to § 1983 and Negligence Claims Against Defendants in Their Official Capacity.**

All defendants contend that the Eleventh Amendment protects state officials from § 1983 and state law negligence claims brought against them in their official capacity. The plaintiff does not oppose the defendants' arguments. To the extent that the plaintiff seeks money damages from the defendants in their official capacities,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 1991039 (W.D.N.Y.)
(Cite as: 2008 WL 1991039 (W.D.N.Y.))

the Eleventh Amendment bars such claims.

It is well established that the Eleventh Amendment's sovereign immunity doctrine generally bars recovery of money damages from a State entity. *Kentucky v. Graham,* 473 U.S. 159, 167, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Dunn v. Carrier,* 137 Fed.Appx. 387, 398 (2d Cir.2005) (unpublished). Official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Graham,* 473 U.S. at 165-66 (*citing Monell v. City of New York Dep't of Soc. Servs.,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611. (1978)). Considering civil rights actions brought under § 1983, the Supreme Court has held that this federal statute does not provide a right to recover damages from either a State or its officials in their official capacities. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).[FN8]

> **FN8.** It should be noted, however, that the Eleventh Amendment does not bar damages actions against state officials sued in their personal capacities. *Hafer v. Melo* 502 U.S. 21, 27-31, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).

*8 Likewise, the Eleventh Amendment bars federal suits for damages against a State or its officials in their official capacity based on a state law violation. *Pennhurst State Sch. Hosp. v. Halderman,* 465 U.S. 89, 120, 21 (1984) (neither pendent jurisdiction nor any other basis for jurisdiction may override the Eleventh Amendment).

Accordingly, the defendants are entitled to summary judgment on the § 1983 and state law negligence claims for money damages brought against each of the individual defendants in their official capacity.

**Pendent State-Law Claims Against Defendants in Their Personal Capacities.**

All defendants contend that the plaintiff's pendent state law claims for negligence are barred by New York Corrections Law § 24 which protects all employees of DOCS sued for damages in their personal capacities. The

plaintiff does not oppose the defendants' arguments.

Section 24 provides in pertinent part that:

(1) [n]o civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the [Department of Correctional Services], in his personal capacity, for damages arising out of any act done or failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

(2) Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of an officer or employee of the [Department of Correctional Services] shall be brought and maintained in the court of claims as a claim against the state.

N.Y. Corr. Law § 24(1)-(2) (2007).

The Second Circuit considered whether § 24 would equally bar personal-capacity suits against DOCS employees brought in federal court. *Baker v. Coughlin,* 77 F.3d 12 (2d Cir.1996). Reasoning that a federal court acts essentially as a state court when it addresses pendent state law claims, the Second Circuit held that "[i]f a state would not recognize a plaintiff's right to bring a state claim in state court, a federal court ... must follow the state's jurisdictional determination and not allow that claim to be appended to a federal law claim in federal court." *Baker,* 77 F.3d at 15. Here, the restrictions set by the state prescribe that the plaintiff may file the relevant claims only in the New York Court of Claims. N.Y. Corr. Law § 24(2). This Court is bound by *Baker* to apply § 24 as it would be applied in state court and thus cannot entertain the plaintiff's negligence claims. *See Ruffin v. Deperio,* 97 F.Supp.2d 346 (W.D.N.Y.2000) (C.Heckman, M.J.) (granting defendants' motion for summary judgment on pendent state law claims for negligence and medical malpractice against defendants in their personal capacities).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 1991039 (W.D.N.Y.)
(Cite as: 2008 WL 1991039 (W.D.N.Y.))

Accordingly, the defendants are entitled to summary judgment on the state law claims for negligence brought against each of the individual defendants in their personal capacity.

**Injunctive Relief.**

**\*9** The defendants assert that the plaintiff's claims for injunctive relief are moot against all defendants employees of Lakeview, Greenhaven, Southport, Clinton, and Attica, because at the time he filed his reply declaration, the plaintiff was confined at Auburn. The plaintiff does not directly address this issue, but states that following an examination by an orthopedic surgeon on August 25, 2004, the medical personnel at Auburn arranged for the plaintiff to undergo surgery and have the broken screw removed from his left shoulder. (Docket No. 75, Pl.'s Reply Decl. at 2.) By letter dated April 12, 2007, the plaintiff has advised the Court that his surgery for removal of the broken screw was scheduled to take place in May 2007. More recently, by letter dated May 21, 2007, the plaintiff has notified the Court that his surgery was successfully completed at Mount Vernon Hospital on May 14, 2007.

It is well settled that "for a federal court to retain jurisdiction over a case, an actual controversy must exist 'at all stages of review, not merely at the time the complaint is filed.' " *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (quoting *Preiser v. Newkirk,* 422 U.S. 395, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975). A claim is deemed moot where "the problem sought to be remedied has ceased." *Prins,* 76 F.3d at 506.

Inasmuch as the surgery requested by the plaintiff has been performed, the plaintiff's claim for injunctive relief is moot. The plaintiff, however, has a right to go forward with his claims for damages caused by the defendants' alleged medical indifference to the plaintiff's complaints of pain and requests for surgery to remove the broken screw. Therefore, at this time the plaintiff's § 1983 medical indifference claim survives as against the following defendants in their personal capacity: John Alves, Kang Lee, I. Ellen, Sheldon Stein, Robert Takos and Stephen Laskowski; DOCS Medical Director Lester Wright and Commissioner Glenn S. Goord.

**Appointment of Counsel**

The plaintiff has filed a motion for the appointment of counsel. The motion is granted. The Court appoints **Robert J. Schreck, Esq .** as counsel for the plaintiffs, *pro bono,* pursuant to 28 U.S.C. § 1915(d). *Hodge v. Police Officers,* 802 F.2d 58 (2d Cir.1986), *Cooper v. A. Sargenti Co.,* 877 F.2d 170 (2d Cir.1989). The Clerk of the Court is directed to make copies of the filed documents in this case and forward them to Robert J. Schreck, Esq. A conference will be held with counsel on **May 27, 2008 at 2:30 p.m.** at 414 U.S. Courthouse, 68 Court Street, Buffalo, New York, to discuss the status and scheduling of this matter.

So Ordered.

W.D.N.Y.,2008.
Tafari v. Stein
Not Reported in F.Supp.2d, 2008 WL 1991039 (W.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)
(Cite as: 1999 WL 9847 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Lawrence SHUSTER, Plaintiff,
v.
NASSAU COUNTY, et al., Defendants.
**No. 96 Civ. 3635(JGK).**

Jan. 11, 1999.

Lawrence Shuster, Fountain Valley, CA, for the Plaintiff,
pro se.

Gina M. Amorini, Mineola, NY, for Nassau County.

Michael Kennedy, Assistant Attorney General, Office of
the Attorney General, Division of State Counsel,
Litigation Bureau, New York, NY, for Hon. Zelda Jones
& NYS Dept. of Motor Vehicles.

*OPINION AND ORDER*

KOELTL, J.

**\*1** The plaintiff filed this action against various defendants
alleging false arrest and malicious prosecution for
violations of the New York Vehicle and Traffic Law
(VTL). The docket sheet reflects that the complaint was
filed on May 15, 1996. Defendants Judge Zelda Jonas, the
New York State Department of Motor Vehicles
(collectively, the "State defendants"), and Nassau County,
who have not answered or moved with respect to the
complaint or the amended complaint, have requested that
the amended complaint be dismissed pursuant to Rule
4(m) of the Federal Rules of Civil Procedure because they
have never been properly served with the summons and
complaint or amended complaint. The docket sheet in this
action does not reflect any service on any defendant. The

Court therefore by Order dated February 17, 1998 directed
the plaintiff to advise the Court in writing why this action
should not be dismissed for failure to serve the summons
and complaint on the defendants within 120 days of filing
of the complaint. While the plaintiff has responded, it is
clear that he has never properly served any of the
defendants.

I.

Rule 4(m) authorizes a court upon motion to dismiss an
action without prejudice as against a defendant if service
of the summons and complaint is not made upon that
defendant within 120 days after the filing of the complaint.
This Rule also authorizes courts to dismiss an action sua
sponte, provided that the court first gives notice to the
plaintiff. See Fed.R.Civ.P. 4(m); see also Gowan v.
Teamsters Union (237), 170 F.R.D. 356, 359-60
(S.D.N.Y.1997) (dismissing action filed by a pro se, in
forma pauperis plaintiff pursuant to Rule 4(m)).

Separate rules govern service upon state agencies and
upon individuals. Under the Federal Rules of Civil
Procedure, "[s]ervice upon a state ... or other
governmental organization ... shall be effected by
delivering a copy of the summons and of the complaint to
its chief executive officer or by serving the summons and
complaint in the manner prescribed by the law of that
state...." Fed.R.Civ.P. 4(j)(2). Service upon an individual
is made by delivering a copy of the summons and
complaint to the individual personally, by leaving a copy
thereof at the individual's dwelling house or usual place of
abode with a person of suitable age and discretion residing
there, or by delivering a copy to an agent authorized to
receive service of process. See Fed.R.Civ.P. 4(e)(2). The
rule further provides that an individual may also be served
in accordance with state law. See Fed.R.Civ.P. 4(e)(1).

Under New York law, a state officer sued in an official
capacity or a state agency must be served by:

(1) delivering the summons to such officer or to the chief
   executive officer of such agency or to a person

Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)
(Cite as: 1999 WL 9847 (S.D.N.Y.))

designated by such chief executive officer to receive service, or (2) by mailing the summons by certified mail, return receipt requested, to such officer or to the chief executive officer of such agency, and by personal service upon the state in the manner provided by subdivision one of this section.

**\*2** N.Y. C.P.L.R. 307(2). Subdivision (1) provides that "personal service upon the state shall be made by delivering the summons to an assistant attorney-general at an office of the attorney-general or to the attorney-general within the state." Hence, "[s]ervice on a state officer may be made either by personal delivery to the officer or by certified mail to the officer. Service on a state agency may be made either by personal delivery to the chief executive officer of the agency (or the chief executive's designee) or by certified mail to the chief executive." N.Y. C.P.L.R. 307(2) supplemental practice commentaries (McKinney 1998).

The New York rules for serving an in-state natural person parallel Fed.R.Civ.P. 4(e)(1), but with additional requirements. Like Rule 4, service may be by personal delivery to the person being served, see N.Y. C.P.L.R. 308(1), or to a duly appointed agent for service. See N.Y. C.P.L.R. 308(3). Service may also be made by delivering the summons to a person of suitable age and discretion at the actual place of business, dwelling place, or usual place of abode of the person to be served, provided that the summons is also mailed to that person's last known residence or sent by first class mail to that person's actual place of business. See N.Y. C.P.L.R. 308(2).

In addition, where service under sections 308(1) and (2) cannot be made with due diligence, service may be effected by nailing the summons to the door of the actual place of business, dwelling place, or usual place of abode of the person to be served, and by mailing the summons to that person at his or her last known residence or by sending the summons by first class mail to that person's actual place of business. See N.Y. C.P.L.R. 308(4). Under sections 308(2) and (4), the delivery and mailing must occur within twenty days of each other. See N.Y. C.P.L.R. 308(2) & (4).

II.

On May 15, 1996, the plaintiff filed the original complaint in this action. On August 14, 1996, the plaintiff filed an amended complaint. In February 1998, well past the 120-day limit for timely service of process, the State defendants requested dismissal of the action pursuant to Rule 4(m). (See Letter from Michael Kennedy dated Feb. 13, 1998). The plaintiff was ordered to advise the Court by March 2, 1998 why the case should not be dismissed on that basis. (See Order dated Feb. 17, 1998). The plaintiff filed a response dated February 17, 1998. The plaintiff also filed a response received on August 13, 1998. In August 1998, more than two years after the original complaint was filed and nearly two years after the amended complaint was filed, the State defendants and defendant Nassau County requested dismissal of this action on the grounds that they still had not been served. (See Letter from Michael Kennedy dated Aug. 3, 1998; Letter from Gina Amorini dated Aug. 3, 1998).

(A)

The plaintiff does not argue that he complied with Rule 4 by delivering the summons and complaint to the chief executive officer of the DMV. Nor does he allege that he delivered the summons and complaint to Judge Jonas, who is sued in her personal and official capacities, personally or to a person of suitable age and discretion at Judge Jonas' dwelling place or usual place of abode. Nor has there been compliance with N.Y. C.P.L.R. 307(2) with respect to either the DMV or Judge Jonas. With respect to the DMV, there has been neither personal delivery to the chief executive officer of the DMV or the chief executive's designee or by certified mail to the chief executive with personal service on an assistant attorney-general or the attorney-general. The plaintiff also has not complied with similar provisions with respect to Judge Jonas.

**\*3** Instead, the plaintiff contends that he had served the State defendants by twice delivering the summons and complaint to the Nassau County Regional Office of the State Attorney General, on July 30, 1996 and February 6, 1998. (See Return of Service (unsigned), attached to Feb. 17, 1998 Shuster Letter). To support his argument that service on the Nassau office constituted effective service on the State defendants, the plaintiff submitted a copy of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)
(Cite as: 1999 WL 9847 (S.D.N.Y.))

a letter from the Office of the Attorney General stating that its Nassau office would accept service on behalf of, among others, Judge Zelda Jonas in a different action. In addition, he argues that the complaint was also attached to the Order to Show Cause which was served on the Nassau office. (*See* Order to Show Cause attached to Feb. 17, 1998 Shuster Letter). The plaintiff also argues that under New York State law, service on the Attorney General's Office is sufficient.

Under New York law, delivering the summons and complaint to a regional office of the State Attorney General does not by itself constitute effective service on a state agency or an individual officer sued in her official capacity. *See Berkowitz v. New York City Bd. of Educ.,* 921 F.Supp. 963, 968 (S.D.N.Y.1996); *Dawkins v. Hudacs,* 159 F.R.D. 9, 10 (N.D.N.Y.1994); *Town of Clarkstown v. Howe,* 206 A.D.2d 377, 614 N.Y.S.2d 327, 328 (2d Dep't 1994); *Sannella v. Regan,* 111 A.D.2d 964, 490 N.Y.S.2d 61 (3d Dep't 1985). Moreover, there is no evidence that the Nassau office was authorized to accept service on behalf of the DMV. As to Judge Jonas, the fact that the Nassau office had been designated to receive service on her behalf in another case does not authorize that office to accept service for her in this case.

The plaintiff also contends that he served the State defendants by handing their attorney a copy of the complaint in this Court on or about July 30, 1996. Even if proven, this is also not sufficient under the Federal Rules and New York law unless the attorney is authorized by appointment or by law to receive service of process. *See United States v. Ziegler Bolt and Parts Co.,* 883 F.Supp. 740, 749 (Ct. Int'l Trade 1995); *Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 709 F.Supp. 1279, 1289 (S.D.N.Y.1989); *Gibbs v. Hawaiian Eugenia Corp.,* 581 F.Supp. 1269, 1271 (S.D.N.Y.1984). The plaintiff has neither alleged nor provided proof that the State defendants intended to be bound by the acceptance of the complaint by their attorney. While the authority of an attorney to accept service may be implied from the surrounding circumstances indicating the intent of the client, *J & L Parking Corp., Inc. v. United States,* 834 F.Supp. 99, 102 (S.D.N.Y.1993); *Olympus Corp. v. Dealer Sales and Serv., Inc.,* 107 F.R.D. 300, 305 (S.D.N.Y.1985), there is no evidence in this case to establish such intent. The State defendants never acted in any way to indicate that the attorney was authorized to

accept service of process. The State defendants never answered the Complaint or filed a responsive pleading, and specifically asserted in correspondence that there had been no service of process. Indeed, the State defendants notified the plaintiff at least as early as February 1998 that service was insufficient. (*See* Feb. 13, 1998 Kennedy Letter).

**\*4** Although the plaintiff is acting *pro se,* his failure to comply with basic procedural rules cannot be excused, particularly in light of the fact that he is familiar with litigation. He has already filed numerous other lawsuits and numerous motions. *See, e .g.,Shuster v. Eiberson,* No. CV-92-1524 (E.D.N.Y. Apr. 23, 1993); *Shuster v. Fenster,* No. 92 Civ. 2323; *Shuster v. Citibank,* No. 93 Civ. 4182, 1994 WL 267550 (S.D.N.Y. June 15, 1994); *Shuster v. Prudential Securities Inc.,* No. 91 Civ. 0991, 1991 WL 102500 (S.D.N.Y. June 6, 1991); *Shuster v. Olem,* 96 Civ.1993, 1997 WL 167046 (S.D.N.Y. Apr. 8, 1997); *Shuster v. Eiberson,* No. 97 Civ.1988, slip. op. (S.D.N.Y. Aug. 12, 1997); *Shuster v. Oppleman,* No. 96 Civ. 1689 (S.D.N.Y. filed Mar. 7, 1996); *Shuster v. Voel,* No. 96 Civ. 8240 (S.D.N.Y. filed Nov. 1, 1996). Accordingly, the State defendants' request for dismissal without prejudice pursuant to Rule 4(m) is granted.

(B)

The docket sheet also does not reflect service of process on defendant Nassau County. Fed.R.Civ.P. 4(1) requires proof of service in the form of an affidavit by the server. *See* Fed.R.Civ.P. 4(1). While it is true that, by its terms, the failure to comply with Fed. R. Civ. 4(1) does not affect the validity of the service, the plaintiff has submitted no proof of timely service for any of the defendants. Nor has the plaintiff explained how he purportedly served Nassau County pursuant to federal or state law. The plaintiff has offered no explanation for his failure to serve in response to the Court's directive or to Nassau County's letter requesting dismissal. Nor has he requested an extension of the time to serve. Because the plaintiff was given notice that the case would be dismissed absent a showing of good cause for the failure to serve the defendants, and has failed to make this showing, defendant Nassau County's application for dismissal without prejudice pursuant to Rule 4(m) is also granted. *See, e.g.,Urquidez v. Officer Lyon # 7505,* No. 97 Civ. 884, 1997 WL 414158 at *1

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)
(Cite as: 1999 WL 9847 (S.D.N.Y.))

(S.D.N.Y. July 23, 1997).

(C)

Similarly, the docket sheet also does not reflect that any of the remaining defendants named in the amended complaint have been served. They include individual defendants D. Dillon, N. Levy, Richard Kramer, "Mr. Rainville," Skip Dwyer, R. Jackson, A. Aducci, and "U.S.A. (Bruce [illegible] )," each of whom is sued in his or her official and personal capacities; the Nassau County Republican Party; and unnamed "clients of Frank Cocozzelli" (collectively, the "remaining defendants"). Although the 120-day limit for service of process has long expired, courts generally consider three factors in determining whether "good cause" exists to warrant an extension of the time for service:

(1) whether the delay in service was "the result of mere inadvertence," or whether there has been a "reasonable effort" to effect service[,] ... (2) prejudice to the defendant[,] ... [and 3] whether or not the plaintiff has moved under Fed.R.Civ.P. 6(b) for an enlargement of time in which to effect service.

*5 Gordon v. Hunt, 116 F.R.D. 313, 319-21 (S.D.N.Y.1987).

These factors do not support an extension of the time to serve the remaining defendants in this case. The plaintiff was directed by the Court to explain the delay in serving the defendants but failed to do so. The plaintiff has not moved for additional time to serve any of the defendants. Moreover, to permit service at this late date would unfairly prejudice the remaining defendants. See Gowan, 170 F.R.D. at 359-60. The delay in proceeding against them has been excessive. Accordingly, pursuant to Rule 4(m), the case against the remaining defendants is dismissed without prejudice.

III.

The plaintiff has also filed a partially illegible "letter and motion for order" in which he seeks an injunction to stop further court proceedings in Nassau County for alleged violations of section 511 of the New York Vehicle and Traffic Law. He argues that the injunction should be granted because all of his past violations of the Vehicle and Traffic Law have been expunged from his record. The Court has already considered and denied a similar motion by the plaintiff on the grounds that the plaintiff failed to show either irreparable harm or a likelihood of success on the merits. See Shuster v. Nassau County, 948 F.Supp. 282 (S.D.N.Y.1996). In the present motion, which consists of one paragraph, the plaintiff offers no new facts to establish either of these requirements for a preliminary injunction. Therefore, the plaintiff's motion for a preliminary injunction is denied.

IV.

The plaintiff also moves for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). This motion is plainly improper because there have been no responsive pleadings because the defendants were never effectively served. The motion is therefore denied.

V.

The plaintiff also moves for an order directing Nassau County to send to the plaintiff a copy of the transcript of a 1996 proceeding before Judge Eiberson in which Judge Eiberson allegedly dismissed various Vehicle and Traffic Law charges against the plaintiff. To the extent that this is a discovery request, it is denied as moot.

CONCLUSION

For the reasons explained above, this action is dismissed without prejudice. The plaintiff's motion for a preliminary injunction is denied. The plaintiff's motion for judgment on the pleadings is denied. The plaintiff's motion for an order directing Nassau County to produce a court transcript is denied as moot.

SO ORDERED.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)
(Cite as: 1999 WL 9847 (S.D.N.Y.))

S.D.N.Y.,1999.
Shuster v. Nassau County
Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.